## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

JASMINE HUFFMAN, JUSTIN ACKERS,     )
CAITLYN HALL, and BENJAMIN CHAMBERS-    )
MAHER,     )
     )
     Plaintiffs,     )  C.A. 21-10986-ADB
     )
     v.     )
     )
CITY OF BOSTON, and MICHAEL BURKE,     )
EDWARD JOSEPH NOLAN, and MICHAEL     )
J. MCMANUS, in their individual capacities,     )
     )
     Defendants.     )
_____  )

## FIRST AMENDED COMPLAINT

## INTRODUCTION

1.     This is a civil rights action for use of excessive and unnecessary force on peaceful protesters. After George Floyd was murdered by a Minneapolis police officer on May 25, 2020, people across the country gathered to protest police brutality and racism in policing. Each of the four plaintiffs went to Boston on May 31, 2020, to peacefully protest the injustice of George Floyd's death. The plaintiffs were peaceful. They did not commit any crimes, nor were they arrested or charged with crimes.

2.     Despite engaging in peaceful protest, each of the plaintiffs was physically attacked by Boston police officers. Officers struck three of the four plaintiffs with wooden riot batons. Officers sprayed two of the four plaintiffs with oleoresin capsicum ("OC") (pepper) spray. Two plaintiffs required medical attention because of the Boston police

officers' baton strikes. Three of the four plaintiffs have video recordings of their assault.

3. Officer Burke attacked Ms. Huffman as she stood still with her arms in the air. Officers attacked the other three plaintiffs after they tried to leave the area to go home. Mr. Ackers was trying to leave on his moped when Officer Burke struck him. Mr. Chambers-Maher was sprayed as he walked away from Officer McManus and other Boston police officers to get to his car. Ms. Hall was struck by Officer Nolan as she stood near the Downtown Crossing T station with her hands up; she had been planning to ride the T but the Boston police had caused the MBTA stations to shut down.

4. The City of Boston is sued for its policies, customs and practices in handling protest demonstrations and allowing the use of unreasonable and excessive force. The police department did not follow a proper plan for handling a protest at the Boston Common, the officers were not properly supervised, and the department had allowed a "blue wall" to exist, which prevented police officers from reporting misconduct by other officers and tolerated use of unreasonable or excessive force.

## JURISDICTION

5. This action is brought pursuant to 42 U.S.C. § 1983 and § 1988 and the First, Fourth, and Fourteenth Amendments to the United States Constitution. Title 28 U.S.C. § 1331 and §1343 provide federal question jurisdiction over all federal claims, and 28 U.S.C. § 1367 provides supplemental jurisdiction over state law claims.

## PARTIES

6. Plaintiff Jasmine Huffman resides in Essex County in the Commonwealth of Massachusetts.

7.      Plaintiff Justin Ackers resides in Suffolk County in the Commonwealth of Massachusetts.

8.      Plaintiff Caitlyn Hall resides in Suffolk County in the Commonwealth of Massachusetts.

9.      Plaintiff Benjamin Chambers-Maher resides in Middlesex County in the Commonwealth of Massachusetts.

10.     Defendant City of Boston is a duly organized city in the Commonwealth of Massachusetts.

11.     Defendant Michael Burke was at all times relevant to this complaint a duly appointed police officer of the Boston Police Department. His actions alleged in this complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City of Boston. He is sued in his individual capacity.

12.     Defendant Edward Joseph Nolan was at all times relevant to this complaint a duly appointed police officer of the Boston Police Department. His actions alleged in this complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City of Boston. He is sued in his individual capacity.

13.     Defendant Michael J. McManus was at all times relevant to this complaint a duly appointed police officer of the Boston Police Department. His actions alleged in this complaint were taken under color of the laws of the Commonwealth of Massachusetts and the City of Boston. He is sued in his individual capacity.

**FACTS**

14.     Outrage at the murder of George Floyd by Minneapolis police officer Derek

Chauvin on May 25, 2020 caused people throughout the country to protest the injustice of his death and persistent violence against Black and brown people by law enforcement officers. People from the greater Boston area gathered on the Boston Common to peacefully protest.

