## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————

JASMINE HUFFMAN, JUSTIN ACKERS, )
CAITLYN HALL, and BENJAMIN CHAMBERS- )
MAHER, )
      )
           Plaintiffs, ) C.A. 21-10986-ADB
      )
           v. )
      )
CITY OF BOSTON, and MICHAEL BURKE, )
EDWARD JOSEPH NOLAN, and MICHAEL )
J. MCMANUS, in their individual capacities, )
      )
           Defendants. )

———————————————————————

## PLAINTIFFS' OPPOSITION TO DEFENDANT CITY OF BOSTON'S PARTIAL MOTION TO DISMISS FIRST AMENDED COMPLAINT

### I.      Introduction

Across the country, people were outraged at the murder of George Floyd by Minneapolis police officer Derek Chauvin on May 25, 2020. People throughout the nation protested the injustice of George Floyd's death and persistent violence against Black and brown people by law enforcement officers. People in Boston held a protest march on May 29. Another protest on May 31 through June 1 attracted thousands of peaceful protestors to the Boston Common. There were hundreds of officers from the Boston Police Department ("BPD"). Many of those officers used excessive force on peaceful protestors. The four Plaintiffs were among the many peaceful protestors who were struck by BPD officers. Other officers did not report the use of unreasonable force. As explained below, the actions of the

Defendant police officers were caused by the combined effect of the customs of the City and its policymaker, then-Commissioner Gross.

II.    **Facts**

A.  **Defendant BPD officers used excessive force on the four Plaintiffs**

The four Plaintiffs in this case attended the protest at the Boston Common on May 31, 2020. First Amended Complaint, Docket # 15, ¶¶ 14, 16. They did not know one another. *Id.*, ¶ 17. They remained peaceful throughout the protest and the aftermath. *Id.*, ¶ 18. None of the Plaintiffs committed a crime, nor were they arrested or charged with a crime. *Id.*, ¶¶ 1, 31, 42, 64, 81.

Jasmine Huffman stood still with her hands up as BPD officers approached her with their riot batons. *Id.*, ¶¶ 34-35. Defendant Burke stepped forward and knocked her to the ground with his riot baton. *Id.*, ¶ 36. The other BPD officers walked over her, some stepping on her hands. *Id.*, ¶ 39. About half an hour before this, Defendant Burke struck Justin Ackers from behind, knocking him to the ground as he was trying to leave the area on his moped. *Id.*, ¶¶ 21-23. Caitlyn Hall was standing in Downtown Crossing with her hands up along with other peaceful protesters who could not leave the area because the T stations were closed and streets were blocked off. *Id.*, ¶¶ 48-51. She tried to prevent Defendant Nolan from hitting a young man, and instead he hit her in the face with his riot baton, causing her to fall and strike her head on the pavement. *Id.*, ¶¶ 51-55. When she regained consciousness and showed him her bloody facial injury, he struck her again. *Id.*, ¶¶ 56-58. Benjamin Chambers-Maher was trying to walk to his car to leave the area. *Id.*, ¶ 73.

Defendant McManus sprayed him twice with OC spray as Mr. Chambers-Maher was walking away. *Id.*, ¶ 76.

Three of the four incidents were video recorded. *Id.*, ¶¶ 40, 28, 75, 79. There was no proper police reason to use force on any of the Plaintiffs. *Id.*, ¶¶ 25, 43, 61, 77. During all four incidents, other BPD officers were present and had the ability to intervene to prevent the Defendants' unlawful use of force but did not do so. *Id.*, ¶¶ 26, 44, 62, 78. Nor did they report this unlawful use of force. *Id.* In addition to the three Defendant officers, other BPD officers used unreasonable force against peaceful protesters during this incident. *Id.*, ¶ 129.

