UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JASMINE HUFFMAN, JUSTIN ACKERS, CAITLYN HALL, and BENJAMIN CHAMBERS-MAHER, | * * * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action No. 21-cv-10986-ADB |
| CITY OF BOSTON, and MICHAEL BURKE, EDWARD JOSEPH NOLAN, and MICHAEL J. MCMANUS, in their individual capacities, | * * * * | |
| Defendants. | * * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Jasmine Huffman ("Huffman"), Justin Ackers ("Ackers"), Caitlyn Hall ("Hall"), and Benjamin Chambers-Maher ("Chambers-Maher," collectively, "Plaintiffs") bring a three-count civil rights action against the City of Boston ("City") and three individual City police officers, Michael Burke ("Burke"), Edward Joseph Nolan ("Nolan"), and Michael J. McManus ("McManus," together with Burke and Nolan, "Officer Defendants," and together with City, "Defendants"). [ECF No. 15 ("Am. Compl.")]. Currently before the Court are the City's motion to dismiss Count III alleged against it, [ECF No. 26], and the Officer Defendants' motions to dismiss Count II as alleged against each officer, [ECF Nos. 22, 24, 35]. For the reasons set forth below, Defendants' motions are all <u>DENIED</u>.

I.  **BACKGROUND**

    A.  **Factual Background**

The following facts are taken from the Amended Complaint and all documents expressly incorporated therein, the factual allegations of which are assumed to be true when considering a motion to dismiss. Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014).

On May 25, 2020, George Floyd was murdered by a Minneapolis police officer. His unjust death at the hands of police sparked protests around the country that called attention to the disparate treatment of people of color by law enforcement and demanded justice and police reform. Plaintiffs, all strangers to each other at the time, arrived at the Boston Common on May 31, 2020 to join in protest against the injustice of Floyd's death. [Am. Compl. ¶¶ 14, 16–17]. That night, each Plaintiff was met with force by officers from the Boston Police Department ("BPD").

    1.  Justin Ackers

At approximately 10:08 p.m., Ackers was heading home from the protest on a moped at Tremont Street near Park Street, when, as he turned his moped, Officer Burke held his wooden riot baton out with both hands and struck Ackers from behind, knocking him off his moped and onto the ground. [Am. Compl. ¶¶ 21–23]. Ackers did not know the officer who hit him, but body camera footage revealed that it was Burke. [Id. ¶¶ 27–28]. Police officers then ordered Ackers to leave the area but would not let him take his moped. [Id. ¶ 24].

Ackers also alleges that earlier that night, while at the protest, an unknown Boston police officer sprayed him in the face with OC, or pepper, spray which caused pain and confusion. [Am. Compl. ¶ 20]. Ackers was video recording on his phone when this incident occurred. [Id. at ¶¶ 19–20]. Ackers contends that both spraying him with OC spray and the actions of Officer

Burke constituted unreasonable force against him. [Id. ¶ 25]. As a result of these incidents, Ackers has suffered fear and mental distress. [Id. ¶ 29]. He also had soreness and bruises, and his moped was damaged. [Id. ¶ 30].

      2.     <u>Jasmine Huffman</u>

Huffman was also present at the May 31 protest. At about 10:44 p.m., she was on the Boston Common near the Park Street T station when a group of BPD officers marched towards her with their riot batons held out in front of them. [Am. Compl. ¶ 34]. Officer Burke was in the first line of officers. [Id. ¶ 34]. As the officers approached, Huffman held her hands up. [Id. ¶ 35]. Nevertheless, Burke struck Huffman below her neck with his riot baton, knocking her to the ground, and causing her head to hit the pavement. [Id. ¶¶ 36, 38]. While she was still on the ground, other unknown BPD officers walked over her and stepped on her hands. [Id. ¶ 39]. The incident was captured on Officer Burke's bodycam. [Id. ¶¶ 40–41]. Huffman suffers continuing fear and mental distress from the incident. [Id. ¶ 45]. Huffman filed an internal affairs complaint with the BPD and was interviewed in June 2020, but has since been told that the internal investigation remains incomplete. [Id. ¶ 47].