15.     Some of the Boston Police Department ("BPD") officers objected to the message of the protesters, feeling it was "anti-police."

16.     On or about May 31, 2020, each of the plaintiffs went to Boston to protest the death of George Floyd at the hands of police officers in Minneapolis, Minnesota.

17.     The plaintiffs did not know one another. Like thousands of other people, they went into Boston to protest the injustice of Mr. Floyd's murder and to support police accountability.

18.     Ms. Huffman, Mr. Ackers, Ms. Hall, and Mr. Chambers-Maher came to peacefully protest. They remained peaceful throughout the incidents described here.

**Justin Ackers**

19.     Mr. Ackers came to Boston to peacefully protest the murder of George Floyd. He was recording the protest and the police on his phone.

20.     As he was recording, an unknown Boston police officer sprayed him in the face with OC spray for no reason, causing pain and confusion.

21.     At approximately 10:08 p.m. Mr. Ackers was preparing to go home. He was on his moped at Tremont Street near Park Street.

22.     As he turned his moped to go home, Mr. Ackers was blindsided and knocked to the ground.

23.     Officer Burke held his wooden riot baton in front of him with both hands and struck Mr. Ackers from behind, knocking him off his moped.

24.     After Mr. Ackers was knocked down, police officers ordered him to leave the area, but they would not let him take his moped.

25.     There was no reason to spray Mr. Ackers with OC. Officer Burke also had no reason to knock him down as he was trying to leave. Officer Burke used unreasonable force on Mr. Ackers.

26.     Other unknown Boston police officers were on the scene and had the ability to intervene to prevent the unlawful use of force, but did not do so. Nor did other officers report this unlawful use of force.

27.     Mr. Ackers did not see who struck him, but body camera footage revealed that it was Officer Burke.

28.     A clip from Officer Burke's body camera video can be viewed here: https://youtu.be/dMy5m99qT_o. The screenshots below show Mr. Ackers wearing a red helmet riding his moped, Burke raising his riot baton to strike Mr. Ackers, and Mr. Ackers and his moped on the pavement:

  

29.     Mr. Ackers suffered fear and mental distress. He did not believe that a police officer would strike him when he was peacefully going about his business. His fear and

distress continue.

30. He had soreness and bruises and his moped was damaged due to the actions of Officer Burke.

31. Mr. Ackers did not commit a crime. He was not arrested or charged with a crime.

**Jasmine Huffman**

32. Ms. Huffman came to the Boston Common to peacefully protest.

33. At one point she saw a Boston police officer who was pressed up against a police car and surrounded by protesters. Concerned about the situation, Ms. Huffman and another person stood in front of the officer to make sure that the situation did not escalate. Ms. Huffman yelled, "Do not hurt this man!" The officer was able to safely rejoin other officers. Photographs show Ms. Huffman protecting the police officer:



34. At about 10:44 p.m. Ms. Huffman was on the Boston Common near the Park Street T station. A group of police officers marching in formation approached her with their riot batons in front of them. Officer Burke was in the first line of police officers.

35. Ms. Huffman stood with her hands up as the officers approached.

36. Officer Burke stepped forward and struck Ms. Huffman with his riot baton, hitting her just below her neck, knocking her to the pavement.

37. When he struck Ms. Huffman, Officer Burke held his riot baton out in front of his body with both hands, as he did when he struck Mr. Ackers about half an hour earlier.

38. Ms. Huffman's head hit the pavement.

39. After Ms. Huffman was on the ground other Boston police officers walked over her. Some of these officers stepped on her hands.

40. Video of the incident from Officer Burke's body camera footage can be viewed here: https://youtu.be/6actiPWCNd8.

41. The screenshot below shows Ms. Huffman a moment before Officer Burke knocked her to the ground.



42. Ms. Huffman was not arrested or charged with a crime.

43.     There was no proper police reason to use any force on Ms. Huffman.

44.     Other unknown Boston police officers were on the scene and had the ability to intervene to prevent the unlawful use of force, but did not do so. Nor did other officers report this unlawful use of force.