### B. Facts regarding Plaintiffs' *Monell* claim against the City of Boston

Plaintiffs allege that the policies and customs of the City were the moving force behind the unconstitutional actions of Defendants Burke, Nolan and McManus, resulting in the damages to Plaintiffs. *Id.*, ¶¶ 120, 135. The First Amended Complaint describes several of the City's policies, customs and practices that were the moving force or cause of the use of unreasonable force on the Plaintiffs: (1) the BPD did not follow a proper plan for handling the protest; protesters were not able to leave the area; (2) officers were not properly supervised or disciplined; (3) use of force complaints were not properly investigated; and (4) the BPD allowed a "blue wall" to exist, which prevented officers from reporting misconduct by other officers and tolerated use of unreasonable or excessive force. *Id.*, ¶¶ 4, 107, 117.

Two days before May 31, at an earlier protest over the murder of George Floyd, BPD officers were photographed by body cameras and by civilians randomly spraying people with OC spray and using unnecessary force on protesters. *Id.*, ¶ 88. Although many BPD officers used unreasonable and excessive force on May 29, no officers filed any use of force report.

3

*Id.*, ¶¶ 89-90. Allowing officers to use force including batons, OC spray and fists without enforcing the requirement that the officers prepare a report explaining the reason force was used sent the message that officers could use force without being concerned that their actions will be reviewed by their supervisors. *Id.*, ¶ 93.

### i. Failing to investigate police use of force

For years, the BPD has ignored its written policy that requires a thorough investigation of every incident in which a police officer strikes someone with any object or an incapacitating agent. *Id.*, ¶ 92. The BPD does not conduct a thorough investigation of use of force reports even when a person has a physical injury. *Id.* Failing to require reports and investigations of use of force abdicated the BPD's responsibility to supervise use of force by its police officers and results in officers using unreasonable force on civilians. *Id.*, ¶ 94.

### ii. Failing to implement a plan and supervision of Floyd protests

Upon learning of the events of May 29, Commissioner Gross (the policymaker for the BPD) did not take steps to ensure that BPD had a plan to properly supervise its officers at further protests, which were likely to take place on the upcoming weekend. *Id.*, ¶¶ 95, 98, 101. BPD officers know that during a time of national protests, they can expect people will gather on the Boston Common, which has long been a meeting place for protesters. *Id.*, ¶¶ 99-100. Although previous commissioners had developed plans to handle protests, Commissioner Gross chose to ignore the plans for the protests over the murder of George Floyd on May 31-June 1, 2020. *Id.*, ¶¶ 102-103. Under Commissioner Gross, BPD officers were provided with long wooden riot batons and were permitted to use these batons to strike people at demonstrations without cause. *Id.*, ¶ 104.

During both the May 29 and May 31 protests over the police murder of George Floyd, some BPD officers objected to the message of the protesters, feeling it was "anti-police." *Id.*, ¶ 15. On May 31, as on May 29, body cameras recorded many BPD officers striking protesters with an object or incapacitating agent. *Id.*, ¶¶ 88, 105. During four separate incidents on May 31, at separate times and places, three different officers used a riot baton or OC spray to unlawfully strike the Plaintiffs. *Id.*, ¶¶ 21-23, 34-36, 48-55, 73-76.

### iii.   Failing to let people leave

Part of the BPD's failure to implement an appropriate plan for the May 31 protest is the way they barred protesters from leaving the area. *Id.*, ¶ 4. Officers ordered people to leave, and protesters were actively trying to leave. *Id.*, ¶ 106. At the same time, the BPD caused all the T stations in the area to close and blocked off many streets. *Id.*, ¶¶ 50, 107. As a result, many protesters were unable to leave the area. *Id.*, ¶¶ 72, 107. Three of the Plaintiffs were assaulted by BPD officers when they were trying to leave. *Id.*, ¶ 108.