      3.     <u>Caitlyn Hall</u>

Hall also attended the May 31 protest. At approximately 9:30 to 9:45 p.m., she was in Downtown Crossing on Washington Street on her way home. [Am. Compl. ¶¶ 48–49]. Hall and other protestors were standing with their hands up when she saw Officer Nolan prepare to use his riot baton to strike a man standing next to her who was recording Nolan with his phone. [Id. ¶ 51]. Hall heard the man say "You look like you want hit me" to Officer Nolan and then Nolan struck him in the head with his baton. [Id. ¶ 52]. Hall tried to intervene by using her hands to protect the man's face from the blows, when Officer Nolan turned to Hall and, holding his riot

3

baton with both hands, struck her in the face. [Id. ¶¶ 53–54]. She fell, her head struck the pavement, and she briefly lost consciousness. [Id. ¶¶ 55, 57]. The strike also caused Hall's tooth to puncture her lip. [Id. ¶ 56]. When she regained consciousness, Hall showed Nolan her injury. [Id. ¶ 58]. He then hit her in the chest, and again on her back as she tried to walk away from him. [Id.]. Hall and other protestors identified Nolan by his badge number, 1185. [Id. ¶ 59]. The blow to Hall's mouth caused such profuse bleeding that her face mask became soaked in blood and unwearable. [Id. ¶ 60]. Hall then walked to Massachusetts General Hospital where she had a CT scan and received a stitch on her lip. [Id. ¶ 65]. In addition to these injuries, Hall suffers continuing fear and mental distress. [Id. ¶ 63].

Hall called a general BPD number to file an internal affairs complaint but was told that she could only file a complaint in person, which she alleges was false. [Am. Compl. ¶¶ 66, 67]. Because she did not want to go to a police station, she did not file a complaint, but unbeknownst to her, an unidentified civilian witness filed an internal affairs complaint against Nolan for his use of force against her. [Id. ¶¶ 67–68].

    4.  Benjamin Chambers-Maher

Chambers-Maher, a disabled veteran, was also present at the May 31 protest. [Am. Compl. ¶¶ 69–70]. At approximately 9:39 p.m., Chambers-Maher was leaving the protest and walking to his car in the North End. [Id. ¶¶ 72–73]. BPD street closures forced him onto Tremont Street between Boylston and Stuart Street, where he was approached by Officer McManus. [Id. ¶¶ 73–74]. McManus and another BPD officer pointed their weapons at Chambers-Maher, so he began so walk away backwards, filming the officers as he did. [Id. ¶¶ 75, 79]. It was at this point that McManus sprayed Chambers-Maher's face with OC spray multiple times and called him names. [Id. ¶ 76]. McManus also hit him in the legs with his

police bicycle. [Id. ¶ 80]. The OC spray soaked the face mask Chambers-Maher was wearing, prolonging the pain, temporarily blinding him, and delayed his ability to leave the area. [Id. ¶¶ 82–83]. Ultimately, his eyes swelled shut, he had bruises to his head, face, and leg, and a cut on his leg, presumably from the officer's bike. [Id. ¶ 84]. Chambers-Maher also experiences continuing fear and mental distress. [Id. ¶ 85]. He filed an internal affairs complaint and was interviewed in July 2020. [Id. ¶ 86]. He assumes the investigation is ongoing. [Id. ¶ 87].

None of the four Plaintiffs committed a crime or were arrested during the relevant events, and all four were peaceful at the time of the officers' approach. [Am. Compl. ¶¶ 31, 42, 64, 81]. All four Plaintiffs assert that other unknown BPD officers present during the incidents of force had the ability to prevent the use of force, or report it, but did neither. [Id. ¶¶ 26, 44, 62, 78]. Furthermore, Plaintiffs Huffman and Chambers-Maher, who were interviewed for internal affairs investigations, stated that the questioning during those interviews was "designed" to make them feel at fault for what had occurred. [Id. ¶¶ 46, 86].