45.     Ms. Huffman suffered fear and mental distress, which continues.

46.     Ms. Huffman filed an internal affairs complaint. She was interviewed by internal affairs in June 2020. The questioning was designed to make her feel like she was at fault.

47.     Ms. Huffman was told that the internal investigation is not complete.

**Caitlyn Hall**

48.     At approximately 9:30 to 9:45 on May 31, 2020, Ms. Hall was in Downtown Crossing on Washington Street, near the Primark store. She had been at the protest on the Common to peacefully protest.

49.     Ms. Hall was trying to return home. However, she could not leave because the MBTA had closed the T stations in the area.

50.     Police officers, including Boston police officers, had blocked off many of the streets in the Downtown Crossing area.

51.     Ms. Hall was standing in Downtown Crossing with her hands up along with other peaceful protesters. She saw BPD Officer Edward Joseph Nolan about to use his riot baton to strike a young man who was standing next to her recording the officer with his phone.

52.     The young man said to the Officer Nolan, "You look like you want to hit

me." Officer Nolan then began to strike the man's head.

53.  Ms. Hall used her hands to protect the young man's face from the blow.

54.  Instead of striking the young man, Officer Nolan then turned to Ms. Hall. He held his riot baton in both hands and struck Ms. Hall in the face.

55.  Ms. Hall fell, striking her head on the pavement.

56.  Officer Nolan's baton strike caused Ms. Hall's tooth to puncture her lip, as shown in the photographs below.



57.  When Ms. Hall's head hit the pavement, she briefly lost consciousness.

58.  When she regained consciousness, she saw Officer Nolan and showed him her injury. He responded by hitting her in the chest. As she walked away from him, he hit her on her back.

59.  Ms. Hall and other protesters recall that the officer who struck Ms. Hall wore badge number 1185. This is Officer Nolan's badge number.

60.  Ms. Hall had been wearing a cloth mask to protest from Covid-19. After Officer Nolan struck her in the face, her mask became too bloody to wear. Other protesters

helped Ms. Hall rinse the blood off her face. One protester gave Ms. Hall the shirt off his back to help soak up the blood.

61.     There was no proper police reason to use any force on Ms. Hall.

62.     Other unknown Boston police officers were on the scene and had the ability to intervene to prevent the unlawful use of force, but did not do so. Nor did other officers report this unlawful use of force.

63.     Ms. Hall suffered fear and mental distress, which continues.

64.     Ms. Hall did not commit a crime. She was not arrested or charged with a crime.

65.     Ms. Hall walked to Massachusetts General Hospital, where she had a CT scan and received a stitch on her lip.

66.     Ms. Hall called a general BPD number to file an internal affairs complaint. She was told that she could only file a complaint in person.

67.     Ms. Hall did not want to go to a police station. This false information discouraged her from filing a complaint.

68.     Unbeknownst to Ms. Hall, a civilian witness filed an internal affairs complaint against Officer Nolan for his assault on Ms. Hall. The Boston police investigators were unable to identify Ms. Hall.

**Benjamin Chambers-Maher**

69.     Benjamin Chambers-Maher is a 100 percent disabled veteran.

70.     He went to Boston to peacefully protest the police murder of George Floyd and racially motivated police misconduct.

71.     Mr. Chambers-Maher did not expect to be subjected to pepper spray or any force by police officers.

72.     His car was parked near the Coast Guard base in the North End. When he left to go home, he could not walk directly to his car because Boston police had blocked off many streets.

73.     At approximately 9:39 Mr. Chambers-Maher was walking on Tremont Street between Boylston Street and Stuart Street, trying to reach his car so he could drive home.

74.     Mr. Chambers-Maher was approached by BPD Officer Michael J. McManus.

75.     Officer McManus and another BPD officer had weapons pointed at Mr. Chambers-Maher, so he walked away backwards, keeping the officers in view. Mr. Chambers-Maher filmed the officers as he backed away from them.