### iv.   Failing to properly handle Internal Affairs complaints

The City had a policy or custom of indifference to misconduct by BPD officers by failing to properly investigate complaints of misconduct and to discipline officers who used unreasonable or excessive force. *Id.*, ¶ 110. The BPD developed a custom of making it difficult for civilians to file complaints about the conduct of its police officers. *Id.*, ¶ 116. The BPD's own review board found that there "is a strong perception that citizens do not have easy access to filing complaints in supportive and non-intimidating environments." *Id.* This custom is evidenced by Ms. Hall's experience being deterred from pursuing her complaint. *Id.*, ¶¶ 66-67, 116. Ms. Hall wanted to file an internal complaint, but a BPD

employee told her false information to discourage her from doing so. *Id.*, ¶¶ 66-67. Unbeknownst to Ms. Hall, a civilian witness filed a complaint against Officer Nolan for his assault on Ms. Hall, but investigators were unable to identify her. *Id.*, ¶ 68.

Once complaints of unreasonable force were filed, the BPD had a custom of failing to properly investigate these claims and failing to discipline officers who used unreasonable force. *Id.*, ¶ 117. As a result, BPD officers with many complaints alleging use of unreasonable force were rarely disciplined for their use of force. *Id.* The Internal Affairs Division has, for many years, had a practice of delaying findings on investigations of officer misconduct. *Id.*, ¶ 118. Often investigations linger for one to two years, sometimes even longer. *Id.* This delay allows misconduct to go unpunished since the civilian complainants often cannot be found or have lost interest in the complaint. *Id.* Ms. Huffman and Mr. Chambers-Maher were both interviewed promptly for their internal affairs complaints, but although there was body camera footage and many witnesses, over a year later they have not learned of any action on these complaints. *Id.*, ¶¶ 46-47, 86-87, 119. Further, the questioning was designed to make them feel at fault. *Id.*, ¶¶ 46, 86. Mr. Ackers did not file an internal affairs complaint; he did not know that the person who struck him was a BPD officer until he saw body camera footage. *Id.*, ¶ 27.

### v. Blue wall of silence

The City also had a policy or custom of tolerating a "code of silence" or a "blue wall" in which BPD officers understood that they were not to report misconduct by fellow officers. *Id.*, ¶ 111. In an example from 1995, the "blue wall" prevented BPD officers from truthfully reporting the beating of Michael Cox, a Black undercover police officer, by other

BPD officers who did not realize he was a fellow officer. *Id.*, ¶ 113. The recently publicized scandals involving Commissioner Dennis White and union president Patrick Rose demonstrate the power of the code of silence from the early 1990s until May of 2021. *Id.*, ¶ 112. These officers were investigated for serious misconduct (domestic abuse and sexual abuse of children, respectively) in the 1990's, but officers protected them. *Id.* On May 14, 2021, Acting Boston Mayor Kim Janey said, "a blue wall of silence was confirmed by one retired officer who said he received five phone calls directing him not to cooperate with this investigation." She said, "officers were intimidated into silence for fear of retaliation" during the 2021 investigation into allegations against Commissioner White. *Id.*, ¶ 114.

Because of this "blue wall," BPD officers felt free to use unreasonable and excessive force on protesters. *Id.*, ¶ 115. They expected fellow officers would not report their misconduct or intervene to prevent their misconduct, and that the BPD would accept the word of a police officer over the word of a civilian. *Id.* BPD officers demonstrated the "blue wall" in each of the four incidents here when they failed to report the use of force and failed to intervene to prevent the unlawful use of force on the Plaintiffs. *Id.*, ¶¶ 26, 44, 62, 78.

## III.    Legal Argument

### A.  Standard of review

A complaint is to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED.R.CIV.P. 8(a)(2). The First Circuit described the requirements to survive a motion to dismiss under *Bell Atl. Corp. v.* Twombly, 550 U.S. 544, 545 (2007) saying:

> (F)actual allegations are "enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even

if doubtful in fact)." *See id.* at 555 (citation omitted). According to the Court, Rule 8(a)(2) must require more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* However, the *Twombly* Court was also careful to explain that "[h]ere, ... we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

*Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 8 (1st Cir. 2011).