     5.     <u>Defendant City of Boston</u>

Two days before the May 31 protest, on May 29, 2020, there was a march in Boston to protest Floyd's murder. [Am. Compl. ¶ 88]. Similar to the events that followed two days later, BPD officers at the march were photographed randomly spraying participants with OC spray and using unreasonable and excessive force with their fists and batons. [Id. ¶¶ 88–89].

Plaintiffs assert that Police Commissioner William Gross ("Commissioner Gross"), the policymaker for the BPD, knew that officers had improperly and indiscriminately used force— by OC spray, baton, or fist—against non-violent protesters on May 29, but did not take any steps to ensure that BPD would have a better, lawful plan to deal with future demonstrations. [Am. Compl. ¶¶ 96–100]. The City had existing plans to deal with protests, and had followed them in

the past, but, the City, acting through Commissioner Gross, treated the May 29 and May 31 demonstrations differently, including that Commissioner Gross supplied officers with long, wooden riot batons and expressly permitted officers to use batons to strike people without cause. [Id. ¶¶ 101–05, 130].  The City, in coordination with BPD, also chose to shut down all T stations and closed streets, which prevented people from leaving the area while officers were simultaneously ordering them to leave.  [Id. ¶¶ 106–07].  Plaintiffs Hall, Ackers, and Chambers-Maher were injured by police while trying to leave the area of the protest.  [Id. ¶ 108].

Plaintiffs allege that, despite police body cameras evidencing uses of force, the City has responded that it has no use of force reports from May 29, [Am. Compl. ¶¶ 88, 90], in violation of BPD's Rule 304, which requires an investigation of every incident in which a police officer strikes someone with an object or an incapacitating agent, [id. ¶ 92].  According to the Amended Complaint, BDP has not followed this policy "for many years," failing to conduct thorough investigations into the use of force even when people suffer physical injuries.  [Id.].  Plaintiffs assert that BPD's failure to follow its own policy to investigate "sends a message to officers that they can use force without being concerned that their actions will be reviewed by their supervisors," [id. ¶ 93], and "abdicate[s] the BPD's responsibility to supervise use of force by its police officers . . . . [which] results in officers using unreasonable force on civilians[,]" [id. ¶ 94].

In addition, the Amended Complaint states that the City has had a broad policy or custom dating back to the early 1990s of indifference to misconduct by its police officers because it consistently fails to properly investigate complaints of misconduct and fails to discipline officers who use unreasonable or excessive force.  [Am. Compl. ¶¶ 110–12].  Examples of this failure include several, now public, scandals about the BPD's failure to investigate or discipline such

6

officers.  [Id. ¶¶ 111–13].  This culture is exacerbated by a "blue wall of silence," in which officers protect each other by not reporting or preventing misconduct, [id. ¶¶ 114–15], and by BPD's customs of making it difficult for citizens to file complaints about officer misconduct and delaying findings until evidence is lost or interest has waned, [id. ¶ 116 ("The Boston Police Department's own review board found that there 'is a strong perception that citizens do not have easy access to filing complaints in supportive and non-intimidating environments.'"); ¶¶ 117–18].  Despite filing complaints shortly after the incidents alleged in the Amended Complaint, Huffman and Chambers-Maher's complaints have remained pending for more than one year.  [Id. ¶¶ 46–47, 86–87].

Plaintiffs contend that the City's custom of failing to supervise, investigate, or discipline the unreasonable use of force by officers, coupled with Commissioner Gross's particularly improper handling of the May 2020 demonstrations, caused the alleged constitutional violations by the Officer Defendants, who relied on those policies and customs to allow them to act with impunity.  [Am. Compl. ¶ 120].

### B.     Procedural Background

Plaintiffs filed their original complaint on June 14, 2021, [ECF No. 1], and an Amended Complaint on August 16, 2021, [Am. Compl.].  Counts I and II of the Amended Complaint are individual civil rights claims brought under 42 U.S.C. § 1983 against the Officer Defendants for the use of unreasonable force and for violations of the First Amendment, respectively.  [Id. ¶¶ 121–32].  Count III is a 42 U.S.C. § 1983 claim against the City for maintaining policies and customs that allowed for violations of their constitutional rights.  [Id. ¶¶ 133–35].  The Officer Defendants filed three individual motions to dismiss the First Amendment violations (Count II) as alleged against each of them.  [ECF No. 22 (Nolan); ECF No. 24 (McManus); ECF No. 35

(Burke)]. The City also moved to dismiss Count III against it. [ECF No. 26]. Plaintiffs have opposed all four motions. [ECF Nos. 32, 33, 37].