76.     Officer McManus sprayed Mr. Chambers-Maher's face with OC spray. Then Officer McManus came back and sprayed Mr. Chambers-Maher again and called him names.

77.     There was no reason to spray Mr. Chambers-Maher either time.

78.     Other unknown Boston police officers were on the scene and had the ability to intervene to prevent the unlawful use of force, but did not do so. Nor did other officers report this unlawful use of force.

79.     The photographs below show Mr. Chambers-Maher being sprayed with OC.



80.    Officer McManus also used his police bicycle to hit Mr. Chambers-Maher in the legs.

81.    Mr. Chambers-Maher had not committed a crime. He was not arrested or charged with a crime.

82.    Mr. Chambers-Maher was in pain due to the OC spray. It temporarily blinded him. He was wearing a cloth face mask to protect from Covid-19; the spray soaked into his mask, causing it to stay in contact with his face longer.

83.    By spraying Mr. Chambers-Maher in the face with OC spray, Officer McManus delayed Mr. Chambers-Maher's ability to leave the area promptly.

84.    Mr. Chambers-Maher suffered injuries including bruises to his head, face and leg, a cut on his leg, and his eyes were swollen shut by the OC spray.

85.     Mr. Chambers-Maher suffered fear and mental distress, which continues.

86.     Mr. Chambers-Maher filed an internal affairs complaint. He was interviewed by internal affairs in July 2020. The questioning was designed to make him feel like he was at fault.

87.     Mr. Chambers-Maher assumes that the investigation is still pending because he has not received any notice that it has been resolved.

**The City of Boston**

88.     On May 29, 2020, there was a march in Boston to protest the injustice of the murder of George Floyd by Minneapolis police officers. The march ended in front of the District 4 police station. This was two days before the protest on the Boston Common. Boston police officers at the May 29 march were photographed by police body cameras and by civilians randomly spraying people with OC spray and using unnecessary force on protesters.

89.     On May 29, many Boston police officers used unreasonable and excessive force on civilians. This included using batons, fists, and OC spray.

90.     Attorney Christian Williams filed a public records request for use of force reports or use of defensive tactics reports from May 29. The City of Boston responded on October 2, 2020, that the Boston Police Department had no such records.

91.     Use of force reports should be made promptly. These reports should also be reviewed by a supervisor promptly in order for the reports to be a meaningful tool for police supervision and police accountability.

92.     Boston Police Department Rule 304 required a thorough investigation of

every incident in which a police officer strikes someone with any object or an incapacitating agent. This formal written policy has not been followed for many years. The department does not conduct a thorough investigation of use of force reports even when a person has a physical injury.

93.     Allowing police officers to use force including batons, OC spray and fists without enforcing the requirement that the officers prepare a use of force report explaining the reason force was used sends a message to officers that they can use force without being concerned that their actions will be reviewed by their supervisors.

94.     When there is no arrest or use of force report, the actions of the officer will not be investigated. Failing to require use of force reports and to thoroughly investigate every time an officer strikes someone with an object or an incapacitating agent abdicated the BPD's responsibility to supervise use of force by its police officers. This results in officers using unreasonable force on civilians.

95.      Police Commissioner William Gross was the policymaker for the Boston Police Department.

96.     Commissioner Gross knew that BPD officers had improperly and indiscriminately used OC spray on protesters on May 29.

97.     He also knew that police officers struck non-violent protesters on May 29.

98.     Despite learning of the improper use of force on May 29, Commissioner Gross did not take steps to ensure that the BPD would have an appropriate plan to deal with additional demonstrations due to the murder of George Floyd.

99.     The Boston Common has long been a place people in Massachusetts gather to

protest and to celebrate. In 1919, Boston police officers protested low wages at Brewer Plaza on the Common near the intersection of Park Street and Tremont Street. In 1921, people protested at the Common when Saco and Vanzetti were denied a new trial. Rev. Dr. Martin Luther King Jr. led a freedom march to the Boston Common in 1965. In 1970, people gathered on the Common to protest the Vietnam war. People protested the Iraq war in 2003 on the Common. A crowd of about 175,000 joined the Boston Women's March for America to support women's rights and protest Donald Trump's inauguration in January 2017.