In deciding whether to dismiss a complaint under Rule 12(b)(6), a court "must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citations omitted); *see also Langadinos v. American Airlines, Inc.*, 199 F.3d 68, 69 (1st Cir. 2000).

There is no heightened pleading rule for civil rights claims, including *Monell* claims. *Leatherman v. Tarrant Cnty. Narcotics Intel. and Coordination Unit*, 507 U.S. 163, 164 (1993); *Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61, 64 (1st Cir. 2004). Neither *Bell Atlantic Corp. v. Twombly*, 500 U.S. 544 nor *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) change the pleading standard. In *Johnson v. City of Shelby, Miss.*, 574 U.S. 10 (2014) the Supreme Court said, "(h)aving informed the city of the factual basis for their complaint, they were required to do no more to stave off threshold dismissal for want of an adequate statement of their claim." 574 U.S. at 12. The standard pleading rules apply. Plaintiffs here have met their burden.

### B.  Plaintiffs have adequately stated a *Monell* claim

Under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) a municipality may be liable for a violation of constitutional rights if the plaintiff can "show that a policy or custom of the city led to the constitutional deprivation alleged." *Santiago v. Fenton*, 891 F.2d 373, 381 (1st Cir. 1989), *citing Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). A custom is "so well settled

and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Baron v. Suffolk Cty. Sheriff's Dep't*, 402 F.3d 225, 236–37 (1st Cir. 2005), *quoting Bordanaro v. McLeod,* 871 F.2d 1151, 1156 (1st Cir. 1989).

Plaintiffs allege that several policies or customs of the City of Boston caused BPD officers to use unreasonable force on them, which is sufficient to survive a motion to dismiss. *See, Haley v. City of Boston*, 657 F.3d 39, 53 (1st Cir. 2011). The City failed to properly supervise police officers by: (1) a longstanding failure to conduct a thorough investigation after a use of force; (2) failure to have a plan for proper supervision at the Floyd protests; (3) failure to conduct prompt, proper investigations of internal affairs complaints; and (4) tolerating a code of silence that prevented police officers from reporting misconduct by fellow officers.

The complaint alleges widespread use of unreasonable force by BPD officers both at a Floyd protest on May 29 and again at a protest two days later when Plaintiffs were injured. The action of many officers using unreasonable force against many peaceful protestors supports the claim that the officers' conduct had the tacit approval of their supervisors. *See, Bordanaro v. McLeod*, 871 F.2d 1151, 1157 (1st Cir. 1989). This is not a "single incident" case; the complaint alleges many BPD officers used of excessive and unreasonable force on many people protesting police misconduct on two separate days.

In *Foley v. City of Lowell*, 948 F.2d 10 (1st Cir. 1991), the court agreed with the D.C. Cir. that "(e)gregious instances of misconduct, relatively few in number but following a common design, may support an inference that the instances would not occur but for

municipal tolerance of the practice in question." *Id.* at 14-15 *citing Carter v. District of Columbia,* 795 F.2d 116, 124 (D.C.Cir. 1986).[1] This is the case here.

The use of unreasonable force at the Floyd protests was also due to a decision by Police Commissioner Gross, who failed to implement a proper plan to supervise police officers at these protests against police misconduct. After the first protest concerning the murder of George Floyd by a Minneapolis police officer, the Commissioner was on notice of the need to implement plans to supervise additional protests, which would require close supervision of BPD officers. Further, Plaintiffs allege the City did not properly train officers on use of the large wooden batons which were used on three of the four Plaintiffs.[2]

As a further result of the lack of a plan, when the protest ended and Plaintiffs and thousands of others tried to go home, police prevented them from leaving. Mr. Ackers and Mr. Chambers-Maher were trying to leave when BPD officers used force on them for no legitimate reason. Ms. Hall was outside an MBTA station, but she could not leave because the station was closed.