## II. LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff. See Gilbert v. City of Chicopee, 915 F.3d 74, 80 (1st Cir. 2019). "[D]etailed factual allegations" are not required, but the complaint must set forth "more than labels and conclusions." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545 (2007). The alleged facts must be sufficient to "state a claim to relief that is plausible on its face." Id. at 570.

"To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability." Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. at 44 (quoting Iqbal, 556 U.S. at 663–64). "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." Hernandez-Cuevas v. Taylor, 723 F.3d 91, 103 (1st Cir. 2013) (quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 14 (1st Cir. 2011)). "The plausibility standard invites a two-step pavane." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (citing Grajales, 682 F.3d at 45). First, "the [C]ourt must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). Second, "the [C]ourt must determine whether the remaining factual

content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Morales-Cruz, 676 F.3d at 224).

### III. DISCUSSION

#### A. Count II: 42 U.S.C. § 1983 Violations of the First Amendment

Plaintiffs assert that the Officer Defendants used unreasonable force against them because of the content of the protest. [Am. Compl. ¶ 130].

The First Amendment to the U.S. Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." U.S. Const. amend. I. "Claims of retaliation for the exercise of First Amendment rights are cognizable under § 1983." Powell v. Alexander, 391 F.3d 1, 16 (1st Cir. 2004). "Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." Powell, 391 F.3d at 16–17 (quoting ACLU of Md., Inc. v. Wicomico Cnty., 999 F.2d 780, 785 (4th Cir.1993).

To succeed on a First Amendment retaliation claim, "a plaintiff must first prove that (1) he or she engaged in constitutionally protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action." D.B. ex rel. Elizabeth B v. Esposito, 675 F.3d 26, 43 (1st Cir. 2012). "The defendant may then avoid a finding of liability by showing that '[he or she] would have reached the same decision . . . even in the absence of the protected conduct.'" Id. (quoting Powell, 391 F.3d at 17). As with all individual liability claims brought under § 1983, the Court gauges the liability of the Officer Defendants based on only their own individual involvement in each

alleged constitutional violation. Rogan v. Menino, 175 F.3d 75, 77 (1st Cir. 1999); Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 16 (1st Cir. 2011).

The Officer Defendants' motions do not dispute the first two prongs. As to the first prong, Plaintiffs' participation in an organized political protest in a "quintessential public forum" like the Boston Common, United States v. Doe, 968 F.2d 86, 87 (D.C. Cir. 1992), lies at the heart of First Amendment, Boos v. Barry, 485 U.S. 312, 318 (1988); McCutcheon v. Fed. Election Comm'n, 572 U.S. 185, 203 (2014), and the Supreme Court has specifically proclaimed that the First Amendment "protects a significant amount of verbal criticism and challenge directed at police officers[,]" City of Houston v. Hill, 482 U.S. 451, 461 (1987).

With regard to the second prong, adverse action need only be more than "*de minimis*," which the First Circuit has defined simply as sufficient to chill a "reasonably hardy" person, or "a person of ordinary firmness," from continuing to exercise their constitutional rights. Barton v. Clancy, 632 F.3d 9, 29 (1st Cir. 2011); Starr v. Dube, 334 F. App'x 341, 342 (1st Cir. 2009). The physical force used by each Officer Defendant easily clears that hurdle. See Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't, 466 F. Supp. 3d 1206, 1212–13 (W.D. Wash. 2020); cf. Brodheim v. Cry, 584 F.3d 1262, 1270 (9th Cir. 2009) ("[T]he mere *threat* of harm can be an adverse action, regardless of whether it is carried out because the threat itself can have a chilling effect[]" on First Amendment rights.).