100. Boston police know that when there is cause for protest in Massachusetts, or when it is a time of national protests, they can expect people will gather on the Boston Common.

101. After the actions of BPD officers on May 29, the policymaker for the BPD had an obligation to ensure that BPD had a plan to properly supervise its officers at further protests over the death of George Floyd, which were likely to take place on the upcoming weekend.

102. The previous Boston Police Commissioners had plans to handle protests in place, including plans for protests at the Boston Common, long before May 31, 2020.

103. Under Commissioner Gross, the City chose to ignore the plans for the protests over the murder of George Floyd on May 31-June 1, 2020.

104. Under Commissioner Gross, BPD officers were expressly provided with long wooden batons, commonly called riot batons, at demonstrations. BPD expressly permitted its officers to use these batons to strike people without cause.

105. Many Boston police officers struck people at the May 31 protest with an

object or incapacitating agent. Many of these incidents were recorded on officers' body camera footage.

106. On May 31, after the protest at the Common ended, the people who gathered there to express their views, including Plaintiffs, were trying to leave. BPD officers were ordering people to leave the area.

107. While its officers were ordering people to leave the area, the BPD, in coordination with the MBTA, caused all of the T stations in the area to close. There were no Uber or Lyft drivers who could access the area. As a result, many of the people who came to protest were unable to leave the area on public transportation.

108. Some people, including Ms. Hall, Mr. Ackers, and Mr. Chambers-Maher, were assaulted by BPD officers when they were trying to leave the area.

109. At the time of the incident, three of the plaintiffs lived in Boston and the fourth lived in a Boston suburb.

110. The City of Boston had a policy or custom of indifference to misconduct by Boston police officers by failing to properly investigate complaints of misconduct and to discipline officers who used unreasonable or excessive force.

111. The City of Boston also had a policy or custom of tolerating a "code of silence" or a "blue wall" in which Boston police officers understood that they were not to report misconduct by fellow police officers.

112. This policy or custom existed in the early 1990s. The recently publicized scandals involving Commissioner Dennis White and union president Patrick Rose demonstrate the power of the code of silence. Both of these officers were investigated for

serious misconduct (domestic abuse and sexual abuse of children, respectively) in the 1990's, but officers protected them.

113.     In 1995, the "blue wall" or code of silence prevented Boston police officers from truthfully reporting the beating of Michael Cox, a Black undercover police officer, by other Boston police officers who did not realize he was a fellow officer. This incident resulted in a successful civil suit and a book, *The Fence*, by Dick Lehr.

114.     On May 14, 2021, Acting Boston Mayor Kim Janey said, "a blue wall of silence was confirmed by one retired officer who said he received five phone calls directing him not to cooperate with this investigation." She said, "officers were intimidated into silence for fear of retaliation" during the 2021 investigation into allegations against Commissioner White. The independent investigator was unsuccessful in her attempts to speak with several current or former members of the BPD.

115.     Because of this "blue wall" police officers in Boston felt free to use unreasonable and excessive force on protesters. They expected fellow officers would not report their misconduct or intervene to prevent their misconduct. They knew that the police department would accept the word of a police officer over the word of a civilian. They knew that there was a culture of police officers protecting each other by not reporting misconduct by fellow officers.

116.     The Boston Police Department developed a custom of making it difficult for citizens to file complaints about the conduct of Boston police officers. The Boston Police Department's own review board found that there "is a strong perception that citizens do not have easy access to filing complaints in supportive and non-intimidating environments."

This custom is evident here in how Plaintiff Caitlyn Hall was deterred from pursuing her complaint against officers.

117.   Once complaints of unreasonable force are filed, the Boston Police Department allowed a custom to develop among its officers of failing to properly investigate these claims and failing to discipline officers who used unreasonable force. As a result, BPD officers with many complaints alleging use of unreasonable force were rarely disciplined for their use of force. See, *Cox v. Murphy*, Civ. No. 12-11817, 2016 WL 4009978, at *10-11 (D. Mass. Feb. 12, 2016).