### C. The claim should be viewed as a whole

In asking this court to dismiss Count III, the City's memo divides the *Monell* claim into separate parts, then argues that each piece standing alone is not enough to support the claim. This ignores the standard for a motion to dismiss. The First Circuit has emphasized that "[t]he make-or-break standard ... is that the combined allegations, taken as true, must state a plausible, [but] not a merely conceivable, case for relief." *Sepúlveda-Villarini v. Dep't of*

---

[1] "(A) custom or practice of deliberate indifference to rights need not be followed at every juncture in order to constitute 'tacit authorization or encouragement of wrongful conduct.'" *Sharp v. City of Houston*, 164 F.3d 923, 935 (5th Cir. 1999).
[2] Plaintiffs have not alleged a failure to train police officers generally.

*Educ. of P.R.,*, 628 F.3d 25, 29 (citations omitted). The City's argument seeks to "divide-and conquer," which "runs afoul of the firmly established requirement that complaints be read as a whole." *Spearman v. Elizondo*, 230 F. Supp. 3d 888, 892-93 (N.D. Ill. 2016).

The City's memo does not consider how the allegations of each of the four Plaintiffs connect to one another and to the *Monell* allegations. Three of them were hit with a baton while one was hit with OC spray twice. Three of the Plaintiffs were trying to leave but could not do so because of the collective actions of the BPD. The photographs and videos embedded in the Amended Complaint tell much of the story. Officer Burke's body camera video shows Mr. Ackers being knocked down from behind while trying to leave on his moped, and later shows Ms. Huffman being knocked down by Officer Burke's baton. Ms. Huffman alleges a group of police officers walked over her, while some stepped on her hands. Photographs show Mr. Chambers-Maher being sprayed with OC spray for no reason in the presence of many police officers. Ms. Hall alleges Officer Nolan struck her in the face with a baton causing her tooth to go through her lip. When she later tried to show Officer Nolan her injury, he struck her again. The violence was so egregious that a witness filed a complaint based on this incident without Ms. Hall's knowledge.

The actions of the Defendant officers took place in areas with many civilians, as shown in the videos. Many police officers were wearing body cameras. BPD officers who did not use unreasonable force did not report fellow officers or assist the injured. For example, after Officer Burke knocked Ms. Huffman to the ground, the other officers stepped on Ms. Huffman's hands rather than assisting her.

A jury could find that police officers would not unlawfully hit peaceful people with a baton or spray them with OC—in public, with body cameras filming, and in the presence of many witnesses—unless the officers felt their police department would tolerate their misconduct. This conduct took place because of the City's toleration of a code of silence and the failure of BPD's internal affairs system.

While the First Amended Complaint provides sufficient facts to comply with Rule 8, if the court desires more detailed facts Plaintiffs request permission to file a second amended complaint. Such additional facts would not be hard to find. More details exist in an article about the May 31-June 1 protest in the online journal, *The Appeal*, which includes many videos. A description of the videos says:

> Over and over in the videos, police officers are seen deploying plumes of pepper spray at demonstrators, often without warning or provocation. Crowds of protesters with their hands raised are regularly attacked and sprayed by officers on bikes and on foot. At times, demonstrators are rushed by surprise by officers spraying at will.

Higgins, Eoin. "Bodycam Video Shows 'Mob Mentality' of Boston Police who Responded to George Floyd Protests, Lawyer Says." *TheAppeal.org*, December 18, 2020.

https://theappeal.org/bodycam-video-shows-mob-mentality-of-boston-police-who-responded-to-george-floyd-protests-lawyer-says/, accessed 9/16/2021. The article reports that a BPD officer says to another officer, "We're pushing the[m] one way, someone's pushing them the other way." "There was no plan," he says. *Id.* The article contains more detailed facts that support Plaintiffs' *Monell* claim.