The thrust of the Officer Defendants' motions to dismiss Plaintiffs' First Amendment claims is that the Amended Complaint (1) fails to state that curbing Plaintiffs' participation in the protests was the motivating or but-for factor in their uses of force and (2) does not allege that the Officer Defendants even knew the Plaintiffs participated in the protest. See [ECF Nos. 23, 25,

10

36]. The first argument, though perhaps colorable, is not appropriate for determination on the pleadings, and the second argument strains credulity.

Plaintiffs have expressly pleaded that the Officer Defendants used unreasonable force "because of the content of the protest," [Am. Compl. ¶ 130], and the Officer Defendants have not offered any alternative motives for the uses of force against the protestors. While the Officer Defendants argue that the Amended Complaint sets forth only conclusory allegations regarding their motives, the Court finds that the Plaintiffs have provided sufficient circumstantial evidence to survive the pleading stage. The motivation prong can be satisfied by circumstantial evidence that the constitutionally protected conduct was the driving factor that caused the retaliation, Rosaura Bldg. Corp. v. Mun. of Mayagüez, 778 F.3d 55, 67 (1st Cir. 2015), and an adverse action that "closely followed First Amendment activity may create a reasonable inference that the defendant acted with a retaliatory motive[,]" Weiss v. Lavallee, No. 01-cv-40177, 2005 WL 8176485, at *17 (D. Mass. Oct. 7, 2005) (citing Ferranti v. Moran, 618 F.2d 888, 892 (1st Cir. 1980). Here, the chronology of events, the location of each incident, and all other surrounding circumstances, plainly allow for a reasonable inference that each of the Officer Defendants would have known the Plaintiffs were protestors and that they used force against them for that reason. See Goodwin v. District of Columbia, No. 21-cv-806, 2022 WL 123894, at *11 (D.D.C. Jan. 13, 2022) (finding that "such temporal proximity . . . support[s] the reasonable inference that defendants lacked a non-retaliatory motive to detain plaintiffs"). Nothing in the record thus far, which includes photos of the Plaintiffs with their arms up and backing away from officers, provides a plausible non-retaliatory motive for the Officer Defendants' use of physical force against the Plaintiffs. Further, because the uses of force against Ackers, Hall, and Chambers-Maher occurred while the officers were being openly recorded, it would be reasonable to infer

11

that the civilians' filming of the officers formed an unlawful retaliatory motive for the use of force. See Glik v. Cunniffe, 655 F.3d 78, 83 (1st Cir. 2011); see also Gericke v. Begin, 753 F.3d 1, 7 (1st Cir. 2014) (considering First Amendment retaliation claim where individual was arrested and charged with several crimes after filming a police traffic stop).

Put simply, the Officer Defendants' argument that they could not have known that the Plaintiffs participated in the protest is untenable. Based on the record currently before the Court, it is evident that each one of these incidents occurred while the BPD was seeking to disperse protesters. See Molina v. City of St. Louis, No. 17-cv-2498, 2021 WL 1222432, at *7 (E.D. Mo. Mar. 31, 2021) (denying summary judgment on First Amendment retaliation counts where defendants argued that police officers did not recognize plaintiffs as protesters who had been dispersed from nearby protest scene in light of all circumstantial evidence to the contrary), appeal filed, Molina v. Book, No. 21-cv-1830, 2021 WL 1222432 (8th Cir. Apr. 14, 2021).

In his motion, Burke avers that "[i]t cannot be the case that any police use of force against any individual who happened to be in the area of the Boston Common at any time on the evening of May 31, 2020, was a First Amendment violation." [ECF No. 36 at 5]. Likewise, however, it cannot be the case that any use of such force could not plausibly be a First Amendment violation. The point of discovery and then trial will be to sort out whether these particular uses of force did or did not implicate the First Amendment. See BEG Invs., LLC v. Alberti, 144 F. Supp. 3d 16, 22 (D.D.C. 2015) ("Causation may be inferred—especially at the pleading stage—when the retaliatory act follows close on the heels of the protected activity.").