118.   The Internal Affairs Division of the BPD has, for many years, had a practice of delaying findings on investigations of officer misconduct. Often investigations linger for one to two years, sometimes even longer. This delay allows misconduct to go unpunished since the civilian complainants often cannot be found or have lost interest in the complaint.

119.   Ms. Huffman and Mr. Chambers-Maher filed complaints shortly after the incident on June 1, 2020. They were interviewed promptly. There is video evidence in both cases. Despite this evidence, over a year later the BPD has not completed its investigations.

120.   The policies and customs of the City of Boston described above were the moving force behind the actions of Defendants Burke, Nolan, and McManus. They felt they could use unreasonable force without fear of discipline or intervention by fellow officers.

**COUNT I    42 U.S.C. § 1983 Claim Against Defendants Burke, Nolan, and McManus: Unreasonable Use of Force**

121.   All paragraphs in this Complaint are incorporated by reference.

122.   Defendants used unreasonable and excessive force against Plaintiffs.

123.   Defendant Burke deprived Plaintiffs Huffman and Ackers of a well-

established right to freedom from the use of unreasonable force.

124.    Defendant Nolan deprived Plaintiff Hall of her well-established right to freedom from the use of unreasonable force.

125.    Defendant McManus deprived Plaintiff Chambers-Maher of his well-established right to freedom from the use of unreasonable force.

126.    As a direct and proximate result of Defendants' actions, Plaintiffs suffered the damages described above.

**COUNT II    42 U.S.C. § 1983 Claim Against Defendants Burke, Nolan, and McManus: First Amendment Violation**

127.    All paragraphs of this Complaint are incorporated by reference.

128.    Defendants Burke, Nolan and McManus used unreasonable and excessive force against Plaintiffs.

129.    Defendant police officers and other Boston police officers used unreasonable force against peaceful protesters during this incident. They refrained from using improper force when policing other events, for example, the Woman's March at the Boston Common in January 2017.

130.    Defendants Burke, Nolan and McManus used unreasonable force against Plaintiffs because of the content of the protest. These police officers failed to act professionally in part because of the content of the protest. They felt Plaintiffs and the other protesters were protesting against police officers rather than against police officers who abused their authority.

131.    Plaintiffs had a well-established constitutional right not to be punished based on the peaceful expression of the content of their views.

132.    As a direct and proximate result of Defendants' actions, Plaintiffs suffered the damages described above.

**COUNT III 42 U.S.C. § 1983 Claim Against Defendant City of Boston**

133.    All paragraphs of this Complaint are incorporated by reference.

134.    The individual Defendants' violations of the Plaintiffs' constitutional rights were undertaken pursuant to the policies and customs of the City of Boston, as described above.

135.    The policies and customs of the Defendant City of Boston were the moving force behind the actions of Defendants Burke, Nolan and McManus resulting in the damages to Plaintiffs described above.

**WHEREFORE,** Plaintiffs request that this Court:

1. Award compensatory damages;

2. Award the costs of this action, including reasonable attorney's fees; and

3. Award such other further relief as this Court may deem necessary and appropriate.

## JURY DEMAND

A trial by jury is hereby demanded.

RESPECTFULLY SUBMITTED,
For the Plaintiffs,
By their attorneys,


/s/ Howard Friedman
Howard Friedman, BBO #180080
**Law Offices of Howard Friedman PC**
1309 Beacon Street, Suite 300
Brookline, MA 02446
(617) 742-4100
hfriedman@civil-rights-law.com


/s/ Mark Loevy-Reyes
Mark Loevy-Reyes, BBO No. 707974
**Loevy & Loevy**
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
Ph: (312) 243-5900
Fax: (312) 243-5902
mark@loevy.com


Dated: August 16, 2021


**CERTIFICATE OF SERVICE**

I certify that on this day I caused a true copy of the above
document to be served upon the attorney of record
for all parties via CM/ECF.

Date:    8/16/2021          /s/ Howard Friedman
                            Howard Friedman