The City's actions after this incident show that Officers Burke, Nolan and McManus were right in expecting that their unconstitutional actions would be tolerated by the City. A

bystander complained about the assault on Ms. Hall. The BPD internal affairs investigators claimed they could not identify her. Ms. Huffman and Mr. Chambers-Maher filed internal affairs complaints about their treatment promptly after the incident.[3] They were interviewed promptly. Well over a year later, the City has not informed them of any action taken. The U.S. Department of Justice's Office of Community Oriented Policing Services publication says, "It is preferable to conclude investigations within 180 days." U.S. Dep't of Just. Office of Community Oriented Policing Services, "Standards And Guidelines For Internal Affairs" 33 (2012) https://cops.usdoj.gov/ric/Publications/cops-p164-pub.pdf (accessed Sept. 16, 2021). While Plaintiffs' internal complaints have not yet been resolved by the BPD, enough time has passed that Minneapolis police officer Derek Chauvin was indicted, tried, convicted, and is serving a sentence for his actions that occurred a few days prior to the Plaintiffs' incidents. The City's failure to act after it learned of the misconduct supports a finding that it had a custom of deliberate indifference to constitutional rights. *Sharp v. City of Houston*, 164 F.3d 923, 935 (5th Cir. 1999).

The First Circuit recognized a policy of tolerating a code of silence could support a *Monell* claim for a law enforcement officer in an employment case. *Baron v. Suffolk Cty. Sheriff's Dep't*, 402 F.3d 225 (1st Cir. 2005) *affirming Baron v. Hickey*, 292 F. Supp. 2d 248 (D. Mass. 2003). Other courts have found code of silence allegations in a police misconduct suit along with other evidence is sufficient to survive a motion to dismiss or a motion for summary judgement against a municipality. *Hallom v. City of Chicago*, No. 1:18 C 4856, 2019 WL

---

[3] The First Circuit held that a City's actions after the incident may be relevant in proving a *Monell* claim. *Foley v. City of Lowell*, 948 F.2d at 14.

1762912, at *4 (N.D. Ill. Apr. 22, 2019); *Doe v. City of San Diego*, 35 F. Supp. 3d 1233, 1242 (S.D. Cal. 2014).

The plaintiff in *Baron* was a correctional officer who won a *Monell* claim alleging he was forced to resign due to harassment because fellow officers felt he was a "rat" who had violated the code of silence by reporting misconduct of an officer. 402 F.3d at 229-231. In this case the code of silence or blue wall served to protect the police officers who used unreasonable force, which caused the officers to use force on the Plaintiffs expecting that there would be no consequences for them. 402 F.3d at 236-243.

Proving a custom requires showing a practice is "so permanent and well-settled as to constitute a 'custom or usage' with the force of law." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 398 (1989), *citing Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 168 (1970). Plaintiffs allege the code of silence in the BPD has existed since at least the early 1990s when it protected police officers who physically abused others including the case of undercover officer Michael Cox, officers with a lengthy record of internal complaints, as well as officers who abused a spouse and even an officer who was found to have sexually abused a child.

Kim Janey, the Acting Mayor of the City, acknowledged that the code of silence existed as far back as the 1990s and as recently as this year. She found that this code protected a police officer from allegations of spousal abuse. It also protected an officer who was charged with child sexual abuse.[4] The City argues that while police officers may have been protected from criminal sexual activity with children this does not mean the code of

---

[4] Patrick Rose was charged with child sexual abuse. The allegations were kept secret and he became the president of the police union. Ryan, Andrew. "For years, the Boston Police kept a secret: the union president was an alleged child molester," 4/10/2021. *The Boston Globe,* https://www.bostonglobe.com/2021/04/10/metro/years-boston-police-kept-secret-union-president-was-an-alleged-child-molester/, accessed 9/16/2021.

silence would prevent police officers from reporting unreasonable force by other officers. At trial an expert will be able to testify that the same code of silence or blue wall that causes retaliation against officers who report misconduct protects officers who use unreasonable force and even protects officers who commit crimes. *See*, 35 F. Supp. 3d at 1242.