In the Court's view, Plaintiffs have pleaded sufficient facts to support all elements of a retaliation claim against each of the Officers Defendants for purposes of a Rule 12(b)(6) challenge. As Plaintiffs rightly point out, see [ECF No. 37 at 2], asking for more of plaintiffs at

12

the pleading stage would make First Amendment retaliation claims all but impossible but for the unlikely scenario of an explicit admission from an officer. Courts around the country, flooded with First Amendments claims pleaded on similar facts following the May 2020 protests, have agreed that the use of force against non-violent protestors can support the inference that officers meant to intimidate protestors and deter antipolice messaging. See e.g., Green v. City of St. Louis, No. 18-cv-1629, 2022 WL 278746, at *4 (E.D. Mo. Jan. 31, 2022), appeal filed, No. 22-cv-1288, 2022 WL 278746 (8th Cir. Feb. 9, 2022); Goodwin v. D.C., No. 21-cv-806, 2022 WL 123894, at *11 (D.D.C. Jan. 13, 2022); Molina, 2021 WL 1222432, at *7; Alsaada v. City of Columbus, 536 F. Supp. 3d 216, 269 (S.D. Ohio April 30, 2021), modified sub nom. Alsaada v. City of Columbus, Ohio, No. 20-cv-3431, 2021 WL 3375834 (S.D. Ohio June 25, 2021); Black Lives Matter D.C. v. Trump, 544 F. Supp. 3d 15, 44 (D.D.C. June 21, 2021); Abay v. City of Denver, 445 F. Supp. 3d 1286, 1292 (D. Colo. June 5, 2020); Detroit Will Breathe v. City of Detroit, 484 F. Supp. 3d 511, 518 (E.D. Mich. Sept. 4, 2020), order clarified, No. 20-cv-12363, 2020 WL 8575150 (E.D. Mich. Sept. 16, 2020).

Accordingly, the Officer Defendants' motions to dismiss Count II, [ECF Nos. 22, 24, 35], are DENIED.

### B.     Count III: 42 U.S.C. § 1983 Monell Claim

Although "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory," § 1983 does impose "liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691–92 (1978). "[A] plaintiff must show that the violation occurred as a result of the municipality's 'policy or custom.'" Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st Cir. 2013) (quoting Monell, 436 U.S. at 694).

13

The Court reads the primary basis of Plaintiffs' Monell claim against the City as alleging a custom of failing to supervise, investigate, or discipline BPD officers for unlawful conduct, which, here, enabled the Officer Defendants to use unreasonable force against Plaintiffs without cause. As part of this custom, Plaintiffs assert that civilian complaints against officers are not properly investigated, officers are not disciplined for unlawful uses of force, and the BPD tolerates a code of silence that prevents police officers from reporting misconduct. [ECF No. 32 at 3–4; Am. Compl. ¶¶ 4, 110–117].

There are two requirements to prove a § 1983 claim based on a municipal custom. First, the custom "must be attributable to the municipality" such that it is "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." Whitfield v. Melendez-Rivera, 431 F.3d 1, 13 (1st Cir. 2005) (quoting Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989)). "Second, the custom must have been the cause of and 'the moving force behind' the constitutional violation." Id. (quoting Bordanaro, 871 F.2d at 1156). Evidence of a single incident of a constitutional deprivation "is insufficient, in and of itself, to establish a municipal 'custom or usage' within the meaning of Monell." Mahan v. Plymouth Cnty. House of Corrs., 64 F.3d 14, 16–17 (1st Cir. 1995). Evidence of "multiple instances of misconduct" that suggest a "systemic pattern of activity," however, may support an inference of a municipal custom. See Doe v. Town of Wayland, 179 F. Supp. 3d 155, 172–73 (D. Mass 2016) (citing Kibbe v. City of Springfield, 777 F.2d 801, 806 (1st Cir. 1985) and Baron v. Suffolk Cty. Sheriff's Dep't, 402 F.3d 225, 238–39 (1st Cir. 2005)). Moreover, a municipality's failure to discipline its employees can be actionable if plaintiff can show a "persistent failure" to do so. Barker v. City of Bos., 795 F. Supp. 2d 117, 124 (D. Mass. 2011). The Court "cannot hold that the failure of a police

department to discipline in a specific instance is an adequate basis for municipal liability." Tambolleo v. Town of West Boylston, 613 N.E.2d 127, 130 (Mass. App. Ct. 1993) (citation omitted); see also Barker, 795 F. Supp. 2d at 124 (same).