The admission by the Acting Mayor that this blue wall exists in Boston, preventing witnesses from speaking to investigators in 2021 about an incident in the 1990's, by itself is sufficient for the *Monell* claim to proceed. Plaintiffs cite incidents from decades ago to show the custom of a blue wall or code of silence has been in place for many years. The strength of the code of silence in the BPD is shown by its ability to protect a police officer from the crime of sexual abuse of a minor against an officer. Although the allegations of spousal abuse against Commissioner White took place years ago, officers refused to discuss the allegations with an investigator this year. This shows the custom of a code of silence exists, and is strong and well-settled. Moreover, if the code of silence protects against those types of crimes, it would certainly protect police from being held accountable for using force on protestors against unlawful police violence.

Defendants Burke, Nolan and McManus and the many other BPD officers who used excessive force on peaceful protestors felt free to use such force in areas where there were many fellow police officers, civilians, and cameras. Officers McManus and Burke were wearing body cameras, but that did not stop them. A jury could infer that they expected other officers would not report their misconduct and their superiors would not act against them if civilians complained about their treatment. The code of silence protects police officers who use unreasonable force just as it protects those who violate the criminal law.

*See,* Myrian Gilles, *Breaking the Code of Silence: Rediscovering Custom in Section 1983 Municipal Liability,* 80 B.U. L. Rev. 17, (2000); *Dahlia v. Rodriguez,* 735 F.3d 1060, 1082–83 (9th Cir. 2013) ("The public's trust is diminished when a law enforcement officer abides by the code of silence to cover up misconduct engaged in by fellow officers. …(I)t is essential that an officer be encouraged or required to report misconduct committed by fellow officers."); *See also Blair v. City of Pomona*, 223 F.3d 1074, 1081 (9th Cir. 2000) (taking judicial notice of the existence of a police code of silence and noting "the seriousness of such a custom and the need of a civil rights remedy").

Plaintiffs allege that Commissioner Gross decided not to follow existing plans for properly handling demonstrations and began the use of riot batons against demonstrators without proper training, resulting in the use of unreasonable force. This alone is sufficient to state a claim under *Pembaur v. Cincinnati*, 475 U.S. 469, 483-84 (1986). Under *Pembaur* a municipality may be liable under section 1983 for "a single decision to take unlawful action … [which is made] by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Wayfield v. Town of Tisbury*, 10 F.3d 805 (1st Cir. 1993). Plaintiffs allege that the police commissioner here chose not to implement plans for properly supervising police officers at the May 31 protest.[5]

---

[5] There are at least several reasons why police misconduct did not take place at the Women's March in January 2017 but did at the Floyd protests. First, William Evans was the Police Commissioner in 2017, Commissioner Gross took office on August 4, 2018. Second, the Floyd events were protests against police misconduct, which some officers likely felt was a protest against police, increasing the likelihood of police antagonism and misconduct towards the protesters thus requiring a plan and close supervision.

## IV.    Conclusion

The complaint contains specific factual allegations to state a claim against the City of Boston under *Monell*. These facts and the reasonable inferences from the facts show Plaintiffs have a plausible claim for relief against the City of Boston.

RESPECTFULLY SUBMITTED,
For the Plaintiffs,
By their attorneys,

/s/ Howard Friedman
Howard Friedman, BBO #180080
**Law Offices of Howard Friedman PC**
1309 Beacon Street, Suite 300
Brookline, MA 02446
(617) 742-4100
hfriedman@civil-rights-law.com

/s/ Mark Loevy-Reyes
Mark Loevy-Reyes, BBO No. 707974
**Loevy & Loevy**
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
Ph: (312) 243-5900
Fax: (312) 243-5902
mark@loevy.com

Dated: September 23, 2021

**CERTIFICATE OF SERVICE**

I certify that on this day I caused a true copy of the above
document to be served upon the attorney of record
for all parties via CM/ECF.

Date: September 23, 2021          /s/ Howard Friedman
                                  Howard Friedman