The City moves to dismiss the Monell claim because, in its view, Plaintiffs have made only bare assertions and recitations of the claim elements. The Court finds that Plaintiffs have, albeit just barely, done more than "say the magic words 'custom' and 'policy'" as the City suggests. See [ECF No. 27 at 9 (citing Allen v. York Cnty. Jail, 2003 WL 221842, at *8 (D. Me. Jan. 30, 2003)]. To support their claim that the City has a custom of failing to investigate or discipline police misconduct, Plaintiffs point mainly to BPD's failure to diligently pursue investigations into the uses of forces against Chambers-Maher and Huffman, Hall's experience being deterred from filing her complaint, and the inaction of all other officers on scene, as well as previous admissions from the City that BPD officers were generally pressured to adhere to a code of silence regarding officer misconduct, and that civilians felt discouraged from filing complaints. [Am. Compl. ¶¶ 110–18; ECF No. 32 at 13–16]. Compare with Allen, 2003 WL 221842 (dismissing *pro se* plaintiff's Monell claim against jail, sheriff, and sheriff's department because it was indisputable that corrections officers deliberately schemed to keep their constitutional violations hidden, undermining any allegation of broader approval by decisionmakers). To further bolster their claim, Plaintiffs also offer examples of past confirmed occasions where BPD failed to investigate or discipline police misconduct, though those incidents did not involve the use of force against protestors. [Am. Compl. ¶ 111–13].

Plaintiffs' allegation that the City condones a code of silence within its police force can support a Monell claim. See Baron, 402 F.3d at 237–40; see also Hallom v. City of Chi., No. 18-cv-4856, 2019 WL 1762912, at *4 (N.D. Ill. Apr. 22, 2019) (municipal liability claim plausibly

pleaded where the allegations allowed for the reasonable inference that others may have suffered similar injuries because of the city's alleged custom of covering up police misconduct); Doe v. City of San Diego, 35 F. Supp. 3d 1233, 12 (S.D. Cal. 2014) ("[A] 'code of silence' may qualify as a type of custom able to invoke Monell liability.").

To be sure, Plaintiffs' support for this claim is presently thin, particularly since Plaintiffs have done little to link their allegations together to present a "systemic pattern" of persistent failure to discipline or investigate, but more is not required at the pleading stage. Plaintiffs have specifically articulated that the City knew constitutional violations occurred and either chose not to investigate or otherwise delayed or discouraged investigation. Taking Plaintiffs' factual allegations as true and viewing the Amended Complaint in the light most favorable to Plaintiffs, the allegations allow for a reasonable inference that the City has a custom of failing to discipline police misconduct. See Poole v. City of Lincoln, No. 21-cv-3030, 2021 WL 2935899, at *12–13 (D. Neb. July 13, 2021); see also Tirado v. City of Minneapolis, 521 F. Supp 3d. 833, 842 (D. Minn. Feb. 22, 2021) ("[A]t the pleading stage, [e]ven if a plaintiff cannot identify the full scope of an alleged custom or policy, the key to surviving dismissal is that the 'complaint must allege facts which would support the existence of an unconstitutional policy or custom.'" (citation omitted)).

To the extent Plaintiffs also contend that the City, acting through BPD, had a custom of using excessive force against the May 2020 protestors, see [ECF No. 32 at 9], that claim has also been sufficiently pleaded for the purposes of a Rule 12(b)(6) motion. The Amended Complaint contains numerous allegations that officers used OC spray, batons, and other physical force against the four Plaintiffs during the May 31 protest. Plaintiffs sufficiently allege, though just barely, that similar constitutional violations occurred on May 29, giving decisionmakers

sufficient notice that officers would continue to use unreasonable force against peaceful protestors in the demonstrations to come.  The City's argument that the allegations are not enough to support a Monell claim because they rest only on "one night of civil unrest" is unavailing.  [ECF No. 27 at 8].  In addition to the fact that Plaintiffs have suggested that similar conduct occurred during demonstrations on surrounding days, "egregious instances of misconduct" even when "relatively few in number but following a common design, may support an inference that the instances would not occur but for municipal tolerance of the practice in question."  Foley v. City of Lowell, 948 F.2d 10, 14 (1st Cir. 1991) (quoting Carter v. D.C., 795 F.2d. 116, 124 (D.C. Cir. 1986)).  Here, Plaintiffs describe four similar incidents of excessive force used against peaceful protesters.  Further, Plaintiffs may not know, or cannot know, without discovery the full extent of the unreasonable force used by the City against protesters during the May 2020 protests.  This Court, in line with several other district courts presented with similar facts, finds that Plaintiffs have sufficiently pleaded that the City had notice of the unlawful use of force against protestors and was deliberately indifferent to those constitutional violations.  See Poole, 2021 WL 2935899, at *12–13; Tirado, 521 F. Supp 3d. at 840–44; Samaha v. City of Minneapolis, 525 F. Supp. 3d. 933, 940–43 (D. Minn. Mar. 11, 2021); Marks v. Doe 1, 528 F. Supp. 3d 1008, 1015 (D. Minn. Mar. 23, 2021).

Finally, as a separate basis of liability, Plaintiffs also claim that the City, acting through its policymaker Commissioner Gross, failed to properly handle the May 2020 protests.  This claim rests on the contention that Commission Gross's decisions to distribute and endorse the use of riot batons against peaceful protestors and to limit the public's ability to leave the protest area, led to the constitutional deprivations.  See [ECF No. 32 at 10, 16; Am. Compl. ¶¶ 96–100, 103–

104].[1]  Government policy or custom may be established by "a single decision by municipal policymakers under appropriate circumstances."  Kelley v. LaForce, 288 F.3d 1, 9 (1st Cir. 2002) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986)).  In other words, liability may attach where there is "a deliberate choice to follow a course of action [] made from among various alternatives by the official . . . responsible for establishing final policy with respect to the subject matter in question."  Pembaur, 475 U.S. at 470, 483; see also Scott v. Louisville/Jefferson Cnty. Metro Gov't, 503 F. Supp. 3d 532, 537–38 (W.D. Ky. 2020).  Because three of the four Plaintiffs' injuries occurred while they were trying to leave the protest area and some of the alleged injuries were caused by blows from riot batons, it can be reasonably inferred that Commissioner Gross's policy decisions led to the constitutional deprivations.

Plaintiffs will have to overcome significant issues of proof if they are to prevail at trial.  Nonetheless, the Court finds that, at this stage, Plaintiffs have adequately pleaded municipal liability based on the role that City customs and policies allegedly played in the constitutional violations.  While the Court does "not lightly infer a municipal policy or practice from a few scattered claims . . . neither should [it] blind [itself] . . . ."  Cox v. Murphy, No. 12-cv-11817, 2016 WL 4009978, at *10 (D. Mass. Feb. 12, 2016) (Chief Judge Saylor explaining that "while a single accusation of excessive force is not enough, at some point, as the accusations and claims begin to pile up, a critical mass may be reached requiring an affirmative response from supervisors. Put simply, a very large amount of smoke could reasonably compel the inference that there must be at least a small amount of fire." (citation omitted)).

---

[1] Plaintiffs state that they are not pursuing a broader theory of failure to train liability but do assert that Commissioner Gross provided officers with riot batons without proper training.  A municipality's failure to train its employees can be an actionable custom under § 1983.  See City of Canton v. Harris, 489 U.S. 378, 388–90 (1989).

The City's motion to dismiss Count III, [ECF No. 26], is therefore <u>DENIED</u>.

## IV. CONCLUSION

For the foregoing reasons, the Officer Defendants' motions to dismiss Count II, [ECF Nos. 22, 24, 35], are <u>DENIED</u> and the City's motion to dismiss Count III, [ECF No. 26], is also <u>DENIED</u>.

**SO ORDERED.**

June 27, 2022                                              /s/ Allison D. Burroughs
                                                          ALLISON D. BURROUGHS
                                                          U.S. DISTRICT JUDGE