**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| JASMINE HUFFMAN, JUSTIN ACKERS, CAITLYN HALL, and BENJAMIN CHAMBERS-MAHER, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. 21-10986-ADB |
| v. | ) ) | |
| CITY OF BOSTON, and MICHAEL BURKE, EDWARD JOSEPH NOLAN, and MICHAEL J. MCMANUS, in their individual capacities, | ) ) ) ) | |
| Defendants. | ) ) | |

# EXHIBIT 76

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 21-10986-ADB

**JASMINE HUFFMAN, JUSTIN ACKERS,
CAITLYN HALL, and BENJAMIN
CHAMBERS-MAHER,**

    Plaintiffs,

    v.

**CITY OF BOSTON *et al.*,**

    Defendants.

---

## EXPERT REPORT OF DR. EDWARD R. MAGUIRE

---

# Contents

I.   **Introduction**                                                              **4**

    A. Assignment                                                            4

    B. Experience and Qualifications                                         4

    C. Structure of Report                                                   6

II.  **Background and Relevant Facts**                                             **8**

III. **Best Practices for Handling Large Protests**                               **13**

    A. Insights from Crowd Psychology                                        14

    B. An Evidence-Based Framework for Policing Crowds                       15

    C. Additional Considerations                                             16

    D. Standards and Practices Recommended by Police                        19
    Professional Organizations

    E. Summary                                                               21

IV.  **BPD Policies**                                                             **22**

    A. BPD Policies Associated with Crowd Management and                     22
    Crowd Control were Inaccurate, Incomplete, and Outdated

    B. BPD Policies on Use of Force and Less-Lethal Weapons                  26
    were Inaccurate and Incomplete

    C. BPD Policies on Mutual Aid were Incomplete                            29

    D. Summary                                                               30

V.   **BPD Training**                                                             **30**

A. BPD Provided Officers with Inaccurate, Incomplete, and Outdated Training on Crowd Management and Control     30

**VI.**     **BPD Strategies and Tactics**     **35**

A. BPD Did Not Rely Sufficiently on Crowd Management Strategies     35

B. BPD Used Inappropriate Crowd Control Tactics     39

**VII.**     **Analysis of Incidents Involving Plaintiffs**     **43**

A. Jasmine Huffman     43

B. Justin Ackers     45

C. Caitlyn Hall     46

D. Benjamin Chambers-Maher     48

**VIII.**     **BPD Accountability Mechanisms**     **49**

A. BPD Had Insufficient Internal Controls for Addressing Officer Misconduct     49

**IX.**     **Conclusion**     **52**

**X.**     **List of Materials Reviewed**     **55**

# I. Introduction

## A. Assignment

1. I have been retained by Loevy and Loevy to review evidence and render an opinion on the Boston Police Department's (BPD's) preparation for, and response to, the racial justice protests that occurred in Boston from May 29-31, 2020 following the death of George Floyd. My review focuses on the policies and training that were in place in the BPD prior to these protests, the strategies and tactics used by the BPD and its partners during these protests, and the specific incidents involving the Plaintiffs in this case.

## B. Experience and Qualifications

2. I am a Professor of Criminology and Criminal Justice at Arizona State University, where I also serve as director of the Public Safety Innovation Lab. I earned a Ph.D. in criminal justice from the State University of New York at Albany in 1997. I have been involved in studying, teaching, training, providing technical assistance for, and collaborating with police for more than 25 years. My work focuses primarily on policing and violence. One of the areas I specialize in is the study of policing crowds, including protests, rallies, and riots.

3. I have authored or edited seven books or monographs, and published more than 120 scientific journal articles and book chapters on a variety of criminal justice issues. Most of that work focuses on policing and violence, with much of my recent work focusing specifically on policing crowd events and police use of force.

4. In January 2020, I published a guidebook for police entitled *Policing Protests: Lessons from the Occupy Movement, Ferguson, and Beyond.*[1] The guidebook presents a summary of scientific evidence from criminology and social psychology on crowds and the police response to crowd events. It also provides an analysis of the police response to Occupy Wall Street and other protests by law enforcement agencies in the United States and abroad. Finally, the guidebook provides a detailed framework for policing protests in a manner that seeks to prevent conflict and violence and minimize harm to protesters, police, and bystanders. The research featured in the guidebook was funded by the Office of Community Oriented Policing Services, a component of the United States Department of Justice.

5. I also serve as Chair of the Police Executive Research Forum's ("PERF") Research Advisory Board (the "Board"), a group of researchers, and law enforcement practitioners who advise

---

[1] Maguire, E.R., & Oakley, M. (2020). *Policing protests: Lessons from the Occupy Movement, Ferguson, and beyond*. New York: Harry Frank Guggenheim Foundation. https://www.hfg.org/s/Policing-Protests.pdf

PERF's efforts to advance police research and innovation. The Board assists PERF's staff in identifying potential research topics; coordinating research efforts with other organizations; conducting human subjects reviews; and disseminating findings to the academic and policing professions. As part of my duties as Chair of the Board, I regularly attend and participate in law enforcement leadership conferences. I also communicate with law enforcement leaders throughout the country to identify and help to implement evidence-based policing practices associated with a variety of issues, including leadership and management, community policing, patrol and criminal investigation practices, violence reduction, and crowd management.

6. In addition, I serve as the Senior Researcher for Law Enforcement for CrimeSolutions.gov, an effort coordinated by the National Institute of Justice, a component of the U.S. Department of Justice. The purpose of the initiative is to provide policymakers and practitioners with an easy-to-follow resource for understanding scientific evidence associated with improving criminal justice practices and reducing crime and violence. My role is to coordinate all reviews of research associated with law enforcement and policing for this U.S. government project.

7. Much of my research and consulting in recent years has focused on crowd management and the police response to protests. I have worked with the Columbus Police (OH) and the Phoenix Police (AZ) to assess their responses to the protests following the death of George Floyd and provide recommendations for reform. I worked with the New York City Corporation Counsel's Office to examine the NYPD's response to the George Floyd protests. I also worked with Seattle's Office of the Inspector General to examine the response of the Seattle Police Department and other city agencies to the protest encampment in downtown Seattle. I was also commissioned by the Inter-American Development Bank to provide guidance for police in Latin America and the Caribbean on appropriate police responses to protests. I have been invited to speak or provide training on policing crowd events for police in six countries (Australia, Canada, Germany, Honduras, the U.K., and the U.S.).

8. Aside from my work on policing crowds, my research has also focused heavily on communication between police and the public.[2] That research is based primarily on social psychology and its implications for police-community relations. It focuses on how the nature and content of communication – whether verbal or nonverbal, intentional or unintentional – can

---

[2] For example, see: Hill, S., Giles, H., & Maguire, E. R. (2021). VOICES: A theory-driven intervention for improving relationships between police and the public. *Policing: An International Journal, 44*(5), 786-799; Maguire, E. R., Lowrey-Kinberg, B., & Johnson, D. (2023). The role of anger in mediating the effects of procedural justice and injustice. *Group Processes & Intergroup Relations, 26*(4), 796-815; Maguire, E. R., & Giles, H. (2022). Public expressions of empathy and sympathy by US criminal justice officials after controversial police killings of African-Americans. *Journal of Language and Social Psychology*, 41(1), 49-75; Nuño, L. E., Hill, S. L., Maguire, E. R., & Giles, H. (2022). Experiencing VOICES: Police and public reactions to an intergroup communication intervention. *Police Practice and Research*, *24*(6), 631–645.

shape the relationships between police and the public. The social psychological principles underlying this body of work also have strong implications for the policing of crowd events.[3]

9. My experience, education, and background are more fully described in my C.V., which is attached to this report. A list of materials I was provided for review is also included at the end of this report. Of additional relevance to this matter, I was retained as an expert and testified at trial in *Epps, et al. v. City and County of Denver et al.* (No. 20-cv-1878-RBJ) in March 2022. I was also retained as an expert and testified at trial in *State of North Dakota v. United States of America* (No. 19-cv-150-ARS) in March 2024.

10. I was retained as an expert and testified at deposition in the following cases: *Sanderlin, et al. v. City of San Jose, et al.* (No. 20-cv-04824-BLF) in February 2023; *NAACP of San Jose / Silicon Valley, et al. v. City of San Jose, et al.* (No. 21-cv-01705-PJH) in March 2023; *State of North Dakota v. United States of America* (No. 19-cv-150-DMT-ARS) in June, 2023; and *Ratlieff v. City of Fort Lauderdale, et al.* (No. 22-cv-61029-RAR) in November, 2023 and January, 2024. The cases listed in ¶¶ 9-10 are the only cases in which, during the previous 4 years, I have testified as an expert at trial or deposition.

11. My opinions are based upon the totality of my specialized knowledge, experience, and my expertise in the field of criminology generally, and policing and violence more specifically. My expertise has been developed during my decades of research of and engagement with law enforcement and my continued experience as a professor, researcher, author, and consultant to governments and law enforcement agencies. Moreover, my expertise is based on an intimate familiarity with standards of training and police practices that have been examined and/or adjudicated in case law; departmental policies and procedures; applicable federal, state, and local police training programs; model policies; and training and research from scholars and police professional organizations.

## C. Structure of Report

12. Part II of this report provides a brief summary of the background and relevant facts in this case. This summary is not intended to provide comprehensive review of all relevant facts, merely a brief overview.

13. Part III of this report examines best practices for policing crowd events, including protests, rallies, and riots. This part of the report provides a summary of the scientific evidence on what

---

[3] Maguire, E. R. (in press). Encounters between police and crowds: New insights from CAT. In H. Giles, D. Markowitz, & D. Clementson (Eds.), *New directions for, and panaceas arising from, communication accommodation theory*. Peter Lang.

works and what doesn't work for preventing conflict and violence and preserving public safety during crowd events.

14. Part IV of this report examines the BPD's policies associated with the handling of protests, rallies, riots, and other types of crowd events. It focuses primarily on the policies that were in place during the racial justice protests held in Boston from May 29-31, 2020. My analysis of the policies that the BPD disclosed finds that they are deficient in numerous respects relative to nationally accepted police standards and practices. These documents provide an inadequate foundation for guiding law enforcement officers on how to respond to crowd events in an informed, professional manner that does not instigate or escalate conflict.

15. Part V of this report examines the BPD's training associated with the handling of protests, rallies, riots, and other types of crowd events. It focuses primarily on the training that was in place within the law enforcement agencies involved in handling the racial justice protests in Boston from May 29-31, 2020. My analysis of the training documents that the BPD disclosed finds that they are deficient in numerous respects relative to nationally accepted police standards and practices. These documents provide an inadequate foundation for guiding law enforcement officers on how to respond to crowd events in an informed, professional manner that does not instigate or escalate conflict.

16. Part VI of this report examines the strategies and tactics used by the BPD and its partner agencies in response to the racial justice protests in Boston from May 29-31, 2020. My analysis concludes that while many law enforcement officers may have acted in a professional and judicious manner during their interactions with protesters, some did not. More generally, the strategies and tactics used by the BPD were flawed and inconsistent with nationally accepted police standards and practices. In some instances, the tactics used by the BPD were contrary to generally accepted policing standards designed to protect the rights and safety of protesters.

17. Part VII of this report examines the specific incidents in which the Plaintiffs allege that they experienced constitutional violations committed by police, and/or were injured by police. My analysis finds that the Plaintiffs were subjected to uses of force that were contrary to generally accepted police standards and practices. Moreover, the heavy-handed policing and physical injuries to which they were subjected resulted from deficiencies in the BPD's policies, training, strategies, tactics, and accountability mechanisms.

18. Part VIII of this report examines the accountability mechanisms that were relied upon by the BPD to ensure that officers behaved in a professional and ethical manner during law enforcement operations in Boston from May 29-31, 2020. My analysis finds that the BPD did not respond in a timely or professional manner to complaints from the public and did not hold officers accountable for policy violations, including the use of excessive force, during these operations.

19. Part IX of this report provides a conclusion summarizing my principal findings.

20. Part X provides listing of materials reviewed.

## II. Background and Relevant Facts

21. On May 25, 2020, Minneapolis police officers arrested George Floyd after receiving a complaint that he had used counterfeit money. Officer Derek Chauvin knelt on Mr. Floyd's neck until he stopped breathing and died. Video footage of Mr. Floyd's slow-motion death under Officer Chauvin's knee quickly went viral. The incident triggered protests around the nation during which protesters expressed their concerns about police use of force and called for racial justice.

22. The purpose of this report is to examine and assess the crowd management and crowd control policies, training, strategies, and tactics of the BPD at the time of the George Floyd protests (referred to herein as "GFP") in Boston as compared to nationally accepted police standards and practices at the time of the GFP. For purposes of this report, my analysis will focus on BPD policies, training, strategies and tactics that were in place at the time of the GFP from May 29-31, 2020.

23. On May 29, 2020, a racial justice protest organized by Mass Action Against Police Brutality was held at Peters Park in Boston's South End to protest the death of George Floyd and others killed by police in the United States.[4] Protesters later assembled in front of two BPD stations, one in District B-2 in Roxbury and the other in District D-4 in the South End. Conflict erupted between police and protesters in both locations. Four police officers were injured with non-life-threatening injuries sustained during the protests.

24. At the D-4 police station, protesters sprayed graffiti on the outside of the station. Police pushed the crowd back using their hands and batons and deployed pepper spray toward protesters (D 001652 – D 001706). Police arrested seven people on a variety of charges, including aiding an arrestee to escape from a police officer (1 person), assault and battery on a police officer (4), assault on a police officer (1), assault and battery by means of a dangerous weapon (1), assault by means of a dangerous weapon (1), disorderly conduct (7), promotion of anarchy (2), resisting arrest (7), and threats (1).[5] An internal BPD investigation concluded that the officers who used force during this incident did so within policy [D 001706 – D 001720].

25. At the B-2 police station, three people were arrested on a variety of charges, including assault and battery by means of a dangerous weapon (1 person), carrying a dangerous weapon, damage

---

[4] https://www.nbcboston.com/news/local/photos-protesters-police-clash-in-boston/2133727/

[5] https://www.wcvb.com/article/peaceful-protests-clashes-boston-police-george-floyd/32717686

to property by graffiti (1), disorderly conduct (1), possession of a class-C substance (1), and resisting arrest (1).

26. On May 30, 2020, a Massachusetts State Police bulletin noted that there would be a "Justice for Big Floyd" protest at Boston Common from 12-6pm [D 008206]. It is unclear from the materials I reviewed whether this event was held. I was unable to locate any BPD arrest reports or use of force reports from this event.

27. On May 31, 2020, the Plaintiffs attended protests in Boston over the death of Mr. Floyd. The BPD was the agency with primary responsibility for monitoring and managing the protests. Additional support was provided by several other state and local law enforcement agencies, including a regional Cops on Bikes for Regional Assistance (COBRA) team, the Massachusetts Bay Transportation Authority (MBTA) Transit Police, and the Massachusetts State Police.[6]

28. There were at least two protests associated with the death of George Floyd scheduled in Boston on May 31, 2020. The first was a "Justice for George" protest which was scheduled at 3pm at Boston City Hall. The flyer below was used to advertise this event.[7]



---

[6] See deposition of William G. Ridge, January 11, 2024 (p. 89).

[7] https://www.thebostoncalendar.com/events/boston-protests-the-murder-of-george-floyd

29. The second was a "Black Lives Matter" protest scheduled later in the day at 6:30pm in Dudley Square (also known as Nubian Square) in Roxbury. After gathering, protesters were expected to march approximately 2.7 miles to the Massachusetts State House [D01603]. The flyer below was used to advertise this event.[8]



30. The BPD disclosed an operational plan for the later event scheduled at 6:30pm. I was unable to locate an operational plan for the earlier event scheduled at 3:00pm. The operational plan for the later event is 18 pages long and describes the event, the BPD's mission during the event, the "concept of operation" (which includes the rules of engagement), and a detailed staffing plan [D01601-01619].

31. At 6:02pm, the BPD issued a Tweet that said: "If you're protesting in Boston this evening, please know our #1 priority is to keep everybody safe. Our officers are out in full force to guard and protect everyone's rights. And, while everyone has a right to free speech, nobody has the right to hurt or harm people or property" [Huffman 0020].

32. At 6:32pm, the BPD issued a Tweet that said: "If you're protesting in Boston this evening, please know the men and women of the #BPD encourage you to exercise and express your right to free speech. But, with one small ask. Please exercise that right in a manner that is safe, peaceful and respectful to all involved" [Huffman 0021].

33. At approximately 8:27pm, the Black Lives Matter protesters who started their march at Dudley Square in Roxbury reached the State House, though others had already arrived there. The

---

[8] https://www.thebostoncalendar.com/events/black-lives-matter-protest

peaceful demonstration at the State House ended at approximately 8:52pm and protesters began to exit the area.[9]

34. At 9:01pm, street camera footage shows that people trying to enter the Downtown Crossing T station were unable to do so.[10] Later, the MBTA issued several announcements indicating that T stations were being closed due to the protests.

35. At 9:07pm, a journalist released a video clip of protesters in Downtown Crossing throwing objects at police.[11] Numerous videos from around this time show conflict beginning to erupt between police and protesters.

36. At 9:12pm, according to a BPD memo, the Law Enforcement Communications Center dispatched BPD's POP Platoon 1 to assist with crowd control in the Boston Common area "after protesters became violent and began assaulting police officers and members of the public. During their deployment, POP Platoon 1 was met by violent protesters who physically assaulted them and members of the public" with a variety of objects [D001888].

37. At 9:22pm, the MBTA issued an announcement via Twitter that the Green, Orange, and Red Lines would be bypassing Park Street and Downtown Crossing due to a demonstration in the downtown area. The MBTA released eight other Tweets throughout the evening announcing additional station closures [Huffman 0023-0024]. As a result, numerous protesters and others attempting to leave the area were unable to do so.[12] It is unclear to what extent protesters were aware of these and other Tweets in real time on the evening of May 31, 2020.

38. At 9:31pm, a reporter covering the protests issued a Tweet that said: "The situation has deteriorated. I'm outside the common and people are throwing plastic bottles at cruisers."[13]

39. At 9:32pm, the BPD issued a Tweet that said: "Reports of protesters now throwing rocks and bricks at officers along Tremont Street. Again, protesters asked to refrain from hurting and harming police officers."[14]

---

[9] https://thescopeboston.github.io/BPDbodycam/index.html

[10] A1 - Wash & Summer 1 PTZ_2020-05-31_20-50-57_2020-05-31_21-05-38.dvt [video]

[11] https://x.com/byChrisVan/status/1267261336175742977

[12] Buell, S. (2020, June 1). As things got ugly, protesters trying to flee downtown Boston found MBTA stops closed. *Boston Magazine*. https://www.bostonmagazine.com/news/2020/06/01/protesters-mbta-george-floyd-boston/

[13] https://x.com/meghanbkelly/status/1267267619800973312

[14] https://x.com/bostonpolice/status/1267267653984452608

40. At 9:40pm, the BPD issued a Tweet that said: "Peaceful protesters along Tremont Street are asked to vacate the area. If you are a peaceful protestor, the time to vacate and go home is now" [Huffman 0021].

41. At 9:41pm, several protesters, including Plaintiff Huffman, protected a BPD officer who was being assaulted by crowd members. Shortly afterwards, the police vehicle that the officer had been driving was lit on fire by crowd members.[15]

42. At 9:44pm, the Massachusetts State Police began issuing a series of dispersal orders over a loudspeaker near the intersection of Tremont and Stuart. The announcements notified protesters that this was an unlawful protest and police would deploy tear gas if they did not disperse. After issuing six announcements at that location, police began deploying chemical agents. Many protesters backed up in response to the chemical agents, but did not leave the area.[16] Some people threw objects at the skirmish line that officers had formed across that intersection. Police continued to issue dispersal orders at that location and deploy chemical agents, and protesters continued to back up and then resume their protest activities once the chemical agents dissipated. To my knowledge, the dispersal orders at this location and time were the only amplified dispersal orders issued by police in Boston on the evening of May 31, 2020.

43. At 9:52pm, a journalist released a video clip showing a protester throwing a water bottle at police guarding the State Capitol.[17]

44. At 9:54pm, police radio traffic indicates that an M80 firecracker exploded near a police officer, injuring the officer.[18]

45. At 9:59pm, the BPD issued a Tweet that said: "Those protesting in the streets of Boston have surrendered the moral high ground as efforts to hurt and harm police officers continue to intensify in the city. Men and women of BPD doing their best to restore order and keep the peace" [Huffman 0022].

46. At 10:32pm, the BPD issued a Tweet that said: "Every law abiding citizen in Boston should be praying for the safety and well-being of our officers. To be clear, our officers are fighting to

---

[15] Watch 2 black protesters save a police officer after getting jumped by crowd - from youtube.mp4

[16] Body-worn video of Michael McManus (May 31, 2020)

[17] https://x.com/simonfrios/status/1267272782930497536

[18] 1705.05312020 THRU 06012020 CH01 1800 THRU 0300AM - CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER [audio file]

protect our city from those who came to Boston looking to disrupt a peaceful protests and hurt and harm police officers [Huffman 0021].

47. At 10:37pm, the BPD issued a Tweet that said: "The time for protesting is over. The peaceful protest ended hours ago. Individuals now congregating in the area of Boston Common and Downtown Crossing need to vacate the area and go home."[19]

48. At 11:48pm, the BPD issued a Tweet that said: "We say again, the time for protesting is over. The peaceful protest ended hours ago. Individuals now congregating and committing crimes in Boston need to vacate the area and leave our city."[20]

49. At approximately 3am on June 1, well after any incidents involving the Plaintiffs in this case, a man fired 10 shots at officers from inside of a car. He was arrested and charged with more than 20 counts of assault with intent to murder.[21]

### III.    Best Practices for Handling Large Protests

50. This section describes current best practices in policing crowd events. These best practices are based heavily on social science research evidence from psychology and criminology, particularly research on the psychology and behavior of crowds (hereafter referred to as "crowd psychology"). Understanding how crowds think and behave is useful for managing them and avoiding unintended consequences, including conflict and violence. My guidebook on policing protests notes that some protest policing practices "are consistent with current perspectives from crowd psychology while others are more consistent with older perspectives in crowd psychology that have since been discredited."[22] Basing police practices on an inaccurate or outdated understanding of crowd psychology "is a recipe for conflict and can endanger both crowds and the police."[23] Many of the key studies from crowd psychology with implications for policing were published and available to police well before 2020.

---

[19] https://x.com/bostonpolice/status/1267284115235184640

[20] https://x.com/bostonpolice/status/1267302031280222212

[21] https://www.wbur.org/news/2020/06/04/boston-protests-sunday-peaceful-police

[22]  Maguire & Oakley (2020), note 1 (p. 46).

[23] Maguire & Oakley (2020), note 1 (pp. 46-47).

## A. Insights from Crowd Psychology

51. Research evidence from crowd psychology is useful for understanding how conflict evolves between police and crowds. When police choose to rely primarily on aggressive crowd control tactics, particularly the use of indiscriminate force or mass arrests – rather than relying on softer crowd management approaches like de-escalation, communication, mediation, and negotiation – they tend to escalate conflict and increase the likelihood that crowds will react in a rebellious manner. This is especially true if police take enforcement action against an entire crowd in response to the misbehavior of a subset of its members. Under such circumstances, the entire crowd is much more likely to "unite around a sense of opposition to the police."[24]

52. Moreover, research evidence shows that when people in a crowd perceive that force is being used against them or their peers unfairly and/or illegally, they are more likely to turn their animus toward police.[25] Under such circumstances, protesters – even those who are ordinarily peaceful and law abiding – may begin to feel justified in resisting or behaving violently toward the police.[26] For these reasons, aggressive crowd control tactics tend to increase tension and conflict and place police officers, crowd members, and bystanders at greater risk.

53. As a result of these well-known crowd dynamics, experts have encouraged police agencies for many years to build their crowd management strategies around the use of dialogue-based approaches that seek to minimize tension and conflict and prevent intergroup violence between police and crowd members. The premature use of aggressive crowd control tactics tends to have the opposite effect, instigating or escalating tension and conflict. These intergroup dynamics can easily become a self-fulfilling prophesy in which actions taken by police ostensibly to prevent violence end up instigating or escalating violence instead.

54. One of the most useful principles from this line of research is a concept called the "transfer of grievance." This is the process through which protesters transfer their focus, whether partially or fully, away from the original object of the protest and toward authority figures like police or security officials. As noted by Her Majesty's Chief Inspector of the Constabulary in England and Wales, "the art of successfully policing public protest has always been to minimize this transfer

---

[24] Maguire & Oakley (2020), note 1 (p. 50).

[25] Maguire & Oakley (2020), note 1.

[26] Drury, J., & Reicher, S. (2000). Collective action and psychological change: The emergence of new social identities. *British Journal of Social Psychology, 39*(4), 579-604; Drury, J., & Reicher, S. (2009). Collective psychological empowerment as a model of social change: Researching crowds and power. *Journal of Social Issues, 65*(4), 707-725; Maguire, E. R. (2015). New directions in protest policing. *St. Louis University Public Law Review, 35*(1), 67-108; Maguire, E. R. (2022). Policing rival protests. In Schafer, J. A., & Myers, R. W. (Eds.), *Rethinking and reforming American policing* (pp. 289-309). Palgrave Macmillan; Stott, C., & Drury, J. (2000). Crowds, context and identity: Dynamic categorization processes in the 'poll tax riot'. *Human Relations, 53*(2), 247-273.

of grievance by allowing protesters a fair and reasonable chance to make their point peacefully"
(p. 7).[27]

## B. An Evidence-Based Framework for Policing Crowds

55. The research evidence I have just discussed has direct implications for policing protests.
Based on this research, British social psychologist Stephen Reicher and his colleagues have
developed an evidence-based strategic framework for policing crowd events, including
protests.[28] This framework is based on decades of research on crowd dynamics, including
interactions between police and crowds. Their framework has four components: education,
facilitation, communication, and differentiation.

56. *Education* is based on the principle that whenever possible, police should educate themselves
about "the social identities of the various groups in a crowd: their values and standards, aims and
goals, their sense of what is right and proper, their stereotypes and expectations of other groups,
their history of interaction with these groups and anything (dates, places, objects, forms of
action) which have particular symbolic significance."[29]  Part of this task will involve the use of
criminal intelligence to learn about whether people in the crowd have criminal histories or are
likely to engage in criminal behavior. However, policing crowd events in a skillful manner
requires police to know much more about the groups within crowds than criminal intelligence
would customarily provide. As Reicher and his colleagues note, "the same effort that is put into
identifying violent individuals should be put into obtaining an understanding of group
identity."[30]  This step is vital, particularly for enabling police to identify people who may be able
to help them de-escalate tensions and serve as allies or intermediaries with aggrieved groups.

57. *Facilitation* is based on the principle that police can go a long way toward preventing
conflict with crowds by seeking to facilitate their aims whenever possible. When police take the
time to identify the legitimate aims of protesters, for instance, they can then factor those aims
into their response plans. According to Reicher and his colleagues, if police are unable to
facilitate the needs of organizers, "it is essential not simply to give a negative response, but to be
positive and creative in finding alternative ways of meeting (and being seen to meet) the

---

[27] Her Majesty's Chief Inspector of Constabulary (2009). *Adapting to protest*.
https://www.justiceinspectorates.gov.uk/hmicfrs/media/adapting-to-protest-20090705.pdf

[28] Reicher, S., Stott, C., Cronin, P., & Adang, O. (2004). An integrated approach to crowd psychology and public
order policing. *Policing: An International Journal of Police Strategies & Management, 27*(4), 558-572.

[29] Reicher et al. (2004), note 28 (p. 566).

[30] Reicher et al. (2004), note 28 (p. 566).

underlying aims." If the threat of violence leads police "to impose limits on the crowd, it is especially important to make clear why it has been necessary to impose these limits and to provide alternative means by which legitimate aims can be met."[31]

58. *Communication* is based on the principle that dialogue enhances mutual understanding, minimizes the likelihood of misunderstandings, and reduces the risk of tension, conflict, and violence. My guidebook on policing protests urges police to communicate with event organizers or leaders (whether formal or informal) before, during, and after protest events. It states that "communication is the principal mechanism through which police can discover the aims of event organizers and how police can best facilitate these aims. It is also the best way for police to learn about potential public order or public safety problems and try to prevent them together with event organizers and participants."[32]

59. *Differentiation* is based on the principle that when police adopt a one-size-fits-all solution to managing crowds, they set in motion the building blocks for tension, conflict, and violence. While police tend to view crowds as homogeneous, research evidence from many different types of crowd events, including protests, reveals that crowds are often heterogeneous. For instance, research shows that protests tend to attract people with widely differing perspectives on the utility or morality of using aggressive protest tactics such as property damage and violence. Reicher and his colleagues advise police: "Do not treat all crowd members as the same. Be aware of their different identities, their different ways of acting and reacting." They further note that differentiation is not "an element to be 'tagged on' at the end of a list of policing options. Rather it is a consideration that must be built into every tactical or strategic decision into training, planning, equipping, briefing and operating in crowds."[33]

## C. Additional Considerations

60. In addition to the four elements I have already discussed, research shows that two additional considerations play a key role in shaping the risk of conflict and violence during crowd events. The first is known as a graded response plan. In a graded response, officers do not deploy to crowd events in riot gear unless violence is imminent or already occurring. Instead, "tactical assets are available nearby and are able to be deployed rapidly if needed, but they are not visible to the crowd. If they are visible to the crowd, instead of enhancing officer safety they may place officers at greater risk by escalating matters."[34]  As noted in my guidebook on policing protests,

---

[31] Reicher et al. (2004), note 28 (p. 567).

[32] Maguire & Oakley (2020), note 1 (p. 68).

[33] Reicher et al. (2004), note 28 (pp. 568-569).

[34] Maguire & Oakley (2020), note 1 (p. 78).

one of the most important ingredients for preventing violence during crowd events is for "crowds to perceive police officers as human beings rather than as soldiers or robots."[35]

61. This same principle was embraced by police professional associations before the GFP in 2020. For example, a discussion paper on crowd management issued by the International Association of Chiefs of Police recommends that "full civil disturbance gear and related equipment should be staged at key locations—but should not be issued initially in crowd management situations, as it may escalate tensions and anxiety (p. 4)."[36]  Similarly, the Police Executive Research Forum advises police agencies to "keep riot gear and heavy equipment nearby but out of sight, in order to avoid giving the impression that they are expecting a riot, or are planning an aggressive response to a peaceful demonstration (p.47)."[37]

62. The second additional consideration is an influential concept known as procedural justice. This concept refers to people's assessments of the extent to which authority figures treat them fairly, based on the use of fair processes and procedures. People routinely make judgments about the level of procedural justice they experience in their interactions with authority figures, including police officers. Decades of research show that these procedural justice judgments play an important role in people's decisions about whether to obey the law or the directives of legal authorities such as police officers. When police officers treat people in a manner that is perceived as procedurally unjust or unfair, those people are less likely to view police (and the law more generally) as legitimate, and are therefore less likely to cooperate or comply with directives issued by police officers.[38]

63. Beyond simply triggering a lack of cooperation and compliance, the perception that police officers are engaging in procedurally unjust behavior can also trigger outright *defiance*. As used by criminologists, the term "defiance" refers to increases in "the prevalence, incidence, or seriousness of future offending…" as a reaction to perceptions of unfairness by an authority figure. The perception of unfairness often results from one or both of two conditions. The first is when an authority figure behaves in a disrespectful manner toward an individual or a group. The

---

[35] Maguire & Oakley (2020), note 1 (p. 78).

[36] International Association of Chiefs of Police (2019). *Concepts and Issues: Crowd Management*. https://www.theiacp.org/resources/policy-center-resource/crowd

[37] Police Executive Research Forum (2022). *Rethinking the police response to mass demonstrations: 9 recommendations*. https://www.policeforum.org/assets/ResponseMassDemonstrations.pdf

[38] Maguire, E. R., Lowrey, B. V., & Johnson, D. (2017). Evaluating the relative impact of positive and negative encounters with police: A randomized experiment. *Journal of Experimental Criminology, 13*(3), 367-391; Mazerolle, L., Bennett, S., Davis, J., Sargeant, E., & Manning, M. (2013). Procedural justice and police legitimacy: A systematic review of the research evidence. *Journal of Experimental Criminology, 9*(3), 245-274.Tyler, T. R. (2006). *Why people obey the law.* Princeton University Press.

second is when an authority figure's decisions in relation to an individual or group are perceived as "arbitrary, discriminatory, excessive, undeserved, or otherwise objectively unjust."[39]  One of the key challenges in developing evidence-based crowd management strategies is enforcing the law in a manner that does not trigger crowd defiance and make matters worse.

64. For example, research during the Occupy Wall Street movement found that procedural justice judgments have a powerful influence on protesters' attitudes and behaviors toward using violence against police officers. Put briefly, when protesters believe that police officers have treated them and their peers unfairly, they are more likely to view the use of violence against police officers as morally appropriate and to defy police authority. These findings reveal an interesting irony associated with policing crowds. Though police often adopt aggressive crowd control measures during protests to ensure officer safety, if these measures are perceived as unfair by protesters, they are likely to result in more risk to officers, not less.[40]

65. Research in a variety of contexts has found that group members, including protesters, make procedural justice judgments at both the individual level ("am I being treated fairly?") and at the group level ("is the group being treated fairly?"). For police to be most effective when policing groups, and to prevent inadvertently triggering defiance and rebellion, they must behave in a manner that is perceived by group members as fair and impartial.[41]

66. The importance of procedural justice in policing was a core emphasis of the President's Task Force on 21st Century Policing. The Task Force's final report, issued in 2015, noted that "people are more likely to obey the law when they believe that those who are enforcing it have the legitimate authority to tell them what to do. But the public confers legitimacy only on those who they believe are acting in procedurally just ways" (pp. 9-10).[42]  When the community trusts that

[39] Sherman, L. W. (1993). Defiance, deterrence, and irrelevance: A theory of the criminal sanction. *Journal of Research in Crime and Delinquency, 30*(4), 445-473; also see Bouffard, L.A., & Sherman, L.W. (2014). Defiance theory. In G. Bruinsma, & D. Weisburd (Eds.), *Encyclopedia of criminology and criminal justice* (pp. 925-932). Springer.

[40] Maguire, E. R., Barak, M., Cross, K., & Lugo, K. (2018). Attitudes among Occupy DC participants about the use of violence against police. *Policing and Society, 28*(5), 526-540; Maguire, E., Barak, M., Wells, W., & Katz, C. (2020). Attitudes towards the use of violence against police among Occupy Wall Street protesters. *Policing: A Journal of Policy and Practice, 14*(4), 883-899; Tyler, D. H., Barak, M., Maguire, E. R., & Wells, W. (2018). The effects of procedural injustice on the use of violence against police by Occupy Wall Street protesters. *Police Practice and Research, 19(*2), 138-152.

[41] See: Jonathan-Zamir, T., Perry, G., & Weisburd, D. (2021). Illuminating the concept of community (group)-level procedural justice: A qualitative analysis of protestors' group-level experiences with the police. *Criminal Justice and Behavior, 48*(6), 791-809; O'Brien, T. C., & Tyler, T. R. (2020). Authorities and communities: Can authorities shape cooperation with communities on a group level? *Psychology, Public Policy, and Law, 26*(1), 69–87; Perry, G., Jonathan-Zamir, T., & Weisburd, D. (2017). The effect of paramilitary protest policing on protestors' trust in the police: The case of the "Occupy Israel" movement. *Law & Society Review, 51*(3), 602-634.

officers are behaving in a lawful and appropriate manner, they feel more "obligated to follow the law and the dictates of legal authorities."[43]

## D. Standards and Practices Recommended by Police Professional Organizations

67. The various principles and practices I have just outlined are not only found within the scientific literature on crowd psychology and the policing of crowds. They are also clearly evident in the recommendations, policies, and professional standards promulgated by police professional associations and other law enforcement bodies. Below I highlight some of the perspectives from within the policing profession on standards and practices for handling crowd events, including protests, rallies, and riots.

68. A report from the National Policing Institute and the Office of Community Oriented Policing Services (a component of the U.S. Department of Justice) notes that "ongoing efforts to communicate with demonstrators and other community members before, during, and after events can… relay peaceful intentions and support de-escalation during otherwise tense situations." The report further notes that how officers behave during a protest – such as adopting militaristic or overly forceful tactics or treating protesters disrespectfully – "can antagonize them and escalate already tense situations" (p. 44).[44]

69. A 2006 report from the Police Executive Research Forum (PERF) notes that "police should seek to facilitate any lawful and legitimate aims of groups who are present – especially when conflict breaks out. The aim should be to permit the pursuit of lawful actions while dealing with groups" (p. 54). The report further recommends that police should communicate with crowd members about how police "are seeking to facilitate the crowd's legitimate aims and how the illegitimate actions of some in the crowd may serve to impede those aims" (p. 54). Treating crowd members with respect helps "win them to law enforcement's side" rather than to the side of people who are promoting conflict and violence (p. 54).[45]

---

[42] President's Task Force on 21st Century Policing (2015). *Final Report of the President's Task Force on 21st Century Policing*. https://cops.usdoj.gov/pdf/taskforce/taskforce_finalreport.pdf

[43] *President's Task Force on 21st Century Policing (2015)*, note 42 (p. 10).

[44] National Policing Institute and Office of Community Oriented Policing Services (2022). *21st century protest response: Promoting democracy and advancing community and officer safety*. https://cops.usdoj.gov/RIC/Publications/cops-p459-pub.pdf

[45] Police Executive Research Forum (2006). *Police management of mass demonstrations: Identifying issues and successful approaches*. https://www.policeforum.org/assets/docs/Critical_Issues_Series/police%20management%20of%20mass%20demonstrations%20-%20identifying%20issues%20and%20successful%20approaches%202006.pdf

70. A 2011 PERF report notes that "when dealing with law-breaking protesters, don't forget that thousands of nonviolent protesters are merely exercising their First Amendment rights. So the police must differentiate the lawbreaking protesters from those who are peaceful" (p. 34).[46]

71. A 2022 PERF report notes that policing mass demonstrations is personnel intensive, but in cities where "police have built trust with many community members and leaders, there will be less need for a massive police response."[47]  The report recommends that community leaders "should be invited to serve as observers and partners to police during demonstrations."[48] Community leaders can help serve as intermediaries between police and demonstrators, improving intergroup communication and reducing misunderstandings that can lead to conflict. Instituting these types of police-community partnerships during demonstrations can help to reduce "the 'us-against them' mentality that sometimes occurs when police respond to protests on their own."[49]

72. The 2022 PERF report also notes that police leaders should make it clear to officers that their role during demonstrations is "to facilitate safe and lawful First Amendment expression."[50]  One way to accomplish this objective is to ensure that officers receive sufficient training on "crowd management strategies that facilitate peaceful protest."[51]  Such training should focus on "distinguishing between peaceful protesters" and people who are engaged in violent behavior, engaging with protesters in a respectful manner and "not in any way that may come across as antagonizing them," and "understanding crowd psychology and how to keep large groups calm."[52]  The PERF report also recommends that police agencies provide officers with training on the use of de-escalation during crowd events. "In the context of demonstrations, de-escalation training could include a discussion of how officers should try to win the trust of demonstrators by taking a reasonable approach to solving minor problems resulting from a demonstration, avoiding an unnecessarily heavy-handed enforcement approach."[53]

---

[46] Police Executive Research Forum (2011). *Managing major events: Best practices from the field.* https://www.policeforum.org/assets/docs/Critical_Issues_Series/managing%20major%20events%20-%20best%20practices%20from%20the%20field%202011.pdf

[47] Police Executive Research Forum (2022), note 37 (p. 12).

[48] Police Executive Research Forum (2022), note 37 (p. 12).

[49] Police Executive Research Forum (2022), note 37 (p. 12).

[50] Police Executive Research Forum (2022), note 37 (p. 25).

[51] Police Executive Research Forum (2022), note 37 (p. 28).

[52] Police Executive Research Forum (2022), note 37 (p. 29).

[53] Police Executive Research Forum (2022), note 37 (p. 30).

73. A discussion paper accompanying a model crowd management policy established by the International Association of Chiefs of Police (IACP) notes that police should try "to identify and make advance contact with event organizers in order to gather information and establish the ground rules for the event" (p. 3).[54]  Furthermore, officers should "maintain a professional, neutral demeanor" and "focus on conveying the message that law enforcement is there to protect crowd participants and their right to demonstrate peacefully."[55]

74. Her Majesty's Chief Inspector of Constabulary in England and Wales notes that: "Indiscriminate use of force by the police can create a sense of unity in the crowd through a common perception of the illegitimacy of police action and corresponding opposition in response. Perceptions of police legitimacy are critical because they affect the crowd's internal dynamics, facilitating or undermining the ability of those seeking conflict to exert social influence over others in the crowd. Consequently, there is an increase in the numbers within the crowd who perceive conflict against the police as acceptable or legitimate behaviour, thereby empowering those prepared to engage in physical confrontation with the police. In this way, the crowd is drawn into conflict even though the vast majority had no prior intention of engaging in disorder" (p. 86).[56]

**E. Summary**

75. Best practices for handling large protests are premised on the importance of preventing conflict and violence through the application of evidence-informed crowd management strategies. Crowd control tactics are sometimes necessary, but they should be treated as a last resort when crowd management strategies have proven insufficient to quell property damage, violence, and other unlawful behaviors. The full spectrum of strategies and tactics associated with crowd management and control should be woven into departmental policies, training, and structures to ensure that officers handle crowd events appropriately. These best practices were well-known in U.S. policing for years prior to the GFP in 2020.

---

[54] International Association of Chiefs of Police (2019), note 36.

[55] International Association of Chiefs of Police (2019), note 36 (p. 6).

[56] Her Majesty's Chief Inspector of Constabulary (2009). *Adapting to protest: Nurturing the British model of policing*. https://www.justiceinspectorates.gov.uk/hmicfrs/media/adapting-to-protest-nurturing-the-british-model-of-policing-20091125.pdf

## IV.    BPD Policies

76. The principal documents outlining the BPD's policies relevant to this case are the *BPD Rules and Procedures*.[57] These documents cover policies and procedures governing BPD administration and operations. For instance, they include policies and procedures associated with territorial operations, organizational structure, disciplinary procedures, using force, handling evidence, making arrests, investigating crimes, and many other topics.

77. In addition to the *BPD Rules and Procedures*, the BPD also allows for the Police Commissioner to issue Special Orders that change previously existing policies and procedures [see BPD Rule 112]. For purposes of this report, these Special Orders constitute BPD policies. Below I outline several concerns with BPD policies that are relevant to this case.

**A. BPD Policies Associated with Crowd Management and Crowd Control were Inaccurate, Incomplete, and Outdated**

78. The principal document outlining BPD policies for handling crowd events is Rule 200, entitled "Critical Incident Management." The version that was in effect during the GFP was dated August 16, 2002 [see BPD Rule 200, D1 – D74]. The document is 74 pages long. The purpose of the document is to "establish the policy of the Boston Police Department for its response to and management of all critical incidents" [D1].

79. The main body of Rule 200 [D1 – D33] outlines the BPD's response to critical incidents in general, including incidents involving crowds. Starting on page D33 there are eight addenda to the policy, lettered A through H. Addendum B to Rule 200 is entitled "Crowd Control Situation" [D43-D53].

80. Addendum B starts with a statement about the First Amendment and the rights it affords. The policy states that "The Boston Police Department not only recognizes the right of free speech but also will actively protect people in the exercise of this right… It is "the policy of the Boston Police Department that during marches, demonstrations, protests or rallies, whether they are planned or unplanned and/or possess parade permits or lack such permits, to preserve the peace while protecting the rights of all those assembled and protecting the property of all" [D44]. It is appropriate for crowd-related policies in police departments to include statements like this affirming their commitment to honoring the First Amendment during crowd events.

81. Addendum B further states that in crowd control situations in which protesters are engaging in unlawful conduct, the BPD will "make reasonable efforts to employ 'non-arrest' methods of crowd management as the primary means of restoring order" [D44]. These methods include

---

[57] https://police.boston.gov/rules-procedures

"establishing contact with the crowd and obtaining voluntary compliance with police directives to minimize enforcement actions" [D44]. It is appropriate for crowd-related policies to include statements like this emphasizing the agency's commitment to using dialogue and other crowd management methods that do not rely primarily on using force or making mass arrests during crowd events.

82. While Rule 200 contains certain provisions that are consistent with generally accepted police standards and practices, other provisions are inaccurate or misleading. For example, page D44 states that "a crowd is quick to sense fear, indecision, poor organization, and training on the part of police officers and will take instantaneous advantage of it." I am unaware of any evidence to support this bold assertion about the psychology and behavior of crowds. It portrays crowds as being inherently negative and ready at a moment's notice to act with ill intent. This pessimistic perspective is contrary to a strong body of research evidence on the prosocial behaviors of crowds.[58] Moreover, this statement fails to mention one of the key findings from research on crowd psychology over the past four decades: when police behave in an overly forceful manner during crowd events, their actions often instigate or escalate conflict and violence. If the BPD is going to make statements about crowd psychology and behavior in its crowd control policy, it should take careful steps to ensure that it states the scientific evidence accurately.

83. Similarly, pages D45 and D46 outline three types of crowd control situations: organized marches and demonstrations with an orderly crowd, peaceful civil disobedience, and non-peaceful civil disobedience. Unfortunately, this taxonomy provides officers with an inaccurate portrayal of the types of crowd events they are most likely to face. Many protests involve a large number of people who are engaged in lawful behavior and a small number of people who engage in more destructive or violent behavior. The most appropriate means of policing events like this is called *differentiation* (see ¶ 59), which means responding differently to those who are behaving peacefully and lawfully and those who are behaving in a violent or destructive manner. Labelling entire *events* as either peaceful or non-peaceful is dangerous because a binary perspective of this sort is likely to encourage the use of more aggressive police tactics during events labelled as non-peaceful. Decades of research have shown that such a response has a strong likelihood of instigating or escalating tension, conflict, and violence.[59]

---

[58] Drury, J. (2012). Collective resilience in mass emergencies and disasters: A social identity model. In J. Jetten, C. Haslam, & S. A. Haslam (Eds.), *The social cure: Identity, health and well-being* (pp. 195–215). Psychology Press; Drury, J., Cocking, C., & Reicher, S. (2009a). Everyone for themselves? A comparative study of crowd solidarity among emergency survivors. *British Journal of Social Psychology, 48*(3), 487–506; Drury, J., Cocking, C., & Reicher, S. (2009b). The nature of collective resilience: Survivor reactions to the 2005 London bombings. *International Journal of Mass Emergencies & Disasters, 27*(1), 66–95; Drury, J., &Winter, G. (2003). Social identity as a source of strength in mass emergencies and other crowd events. *International Journal of Mental Health, 32*(4), 77–93; Maguire, E. R., Tyler, D. H. F., Khade, N., & Mora, V. (2024). Crowd reactions to the police use of force at the 2017 Phoenix Trump rally. *Psychology, Public Policy, and Law, 30*(2), 223–235.

[59] Maguire & Oakley (2020), note 1.

84. Aside from provisions that are inaccurate or misleading, Rule 200 is also missing key provisions that should be included in crowd-related policies. For instance, the 74-page policy contains no mention whatsoever of dispersal orders, including when, why, or how to issue them. It is inconceivable, and contrary to generally accepted police standards and practices, that a major city police department's policy on handling crowds would contain no provisions for issuing dispersal orders. For example, the model policy on crowd management established by the International Association of Chiefs of Police in April of 2019 (and freely available on the IACP's website) contains an entire section that outlines procedures for dispersing crowds, including the use of dispersal orders.[60] Similarly, the Police Executive Research Forum's guidelines on policing mass demonstrations go into great detail about the importance of warning demonstrators before using force or making mass arrests.[61]

85. Rule 200 is also missing provisions associated with other key issues. For example, while the policy contains detailed coverage of internal department communications during critical incidents and crowd events, it contains very little discussion of external communications. With regard to crowd events, the policy states that the Department should aim to establish contact with the crowd and obtain voluntary compliance with police directives, but it provides no details about who should do it or how it should be done. Later, the policy states that the patrol supervisor shall attempt to contact the protest organizers and "find out their intentions, their route of march and/or the length of their protest." The mismatch in coverage between internal and external communication is not a minor issue. The single most powerful strategy for preventing and minimizing tension, conflict, and violence during crowd events is dialogue between police and crowd members.[62] By largely ignoring the importance of dialogue, this policy sets up police to rely primarily on aggressive crowd control tactics rather than more effective, evidence-based crowd management strategies.

86. Rule 200 also contains no coverage of training to ensure that officers know how to carry out the duties the policy requires them to execute. Training in a broad range of crowd control and crowd management topics is essential for ensuring that an agency is able to execute the provisions outlined in the policy. For example, the IACP model policy on crowd management states that officers should receive initial and ongoing training in both crowd control and crowd management. It also states that officers should engage in joint training with other agencies that

---

[60] International Association of Chiefs of Police (2019), note 36

[61] Police Executive Research Forum (2022), note 37 (pp. 38-40).

[62] Maguire & Oakley (2020), note 1; Reicher et al. (2004), note 28; Stott, C., Adang, O., Livingstone, A., & Schreiber, M. (2008). Tackling football hooliganism: A quantitative study of public order, policing and crowd psychology. *Psychology, Public Policy, and Law, 14*(2), 115-141.

may be involved in responding to crowd events.[63] By not emphasizing the need for training, Rule 200 does not ensure that officers are appropriately prepared to respond in a professional manner during crowd events.

87. Rule 200 also contains no coverage of evidence preservation during these events. Critical incidents and crowd events are often chaotic and require special provisions to ensure that all evidence, including photographic and video evidence, is captured and documented appropriately. For example, the IACP model policy on crowd management notes that "photographic or video evidence of crowd actions and officer response should be captured…" It further notes that "photographs or videos of any injuries sustained by law enforcement officers or the public should be taken."[64] Such evidence is crucial for writing accurate reports (including incident, offense, arrest, and use-of-force reports), conducting post-event investigations, and writing after-action reports. The absence of such evidence often hampers both criminal investigations and internal evaluations of alleged employee misconduct.

88. Aside from having content that is inaccurate, misleading, or missing altogether, Rule 200 is also outdated. One clear indicator that Rule 200 has not been carefully and regularly updated since its inception in 2002 is that it still lists the FN-303 projectile system as an authorized form of less-lethal force [D47].[65] The FN-303 was the weapon that killed 21-year old Victoria Snelgrove in 2004 during a chaotic celebration after the Boston Red Sox defeated the New York Yankees in game 7 of the American League Championship Series.[66] The BPD stopped using the FN 303 after this incident.[67] Yet, nearly 16 years later, the device was still listed in the BPD's crowd control policy during the GFP in the summer of 2020 [D47]. Moreover, it remains in the policy today, nearly 20 years later.[68]

89. Rule 200 also notes that the BPD uses the "Jay-Cor" PepperBall system and 37mm launchers. While the PepperBall platform still exists, JayCor, Inc. has not owned the brand for more than two decades. Moreover, while the BPD's less-lethal weapons policy authorizes the use

---

[63] International Association of Chiefs of Police (2019), note 36.

[64] International Association of Chiefs of Police (2019), note 36.

[65] The FN-303 is a less-lethal .68 caliber launcher manufactured by FN Herstal, For more information, see: https://fnamerica.com/products/less-lethal/fn-303-tactical-launcher

[66] Stern, D. K., Downs, R., Gittens, R. P., Howe, J. W., Ijames, S., King, P. J., & Stone, C. E. (2005, May 25). *Commission investigating the death of Victoria Snelgrove.* https://www.cityofboston.gov/images_documents/sternreport_tcm3-8954.pdf

[67] *New York Times* (2007, Feb. 23). Boston Police to destroy pepper-spray guns. https://www.nytimes.com/2007/02/23/us/23pepper.html

[68] Boston Police Department (2024, May 30). Rules and Procedures, Rule 200: Critical Incident Management. https://police.boston.gov/rules-procedures

of 40mm launchers, it does not authorize the use of 37mm launchers. The fact that these weapons platforms remain in Rule 200 serves as further evidence that the policy (including Addendum B) is dated and has not been carefully updated over time. It is vital for police agencies to revise policies on a regular basis to ensure that they remain accurate and up-to-date. Revising crowd-related policies regularly enables police agencies to incorporate newly available information on effective and ineffective crowd management practices from multiple sources, including from their own experiences, from within the policing profession, and from research evidence on policing crowds. Allowing crowd-related policies to become outdated over time provides officers and those who supervise and lead them with insufficient guidance on policing crowd events.

90. In short, the principal policy that guides the BPD's response to crowd events is inaccurate, incomplete, and outdated. These policy issues caused, in part, the injuries and constitutional violations experienced by the Plaintiffs and others.

**B. BPD Policies on Use of Force and Less-Lethal Weapons were Inaccurate and Incomplete**

91. The principal documents outlining BPD policies on the uses of force most relevant to this case are Rule 303 ("Use of Deadly Force"), Rule 303A ("Use of Less Lethal Force"), Rule 303D ("Use of Less-Lethal Force, 40mm Direct Impact Launcher"), and Rule 304 ("Use of Non-Lethal Force").

92. The version of Rule 303 that was in effect during the GFP is dated April 11, 2003, approximately 17 years before the events at issue in this case (May 29-31, 2020). It is vital to for police agencies to update their policies on a regular basis, particularly for weighty issues like the use of deadly force. Use of force policies in U.S. police departments changed in many ways from 2003 to 2020. By 2020, these policies were more likely than they were previously to contain provisions for issues such as the following: slowing encounters down through the use of time, distance, and cover; the use of de-escalation; the sanctity of life; the use of chokeholds and strangleholds; and mechanisms for enhancing accountability, transparency, and trust. Rule 303 does not address these issues.

93. While Rule 303 contains numerous provisions that are consistent with generally accepted police standards and practices, the policy focuses entirely on deadly force involving the use of firearms. It is well known in policing that deadly force can be administered using many different types of weapons, including those that the BPD classifies as "less-lethal" and "non-lethal." This was one of the points raised by the Stern Commission that investigated the death of Victoria Snelgrove in Boston in 2004. The Commission noted that although the BPD treats batons as non-lethal, "certainly batons can produce deadly injuries when abused" (p. 39).[69] Similarly, many

---

[69] Stern et al. (2005), note 66 (p. 39).

agencies treat the use of less-lethal kinetic impact projectiles as forms of deadly force when aimed at the head or other vulnerable parts of the body. The IACP recommends that impact projectiles should not intentionally be directed at the head, neck, throat, genitals, or spinal column unless deadly force is authorized.[70]

94. The IACP acknowledges these issues in defining deadly force as "any use of force that creates a substantial risk of causing death or serious bodily injury" (p. 10). The IACP further states that the difference between deadly force and less-lethal force "is not determined simply by the nature of the force technique or instrument that is employed by an officer. Many force options have the potential to result in the death or serious bodily injury…" (p. 10).[71]

95. In short, by failing to acknowledge that many types of force other than the use of firearms can be lethal, Rule 303 minimizes the potential risks of these other types of force. After the death of Victoria Snelgrove in 2004, the BPD should have been well aware of these risks and incorporated them into their deadly force policy. Due to this shortcoming, Rule 303 is inconsistent with generally accepted police standards and practices and provides officers and those who supervise and lead them with insufficient guidance on using force.

96. The version of Rule 303A that was disclosed by the Defendants is dated June 22, 2000, nearly 20 years before the events at issue in this case. Once again, it is vital for police policies to be updated regularly to ensure that they remain up-to-date, particularly for serious issues like the use of force. Not updating a use of force policy for two decades is contrary to generally accepted police standards and policies.

97. Rule 303A contains certain provisions that are consistent with generally accepted police standards and practices. However, despite its title ("Use of Less-Lethal Force"), it is an incomplete less-lethal force policy. The only type of force it mentions is the use of a 12-gauge shotgun to fire a "Super Sock" round (often referred to as a beanbag round).[72] There are many types of less-lethal force beyond this one specific weapon type and projectile. Ordinarily a less-lethal weapons policy would cover *all* of the less-lethal weapon types authorized by the agency. For example, during the GFP, the BPD deployed CS ("tear gas") to disperse crowds. CS can be an effective mechanism for crowd dispersal, but the rules of engagement and other guidelines for

---

[70] International Association of Chiefs of Police (2023, Feb.). *Impact projectiles* [model policy]. IACP Law Enforcement Policy Center.

[71] International Association of Chiefs of Police (2017, Oct.). *National consensus policy and discussion paper on use of force* (p. 10).

[72] The Super-Sock™ round is a less-lethal projectile manufactured by Combined Tactical Systems. https://www.combinedsystems.com/product/2581-12ga-super-sock-bean-bag-priced-individually-per-cartridge-must-order-in-quantities-of-5/

its use should be carefully elaborated in the Department's less-lethal force policy. However, the use of CS is not described in Rule 303A or any other BPD less-lethal force policies.

98. Furthermore, even from the perspective of a policy solely focused on the use of 12-gauge shotguns to fire beanbag rounds, the policy is missing crucial elements. For example, research has shown that kinetic impact projectiles, including beanbag rounds, can cause death, serious injury, and permanent disability, particularly when fired at vulnerable targets like the head, neck, and genitalia.[73] Yet Rule 303A does not discuss these risks. Policies outlining the appropriate use of kinetic impact projectiles like beanbag rounds typically include a listing or image outlining authorized and unauthorized target areas, but Rule 303A does not contain this information. Kinetic impact projectiles, including beanbag rounds, can also be particularly dangerous when fired into crowds, yet the policy does not discuss the dangers of deploying them in this setting. In short, as a policy on the use of less-lethal force, Rule 303A is missing much of the content that would ordinarily be included in such a policy. Even when viewed solely as a policy on the use of 12-gauge shotguns to fire beanbag rounds, the policy fails to address the risks of using such weapons and the steps officers can take to minimize those risks.

99. Two versions of Rule 303D disclosed by the Defendants predate the GFP in Boston by approximately two years, one dated June 19, 2018 [D 007315 – D 007317] and the other dated June 27, 2018 [D010335 – D010337]. Here I focus on the latter since it was presumably the policy in effect at the time of the GFP.

100. Rule 303D covers the use of the 40mm launcher. The policy contains numerous provisions that are consistent with generally accepted police standards and practices, but the policy is missing crucial elements. For example, as noted in ¶ 98, kinetic impact projectiles can cause death, serious injury, and permanent disability, particularly when fired at vulnerable targets like the head, neck, and genitalia. Yet Rule 303D does not discuss these risks and does not specify authorized and unauthorized target areas. Kinetic impact projectiles can also be particularly dangerous when fired into crowds, yet the policy does not discuss the dangers of deploying them in this setting.[74] In short, Rule 303D fails to address the risks of using such a weapon and the steps officers can take to minimize those risks.

---

[73] de Brito, D., Challoner, K. R., & Mallon, W. (2001). The injury pattern of a new law enforcement weapon: The police bean bag. *Annals of Emergency Medicine, 38*(4), 383-390; Haar, R. J., Iacopino, V., Ranadive, N., Dandu, M., & Weiser, S. D. (2017). Death, injury and disability from kinetic impact projectiles in crowd-control settings: A systematic review. *BMJ Open, 7*(12), e018154; Marrufo, A. S., Boyd, W. D., & Leshikar, D. E. (2019). Minimally invasive surgical management of penetrating chest injury from kinetic impact bean bag projectile. *Trauma Case Reports, 22*, 100210; Olson, K. A., Haselden, L. E., Zaunbrecher, R. D., Weinfeld, A., Brown, L. H., Bradley, J. A., ... & Aydelotte, J. D. (2020). Penetrating injuries from "less lethal" beanbag munitions. *New England Journal of Medicine, 383*(11), 1081-1083.

[74] Haar, R. J., Iacopino, V., Ranadive, N., Dandu, M., & Weiser, S. D.  (2017), note 73.

101. The version of Rule 304 that was in effect during the GFP is dated May 29, 2020 [D007318-D007324]. The policy refers to the use of a baton as "non-lethal force." As noted earlier in this report (see ¶¶ 93-95), batons can cause serious injury, permanent disability, or death if used improperly. Consider the following passage from the International Association of Chiefs of Police:

> *For example, a police baton, if used properly in accordance with professionally accepted training guidelines, is not likely to cause death. But it can result in the death of subjects when used inappropriately by an officer who lacks training, or in situations where blows are accidentally struck to the head or other vulnerable area of the body.*[75]

In 2005, the Stern Commission made a similar point based on its investigation of the BPD following the death of Victoria Snelgrove. The Commission recommended that the BPD stop using the term "nonlethal" and use the term "less-lethal" to describe all of its weapons that are not intended to be lethal.[76] The BPD did not heed that recommendation.

102. In summary, BPD policies on the use of force and l**ess**-lethal weapons were inaccurate and incomplete. As a result, they provided officers and those who supervise and lead them with insufficient guidance on the use of force during crowd events. I reserve the right to amend my opinions should new evidence become available.

## C. BPD Policies on Mutual Aid were Incomplete

103. To my knowledge, the Defendants did not disclose a mutual aid policy during discovery, but I was able to locate such a policy on the BPD's website.[77] The BPD's mutual aid policy is contained in Rule 328, which was established on January 26, 2007. The policy describes the procedures for BPD officers responding to mutual aid requests from outside agencies and communities. However, it does not describe the procedures through which the BPD issues its own mutual aid requests and manages personnel from outside agencies who respond to those requests or otherwise render assistance during critical incidents, including crowd events. These are important details because agencies working together during critical incidents need to coordinate, communicate, and operate under a clear and shared set of principles and rules of engagement. Agencies that request mutual aid or that work alongside other agencies during critical incidents should have policies governing these joint operations. The absence of such a policy in the BPD is contrary to generally accepted police standards and practices.

---

[75] International Association of Chiefs of Police (2017, Oct.). *National consensus policy and discussion paper on use of force.* https://www.theiacp.org/sites/default/files/all/n-o/National_Consensus_Policy_On_Use_Of_Force.pdf

[76] Stern et al. (2005), note 66.

[77] https://police.boston.gov/rules-procedures

**D. Summary**

104. My review of BPD policies associated with three topic areas that are directly relevant to this case – crowd management and control, use of force and less lethal weapons, and mutual aid – finds deficiencies in all three. BPD policies on these topics are contrary to generally accepted police standards and practices.

## V. BPD Training

### A. BPD Provided Officers with Inaccurate, Incomplete, and Outdated Training on Crowd Management and Control

105. Below is a table listing the most relevant training materials produced by the City of Boston in this case. The table lists the title of the document or video, the date of creation/publication (where available), and a brief description. This table is not intended to analyze the training materials, but to set forth the scope of materials that helped inform the analysis undertaken in this section of the report.

| Title and Bates Number | Date | Description |
|---|---|---|
| Center for Domestic Preparedness, *Mobile Field Force Formations and Commands* [D176 – D192] | N/A | This is a 17-page document that covers crowd control formations for mobile field forces. |
| Boston Police Academy, *Use of Force, Defensive Tactics, 2019 edition* [D1994-D2134] | N/A | This is a 141-page document that appears to be used by the Boston Police Academy to provide training on use of force. |
| Center for Domestic Preparedness, *Field Force Operations* PER-200 [D008905-D009042] | N/A | This is a 138-page document that covers basic Field Force Operations. |
| Boston Police Academy, *Crowd Control* [D09317-D09400] | 2016 | This is an 84-page document that appears to be used by the Boston Police Academy to provide training on crowd control. |
| Crowd Control Theory and Tactics [D09566-D09596] | N/A | This is a 31-page presentation on crowd control formations. |
| Introduction to Chemical Munitions [D09597-D09674] | N/A (possibly 2020?) | This is a 78-page document that teaches BPD patrol officers about chemical munitions. |

| BPD Crowd Management video | N/A | This is a video (23:13 in length) that teaches crowd control tactics, including the use of formations, gas masks, and flex-cuffs. |
|---|---|---|

106. As evidenced by the above table, most of the training materials produced by the City of Boston that are relevant to the BPD's response to crowd events are undated, thus it is unclear when they were last updated. Moreover, several of them include content that is inaccurate, inconsistent with scientific research evidence, and outdated. These training materials need to be updated and aligned with nationally accepted police standards and practices. Below I discuss each document/video listed in the table.

107. The BPD disclosed an undated 17-page presentation from the Center for Domestic Preparedness entitled "Mobile Field Force Formations and Commands." This document introduces standard Mobile Field Force tactics for crowd control purposes. It also includes a sample dispersal order.

108. The BPD disclosed an undated 141-page document entitled "Use of Force Defensive Tactics, 2019 Edition." The document includes a wide variety of content associated with defensive tactics, such as BPD policies, case law, and defensive tactics training materials. Below I review only the training material that is most directly relevant to this case, including coverage of baton use and OC spray deployment.

- The training materials for the baton divide the body into three zones labelled green, yellow, and red (D002047). Green areas are the primary target for a baton strike because these areas minimize the likelihood and severity of injuries. Green areas include calves, thighs, buttocks, upper arms, and other lower-risk body parts. Yellow areas are designated as secondary target areas to be used if strikes to the Green areas are unavailable or ineffective. Yellow areas include the collarbone, ribcage, upper abdomen, groin, elbows, and knees. Red areas are prohibited unless deadly force is justified. Red areas include the head, neck, spine, and other vulnerable areas.
- Although the BPD specifies the groin as a secondary target area (designated as yellow), police agencies typically prohibit intentional strikes to the groin (unless lethal force is warranted) to reduce the likelihood of serious physical injury.
- The training materials for OC spray (often called pepper spray) note that officers are authorized to deploy it when they perceive an individual as being "actively resistant" [D002117]. When possible, officers are advised to spray people in the face from a distance of 4-6 feet. The training materials do not teach officers how to evaluate and address the challenges involved in using OC spray in a crowd setting.

109. The BPD disclosed an undated 138-page document from the Center for Domestic Preparedness entitled "Field Force Operations." Most of this document is based on standard crowd control doctrine using Mobile Field Forces. Understanding these tactics and techniques is

important for police officers assigned to handle crowd events, including protests. However, much of Module 7, entitled "Crowd Dynamics," is inconsistent with decades of research on crowd psychology and behavior. I have previously criticized this training elsewhere for perpetuating theory and research on crowds that has long been discredited within the scientific community.[78]

110. The BPD disclosed an 84-page document from 2016 entitled "Crowd Control."

- On page 3 [D09319], the document describes the differences between crowd management, intervention, and control. Although this document acknowledges these differences, the training offered by the BPD focuses almost exclusively on crowd control.
- On page 4 [D009320], the document describes psychological factors associated with individual protesters. The document states that "everyday citizens gathering to peacefully demonstrate" differ from "professional protesters" and "anarchists." To support these distinctions, the document cites a 2003 newspaper article in the *Miami Herald*. Once again, the document makes broad generalizations about crowd psychology and behavior that have little basis in scientific research evidence.
- On pages 4-6 [D009320-D009322], the document discusses psychological factors associated with crowds. This section draws on social contagion theories of crowd psychology and behavior that have long been discredited among specialists who study crowds. This perspective is known among specialists as the "classical view" of crowd psychology. My guidebook on policing notes that this perspective "provides an implicit justification for repressive crowd control measures" and that it "has long been discredited as inaccurate."[79] According to leading crowd psychology scholars, the classical view is not only wrong, but "dangerously wrong."[80] Publications outlining the evidence against social contagion theories and the resulting implications for policing had been available for many years prior to the GFP in 2020.
- The remainder of the document discusses laws related to policing protests, crowd control tactics, and BPD policies.
- While much of the material in this policy consists of standard crowd control tactics, all content associated with the psychology of individual protesters and crowds is inconsistent with decades of scientific research evidence on crowd psychology and behavior. When training police officers on these vital issues, it is important for police agencies and police training academies to ensure that the training is accurate and up-to-date. As a result of the deficient training provided by the BPD, when officers who received this training are

---

[78] Maguire, E. R. (2022). *The role of the US government in the law enforcement response to protests*. Niskanen Center. https://www.niskanencenter.org/the-role-of-u-s-law-enforcement-in-response-to-protests

[79] Maguire & Oakley (2020), note 1 (p. 48)

[80] Reicher et al. (2004), note 28 (p. 558).

assigned to handle crowd events, they are operating on the basis of inaccurate, outdated, and potentially dangerous information about crowd psychology and behavior.

111. The BPD disclosed an undated 31-page presentation entitled "Crowd Control Theory & Tactics." It provides basic instruction to officers on crowd control formations and the hand signals and verbal commands that are used during crowd control operations.

112. The BPD disclosed a 78-page training document entitled "Introduction to Chemical Munitions." The document is undated, but the filename has "2020" in it. I do not know if this document predates the GFP.

- On page 18 [D09615], the document discusses the health effects of CS. It states that exposure to CS is not lethal and does not result in abnormalities in embryos and fetuses. It also states that people exposed to CS experience "rapid recovery after exposure." This discussion fails to mention that CS is sometimes associated with serious, debilitating injuries, whether from the chemical agent itself or its deployment mechanism. A 2017 systematic review of scientific evidence on the health effects of chemical agents used in crowd control concluded: "given the frequency of serious injury, disability, and death, the use of chemical irritants should be strictly limited to situations of imminent harm that cannot be policed effectively with safer methods" (p. 11).[81] The same study found that among people seeking treatment for exposure to chemical agents, 27.9% of those exposed to CS had serious injuries, compared to 6% of people exposed to OC.

- When training police officers on the use of less-lethal weapons, police agencies and police training academies should provide those officers with accurate and up-to-date summaries of the health risks associated with those weapons. Failure to do so results in officers making decisions in the field without a sufficient understanding of these risks.

- On pages 21 [D09617] and 27 [D09623], the document describes the psychological effects of chemical agents, including "possible mental disorientation, confusion and fear" [D09617]. However, these slides do not include one of the most important and well-established scientific findings on the effects of less-lethal weapons on crowd psychology and behavior. When people, including those who are behaving in a peaceful and lawful manner, perceive that the use of force against them is unfair or illegal, they may respond in a defiant manner. Put differently, the use of these types of weapons can *increase* the level of conflict, tension, and violence in some cases.[82] Understanding this common psychological reaction is vital to developing effective, evidence-based strategies for managing and controlling crowds.

---

[81] Haar, R. J., Iacopino, V., Ranadive, N., Weiser, S. D., & Dandu, M. (2017). Health impacts of chemical irritants used for crowd control: A systematic review of the injuries and deaths caused by tear gas and pepper spray. *BMC Public Health, 17,* 831.

[82] Maguire & Oakley (2020), note 1; Reicher et al. (2004), note 28; Stott et al. (2008), note 62.

- When training police officers on the use of less-lethal weapons, police agencies and police training facilities should provide those officers with accurate and up-to-date summaries of the psychological effects associated with those weapons. Failure to do so results in officers making decisions in the field without a sufficient understanding of the benefits and drawbacks of the various options available to them.
- On page 63 [D09659], the document describes four types of crowds: casual, sighting, agitated, and mob-like. This depiction of crowds is inconsistent with decades of research from the study of crowd psychology and behavior. For example, the document notes that in an agitated crowd, "individuals with strong emotional feelings quickly spread and infect the rest of the crowd." These depictions of the various types of crowds have no basis in scientific evidence. Moreover, the idea of emotions spreading and infecting crowds is based on contagion theories that have long been discredited among those who study crowds (for more details, see ¶ 110).
- On page 64 [D09660], the document states that crowd members use certain tactics "to resist authority and disrupt and add turmoil in order to achieve their goals… the more organized and purposeful a crowd becomes, the more likely a tactic will be used." This claim has no basis in scientific evidence from the study of crowds.

113. The BPD disclosed an undated training video that is approximately 23-minutes long. Although the video has the term "crowd management" in the title, it teaches basic crowd control tactics, including formations and the use of gas masks and flex cuffs.

114. To summarize, at the time of the GFP, the BPD relied on inaccurate, incomplete, and outdated training for crowd control and crowd management. It devoted insufficient attention to evidence-based crowd management strategies, including de-escalation, communication, mediation, and negotiation. It provided almost no coverage of crowd psychology and behavior, and what coverage it did provide was outdated and inaccurate. This training did not adequately prepare officers for the challenges they faced during the GFP. The foreseeable consequence of BPD's failure to provide adequate training to its officers was officers' use of inappropriate tactics on, and violation of the constitutional rights of, the Plaintiffs and others.

## VI. BPD Strategies and Tactics

### A. BPD Did Not Rely Sufficiently on Crowd Management Strategies

115. Consistent with my findings regarding the BPD's policies and training on crowd management and control, the BPD's response to the GFP involved an insufficient reliance on crowd <u>management</u> strategies. Instead, the evidence reveals that the BPD relied primarily on crowd <u>control</u> tactics, particularly the use of skirmish lines, less lethal weapons, and other types

of force. This heavy reliance on crowd control and insufficient use of crowd management is inconsistent with nationally accepted police standards and practices.

116. The materials I reviewed provide no evidence that the BPD relied on dialogue-based de-escalation strategies to reduce tension and prevent conflict and violence with crowds during the GFP. Instead, the BPD relied primarily on militaristic crowd control tactics. The importance of relying on crowd management strategies is supported by a substantial body of research evidence from the study of protests and other crowd events. This research has taken place in a variety of settings around the world and has accumulated over approximately four decades.[83] Moreover, the use of communication and dialogue to reduce tension, conflict, and violence between police and protesters is endorsed by numerous police professional organizations. In the United States, these include the International Association of Chiefs of Police,[84] the National Policing Institute,[85] the Office of Community Oriented Policing Services,[86] the Police Executive Research Forum,[87] and the President's Task Force on 21st Century Policing.[88] These communication techniques are also endorsed by police professional organizations in other nations, including Sweden[89] and the United Kingdom.[90]

117. The 18-page Operations Plan issued by Superintendent William Ridge for May 31, 2020 [D01602-D01619] does not provide any evidence of officers being assigned to engage in dialogue or de-escalation with protesters. The Operations Plan lists assignments for numerous functions, but there is no evidence of any personnel being assigned to roles focusing specifically on dialogue or de-escalation.

118. Two after-action reports completed by BPD officials do not describe any attempts to communicate with the crowd or engage in verbal de-escalation, communication, mediation, or

---

[83] Reicher, S.D. (1984). The St. Pauls' riot: An explanation of the limits of crowd action in terms of a social identity model. *European Journal of Social Psychology*, *14*(1), 1-21.

[84] International Association of Chiefs of Police (2019), note 36.

[85] National Policing Institute and Office of Community Oriented Policing Services (2022), note 44.

[86] National Policing Institute and Office of Community Oriented Policing Services (2022), note 44.

[87] Police Executive Research Forum (2006), note 45; Police Executive Research Forum (2011), note 46; Police Executive Research Forum (2022), note 37.

[88] President's Task Force on 21st Century Policing (2015), note 42.

[89] Swedish National Police Board (2010). *Dialogue police: Experiences, observations and opportunities*. https://phsblog.at/wp-content/uploads/2016/04/Dialogue_bok100630Webb.pdf

[90] Her Majesty's Chief Inspector of the Constabulary (2009), note 27.

negotiation. Both reports focus primarily on crowd control tactics and the equipment used by officers.[91]

119. The standard approach in policing is to communicate with protest organizers or influential participants before, during, and after protests. A continuous line of communication between police and protesters reduces tension and prevents conflict and violence from escalating (see ¶¶ 54-55). I do not see any evidence that this type of communication between police and protesters was part of the BPD's strategy during the GFP. In his deposition, Superintendent Ridge confirmed that he did not instruct his subordinates to communicate with protest organizers or leaders prior to the protests in Boston on May 29th and 31st, 2020. Moreover, he testified that, to his knowledge, nobody from the BPD had communicated with people within the Black Lives Matter movement in Boston about the May 31st protests.[92]

120. The use of dialogue-based crowd management strategies is especially important when protests are focused on the police. As noted in my guidebook for policing protests, "In the aftermath of a controversial arrest or use-of-force incident, people are angry, emotions run high, and event participants may be less willing to communicate or cooperate with police in a calm and productive manner. The ratio of moderates to radicals may be smaller than usual relative to other types of protests. Police may naturally feel frustrated and defensive and less willing to negotiate or facilitate under these conditions. While this is certainly understandable at a human level, at a professional level these are exactly the moments when communication and facilitation become most important. People who are protesting police misconduct expect the police to treat them poorly. They may even attempt to goad the police into treating them poorly to capture it on video, provide grounds for a complaint or a lawsuit, or otherwise prove a point. Changing the interpersonal dynamic at moments like this can have powerful effects on the tone of these events and prevent them from escalating into conflict or violence. Communicating in a patient, thoughtful, and professional manner when people are angry or frustrated with you and the institution you represent can sometimes help calm people down."[93] Because the protests were about the police, the BPD's decision to rely so heavily on crowd control tactics, instead of evidence-based crowd management strategies, very likely inflamed tensions and promoted unnecessary tension, conflict, and violence between police and protesters.

121. Aside from dialogue and de-escalation, another crucial element of crowd management is providing verbal warnings or dispersal orders prior to using force against a crowd. My review of

---

[91] After action review by Deputy Superintendent Tarantino [D009308-D009316]; After action review by Lt. William Meade [D010197-D010205].

[92] Deposition of William G. Ridge, January 11, 2024 (pp. 53-57, 81-86).

[93] Maguire & Oakley (2020), note 1 (p. 69).

video footage from the GFP revealed numerous instances of police using force against crowds without any warning or without an order to disperse. BPD officials justified this approach during their depositions, citing exigent circumstances because people in the crowd were throwing objects at police. For example, Commissioner William Gross testified that it would not have been possible to issue an unlawful assembly order using a loudspeaker because officers were "immediately attacked by Antifa."[94]

122. In his deposition, Superintendent Ridge testified, in his capacity as incident commander on May 31, 2020, that he never instructed people under his command to make amplified announcements declaring an unlawful assembly or ordering the crowd to disperse. He also testified that even in the absence of such announcements, officers were still authorized to use force against people who remained in the area of the protest, even if those people were behaving peacefully and not engaging in any illegal acts. Ridge stated that regardless of their individual behavior, "if they were part of a group that was assaulting the officers, then they were not peaceful protesters."[95] I do not understand or agree with the logic of treating everybody present in a crowd as a rioter when the police department has not declared the event as an unlawful assembly or issued a sufficiently audible dispersal order. This is especially concerning coming from the person who served as incident commander during the GFP and who set the tone for the overall BPD response to the protests. There may be moments when exigent circumstances (in the form of serious threats to officer safety) do not allow police officers to issue a warning or dispersal order first and then wait before using force. However, even in circumstances where police officers are encountering active aggression from people in the crowd, there should still be a person designated to make announcements to the crowd while other officers handle the aggressors. It is customary in policing to issue warnings prior to deploying indiscriminate force against crowds (such as the use of tear gas) unless there are immediate life safety issues.

123. My review of the video evidence and depositions revealed a widespread custom or practice of firing chemical agents and kinetic impact munitions at crowds in the absence of clearly audible warnings or orders to disperse. The research evidence shows that decisions like this tend to escalate conflict and violence between police and crowds. This is why British police rely on a "no surprises" approach, letting protesters know ahead of time about likely police actions so they can make informed choices about whether to alter their behavior or exit the area.[96] In those moments when exigent circumstances do not allow police to issue warnings or announcements prior to using reasonable force, they can simply issue those warnings or announcements as soon as practicably possible. The idea that once a crowd is aggressive, police no longer need to

---

[94] Deposition of William G. Gross, February 29, 2024 (pp. 108-109, 121).

[95] Deposition of William G. Ridge, January 11, 2024 (pp. 100-107).

[96] Her Majesty's Chief Inspector of the Constabulary (2009), note 27 (p. 164).

communicate with or issue announcements to the crowd is professionally irresponsible and dangerous.

124. In addition to the need to issue verbal warnings or dispersal orders before using force against a crowd, police also have an obligation to ensure that these warnings are loud enough for the crowd to hear them.

- Crowd events tend to be loud, and the sound amplification devices typically used by police (such as bullhorns and vehicle-based public address systems) are often not loud enough to enable the full crowd to hear police announcements. The materials I reviewed suggest that when warnings were issued during the GFP, they were typically made without amplification. The video footage reveals that many of these warnings were not loud enough to reach the full crowd.

- Evidence from the depositions in this case reveals that BPD officials were not particularly sensitive to this issue. For instance, in his deposition, Superintendent William Ridge, in his capacity as incident commander on May 31st, did not instruct officers to make amplified announcements ordering protesters to disperse.[97]

- According to an after-action report prepared by James Tarantino, Deputy Superintendent of Field Services, "most officers stated that they couldn't hear commands" [D009311]. Another after-action report prepared by Lt. William Meade stated that "communication was difficult due to noise" [D010197]. If officers could not hear commands from supervisors who were located close to them, then crowd members, many of whom were located further away, presumably also had difficulty hearing the unamplified commands issued by officers.

- I conclude from the available evidence that the BPD did not take seriously the question of whether the crowd could hear their warnings or orders to disperse. As a result, some protesters were subjected to chemical agents, baton strikes, and other types of force without having been ordered to disperse.

125. All of these issues were exacerbated by the fact that protesters and others who wanted to leave the area had difficulty doing so because the MBTA had closed numerous stations in the area and because the BPD had neither established nor communicated exit routes for protesters. An after-action review by Lt. William Meade acknowledges this issue, noting that "peaceful protesters could not leave the area as some MBTA stations were closed" [D010199]. A key aspect of handling crowd events in a professional and organized manner is working with partner agencies to ensure a coordinated response. Captain John Danilecki testified that some officers learned about the MBTA station closures from protesters who were trying to exit the area.[98]

---

[97] Deposition of William G. Ridge, January 11, 2024 (pp. 104-106, 112-114, 128).

[98] Deposition of John Danilecki, November 6, 2023 (pp. 85-87).

Superintended William Ridge, who served as the BPD's incident commander on May 31st, first heard about the MBTA station closures over the police radio even though he was in the Law Enforcement Command Center along with representatives from the MBTA police.[99] This lack of interagency coordination and communication between the BPD and its local partners played an enormous role in the chaos that occurred in the City of Boston on the evening of May 31, 2020.

126. To summarize, at the time of the GFP, the BPD did not rely sufficiently on crowd management strategies to reduce tensions and prevent conflict and violence. Instead, the BPD appears to have defaulted to the use of crowd control tactics, including the use of skirmish lines, less-lethal weapons, and arrests in an effort to control the crowds. Moreover, the BPD did not issue amplified unlawful assembly or dispersal orders before deploying chemical agents and other types of force at crowds. These approaches are inconsistent with nationally accepted standards and practices in policing. Unfortunately, these approaches are consistent with the policies and training reviewed in previous sections, which focused heavily on crowd control and did not provide officers with accurate, complete, and up-to-date guidance on evidence-based practices for handling crowd events. The crowd control approach used by the BPD likely had the effect of inflaming tensions between protesters and police during the GFP, rather than de-escalating tensions and preventing conflict and violence.

**B. BPD Used Inappropriate Crowd Control Tactics**

127. In addition to not relying sufficiently on crowd management strategies during the GFP, the BPD also relied on a variety of inappropriate crowd control tactics. For instance, although the Operations Plan for May 31, 2020 stated that that the incident commander's intent was to support the First Amendment rights of rally participants [D01604], I could find little evidence substantiating this claim. The BPD engaged in a custom or practice of using aggressive crowd control tactics during the GFP that unnecessarily endangered peaceful protesters and others who were not committing crimes. Moreover, these tactics very likely had the effect of inflaming tensions and escalating conflict and violence between police and protesters.

128. Video evidence reveals numerous instances of police using chemical agents and other types of force against peaceful members of the crowd during the GFP. In multiple depositions, BPD officers defended this practice based on officer safety concerns because they were being struck by harmful objects such as rocks and bottles. Officers have the right to defend themselves against assault by crowd members, but the appropriate response is not to punish or harm members of the whole crowd based on the violent or destructive behavior of a subset of its members, particularly in the absence of sufficiently audible warnings or dispersal orders. The appropriate response is to target the people engaging in violent or destructive behavior. My guidebook on policing protests

---

[99] Deposition of William G. Ridge, January 11, 2024 (pp. 95-96; 107-111).

refers to this as a "differentiated" strategy. It is meant to accomplish three key objectives: protecting the First Amendment rights of people who are behaving peacefully, ensuring that peaceful protesters are not injured or killed, and preventing the unnecessary escalation that results when police take enforcement action "against the whole crowd in response to the misbehavior of a subset of its participants."[100]

129. If crowd management efforts have failed (or if they have not been attempted) and crowd members are throwing objects at officers, the police have several reasonable alternatives they can employ. They can arrest the offenders, they can use targeted forms of force against the offenders, or they can issue orders declaring the event unlawful and instructing the crowd to disperse. The less-lethal systems available to BPD officers during the GFP included at least two targeted forms of force that can be used during crowd events: 12-gauge shotguns that fire beanbag rounds, and 40mm launchers that fire foam baton rounds. The use of these weapons is appropriate as long as the use of force is warranted, the rounds strike authorized parts of the body, and the rounds do not strike people who are not engaged in violent or destructive behavior. Many situational variables factor into whether these targeted forms of force are appropriate for a particular setting, including the distance between the officer and the crowd, the mobility and density of the crowd, and the weather conditions, including the presence of heavy winds.

130. When being assaulted by protesters throwing objects at them, if officers were unable to arrest the offenders or use targeted force against them, another option was to issue dispersal orders, provide clear instructions about what route people should take when exiting the area, and give the crowd sufficient time to follow police orders to disperse. That approach is consistent with nationally accepted police standards for dispersing a crowd peacefully when officers are under assault and do not have other options available for stopping the assault. Once people have been ordered to disperse, police confirm that the order is sufficiently loud for the whole crowd to hear it, and the crowd members have been given sufficient time to follow the order, police then have a reasonable justification for using more indiscriminate forms of force against the entire crowd. At that point, consistent with the British "no surprises" approach, crowd participants have been given the information they need to make an informed decision about whether to comply with police orders.

131. My review of the video evidence in this case, as well as the depositions, indicates that officers did not follow this approach to dispersing crowds. Instead, police routinely used chemical agents to disperse crowds either without any warning or order to disperse, or without sufficiently audible warnings or orders to disperse, and without providing protesters information about where the police wanted them to go. In fact, several depositions and two after-action reviews reveal that there was no clear coordination or communication within the BPD regarding

---

[100] Maguire & Oakley (2020), note 1 (pp. 76-81).

where protesters were supposed to go. The after-action reviews state that protesters were pushed in opposite directions. These issues reflect a failure of effective incident command.

132. The video evidence I reviewed also revealed several instances of officers engaging in what appear to be content-based enforcement actions associated with protest signs, including seizing them, tearing them, and knocking them out of people's hands. For example:

- Captain John Danilecki was caught on video seizing a Black Lives Matter sign from a protester and then tearing it and discarding it on the ground.[101]
- An officer was caught on video knocking a sign out of a protester's hand.[102]
- An officer was caught on video shoving a protester and trying to grab a Justice for George sign out of the protester's hands.[103]

These types of actions communicate to the crowd that police are not behaving in a fair and impartial manner. Such actions have the effect of escalating and intensifying tension, conflict, and violence and increasing, not decreasing, the risks to officers.

133. One theme that emerged from the depositions was the idea of police using crowd control formations and less lethal weapons as a form of nonverbal communication with crowds. It is well known that communication has both verbal and nonverbal components, so it is possible to communicate nonverbally in both interpersonal and intergroup settings.[104] However, it is not a good idea for police to rely on the use of crowd-control formations or less-lethal weapons as forms of communication with protesters. For example, when asked how crowd members were supposed to know they were part of an unlawful assembly in the absence of announcement to that effect, Captain William Connolly responded, "I think when you see police officers in a line, all the things that are going on, I mean I think a reasonable person would be believing there was an unlawful assembly, and I don't want to be in this area. That's what I would believe."[105] While nonverbal cues are a crucial component of effective communication, they are not a *replacement* for verbal communication. On May 31st, a more appropriate approach would have been to tell the crowd precisely what the police wanted them to do. Less lethal weapons should be

---

[101] Memo from Lt. Timothy Gaughan to Deputy Superintendent Courtney Matthews regarding IAD complaint # IAD2020-0178 (August 12, 2020); sign ripping video - from Boston Globe.mp4

[102] Video of bike officer in black vest knocking sign - slow motion.mp4

[103] Protest_Tremont.mp4

[104] Interpersonal communication takes place between individuals. Intergroup communication takes place between representatives of different groups. There is a large body of research on intergroup communication. Some of that research focuses on the intergroup dynamics between police and members of the public. For more information about the application of intergroup communication to the police, see: Giles, H., Maguire, E. R., & Hill, S., Eds. (2021). *The Rowman and Littlefield Handbook of Policing, Communication, and Society*. Rowman & Littlefield.

[105] Deposition of Timothy Connolly, January 19, 2024 (pp. 84-85)

41

conceptualized as an option available to police (if legally permissible) when the use of verbal communication to seek compliance has failed, not as a *substitute* for verbal communication.

134. My review of the evidence reveals a tendency by the BPD not to issue warnings or dispersal orders before using force against protestors or crowd members. BPD officers frequently justified this approach based on exigent circumstances such as protesters throwing objects at police officers. Within the BPD, there was a widespread custom or practice of using less-lethal force against crowds in the absence of warnings or orders to disperse. One BPD official (Captain Timothy Connolly) testified at deposition that even in the absence of an announcement that could be heard by protesters, the policies and customs of the BPD permitted officers to treat everyone present at a protest as being there illegally and therefore subject to the use of force.[106]

135. Some of the depositions confirm that the BPD often doesn't see the need for, or the opportunity to, issue verbal warnings or dispersal orders before using force against crowd members. At the same time, I see a tendency among BPD officials to view formations and less lethal weapons as nonverbal forms of communication with protesters. There are two major problems with these approaches.

136. First, conventional best practice is for police to communicate with crowd members before, during, and after crowd events. This verbal communication is intended to help build trust, avoid misunderstandings, and de-escalate tensions. Verbal communication is one of the principal tools for avoiding conflict and violence during protests and other crowd events.[107] The most innovative and evidence-based approaches to policing protests and other types of crowd events rely heavily on dialogue between police and protesters.[108] Choosing not to communicate verbally with crowd members is a recipe for misunderstandings and conflict.

137. Second, there is usually a large gap between the nonverbal messages police think they are sending at protests and the way crowd members perceive those messages. For instance, police often don riot gear to protect themselves and remain safe, but protesters usually perceive officers putting on riot gear as an act of escalation.[109] Similarly, in the examples given above, police are seeking to communicate to protesters that they should step back or leave the area altogether. However, based on my experience interviewing and surveying protesters, I believe these nonverbal cues send a very different message to protesters. The use of crowd control formations and less-lethal weapons most likely communicates to protesters that police are escalating and looking for a fight.

---

[106] Deposition of Timothy Connolly, January 19, 2024 (p. 179).

[107] Maguire & Oakley (2020), note 1.

[108] Stott, C., Scothern, M., & Gorringe, H. (2013). Advances in liaison based public order policing in England: human rights and negotiating the management of protest? *Policing: A Journal of Policy and Practice*, *7*(2), 212-226.

[109] Maguire & Oakley (2020), note 1.

138. The principal mode of communication when policing protests should be verbal. Nonverbal communication can certainly play a role, but police need to think very carefully about the message they are trying to send and how it is being received by others who have a different identity and worldview than theirs. Less lethal weapons should not be treated as a substitute for verbal communication, including genuine dialogue.

## VII.    Analysis of Incidents Involving Plaintiffs

### A. Jasmine Huffman

139. Plaintiff Jasmine Huffman chose to attend a protest in Boston on May 31, 2020 because she was shocked and saddened by George Floyd's death. She viewed the protest as "a really great, safe place to put energy into shedding light to that horrible murder."[110]

140. Ms. Huffman joined the protest at Dudley Square in Roxbury and then marched with other protesters to the State House. Once there, the protesters assembled on the steps in front of the State House and organizers spoke to the crowd. After the speakers were finished, protesters chanted messages such as "hands up, don't shoot." She does not recall seeing protesters throwing any objects at police or engaging in any physical altercations with police either during the march or at the State House.[111]

141. After leaving the State House, Ms. Huffman walked to Tremont St. near Boston Common. While there, she was exposed to pepper spray deployed by a police officer standing approximately six feet away. Although, that officer was targeting someone else, Ms. Huffman was exposed to the pepper spray and felt its chemical irritant effects. She was also struck in the knee by a silver metal canister emitting some type of chemical agent. The canister appeared to have come from the other side of the street where police were standing. When struck by the canister, she felt immediate pain and fell to the ground. Prior to being exposed to these two uses of force by police, she did not recall seeing anyone throwing objects at police, though she did recall seeing these behaviors later.[112]

142. After having been exposed to two uses of force by police, Ms. Huffman noticed a police officer whose vehicle was surrounded by a crowd of protesters. One individual struck the vehicle with a skateboard, breaking a window. The officer exited the vehicle and attempted to apprehend

---

[110] Deposition of Jasmine Huffman, February 27, 2024 (pp. 56, 62)

[111] Deposition of Jasmine Huffman, February 27, 2024 (pp. 72-77)

[112] Deposition of Jasmine Huffman, February 27, 2024 (pp. 78-87).

the individual, but the suspect resisted and the two of them ended up in a fight. Other crowd members attempted to aid the suspect by striking and pulling on the officer. Ms. Huffman and several other protesters then placed their bodies between the officer and the crowd to protect the officer, later identified as Stephen Canto. Shortly thereafter, crowd members vandalized the officer's vehicle and lit it on fire.[113] During his deposition, Officer Canto asked the attorneys to pass along his thanks to Ms. Huffman for helping to shield him from those crowd members who were trying to assault him.[114]

143. After helping Officer Canto to safety, Ms. Huffman testified that a police officer struck her on the chest with a baton while saying "move." At the time, she was standing on the outskirts of Boston Common with her hands up. The officer who struck her was later identified as Michael Burke. She testified that after being struck with a baton, she fell down and hit her head on the ground. Some officers then stepped on her arms and hands and continued marching past her. The final row of officers dragged her to the side of the road and then continued marching. She testified that she did not hear the officers issue any orders or instructions prior to Officer Burke saying "move" as he struck her.[115]

144. Officer Burke's bodyworn video camera recorded the incident. The video footage shows him using a two-handed horizontal strike with the baton, hitting Ms. Huffman on the chest and knocking her to the ground.[116] While it is common for police officers engaged in crowd control to use a two-handed baton push to move crowd members back, Officer Burke relied on a baton strike, not a push. Rule 304 states that the baton's purpose is to "provide officers with an advantage when fending off and subduing an unarmed assailant" [D007322]. Ms. Huffman was not engaging in assaultive behavior at the time when Officer Burke struck her with a baton. Moreover, Rule 304 also prohibits baton strikes above the thighs with the exception of the arms.

145. Officer Burke testified at deposition that he recalled striking Ms. Huffman with his baton and that Ms. Huffman fell to the ground as a result. I was unable to locate a use of force report documenting this incident, though such a report is required under Rule 304 [D007323 – D007324]. Failing to file a use of force report is contrary to generally accepted police standards and practices. For example, the IACP's model policy on use of force reporting states: "the authority to use force carries with it the need for accountability in order to safeguard the rights of the public and to preserve the integrity of the law enforcement agency and the jurisdiction that provides this authority. As such, it is the policy of this law enforcement agency that use of force,

---

[113] Deposition of Jasmine Huffman, February 27, 2024 (pp. 87-114).

[114] Deposition of Stephen J. Canto, November 15, 2023 (p.30).

[115] Deposition of Jasmine Huffman, February 27, 2024 (pp. 117-145).

[116] Bodyworn video footage, Officer Michael Burke, May 31, 2020 (Bates # 2711).

as designated herein, be reported in a timely, complete, and accurate manner by involved officers…"[117] Moreover, the operational plan expressly stated that "use of force reports shall be reported pursuant to Rules 303, 303A, and 304" [D1605].

146. Officer Burke testified at deposition that the woman he struck with his baton did not pose a physical threat to him at the time when he struck her.[118]The video evidence in this case substantiates Ms. Huffman's claim that she was unarmed and had her hands raised above her head at the time she was struck. Rather than using a standard two-handed pushing motion with his baton, he chose to use a much more powerful two-handed horizontal baton strike to Ms. Huffman's chest. This strike did not serve a legitimate law enforcement purpose and was out of proportion to the threat she posed. Given that no amplified dispersal order had been issued, Ms. Huffman's presence on the outskirts of Boston Common did not warrant such a potentially dangerous use of force. Finally, Officer Burke did not file a report documenting his use of force against Ms. Huffman. My review of the evidence suggests that Officer Burke's conduct was contrary to multiple provisions of Rule 304, as well as generally accepted police standards and practices.

## B. Justin Ackers

147. Plaintiff Justin Ackers drove his moped from his home in Brighton to the State House in Boston to participate in the Black Lives Matter protest on May 31, 2020. He testified at deposition that he remained at the State House for approximately two hours before walking down to the Park Street T stop to meet up with his roommate. There he observed police setting up barricades and crowd members starting to throw water bottles and trash cans at them. In response, police began deploying chemical agents and pushing protesters back.[119]

148. Mr. Ackers began filming and livestreaming what he was seeing. While still filming, he observed a bicycle officer chasing a crowd member who had picked up a gas canister deployed by police and thrown it back toward them. That officer pepper sprayed Mr. Acker, whose only involvement in the incident up to that point was filming and livestreaming it.[120] As a result of his exposure to pepper spray, he decided to retrieve his moped (which was parked and locked up near the State House) and leave the area.

---

[117] International Association of Chiefs of Police (2017, March). *Model policy: Reporting use of force*. https://www.theiacp.org/resources/policy-center-resource/reporting-use-of-force

[118] Deposition of Michael Burke, October 12, 2023 (p. 53).

[119] Deposition of Justin Ackers, February 26, 2024 (pp. 55-65).

[120] Ackers OC sprayed - street cam.mp4

149. Given all the roadblocks and police skirmish lines (together with no clear direction from police about routes that should be taken to leave the area), Mr. Ackers experienced difficulty in finding a road that would enable him to exit the area and go home. As he was driving, he passed a burning police cruiser and decided to film it.[121] He testified that he then encountered a line of police officers blocking the road, so he decided to turn his moped around. Shortly thereafter, BPD Officer Michael Burke struck him from behind with a baton, knocking him off his moped. Other officers dragged his moped to the sidewalk. He explained to the officers that he was trying to leave the area and go home, but they did not allow him to retrieve his moped and do so. At that point, he started backing up on foot with his hands raised and left the area. He later returned, retrieved his damaged moped, and went home.[122]

150. BPD Officer Michael Burke acknowledged during his deposition testimony that he was the officer who struck Mr. Ackers with a baton while Ackers was sitting on his moped.[123] Footage from Officer Burke's bodyworn video camera captured the baton strike at approximately 10:08pm.[124] Officer Burke testified at deposition that he did not submit a use of force report documenting this incident.

151. The baton strike by Officer Burke was out of proportion to the threat posed by Mr. Ackers, since he was facing away from officers and could easily have been ordered to simply drive away. Moreover, Officer Burke did not file a report documenting his use of force against Mr. Ackers. My review of the evidence suggests that Officer Burke's conduct was contrary to multiple provisions of Rule 304, as well as generally accepted police standards and practices. Similarly, the use of OC spray on Mr. Acker as he was filming the protest was out of proportion to the level of threat he posed.

**C. Caitlyn Hall**

152. Plaintiff Caitlyn Hall[125] chose to attend a protest in Boston on May 31, 2020 to show support for George Floyd and to protest against police brutality.[126] Ms. Hall joined the protest at

---

[121] Deposition of Justin Ackers, February 26, 2004 (pp. 128-131).

[122] Deposition of Justin Ackers, February 26, 2004 (pp. 114-131).

[123] Deposition of Justin Ackers, February 26, 2004 (pp. 114-146).

[124] Ackers assault on Burke bodycam - from Appeal montage.mp4

[125] Caitlyn Hall subsequently changed her name to Caitlyn Papa. I use her prior name for consistency with the documents.

[126] Deposition of Jasmine Huffman, February 27, 2024 (pp. 56, 62).

Dudley Square in Roxbury and then marched with other protesters to the State House. Once there, the protesters assembled in front of the State House and organizers spoke to the crowd using megaphones. After the speakers were finished, protesters began chanting and singing. She does not recall seeing protesters throwing any objects at police during the march or at the State House.[127]

153. After leaving the State House, Ms. Hall walked to Downtown Crossing and discovered that the T-station was closed and therefore she couldn't go home. She remained at Downtown Crossing and began chanting with other protesters. While there, she observed conflict erupt between police and protesters. Police were pepper spraying protesters, and protesters were throwing water bottles at police. She also observed crowd members throwing objects at windows in the area.

154. Ms. Hall testified that while still in the Downtown Crossing area, she became concerned that an officer was going to strike a black man in the head with a baton. To prevent that from happening, she put her arm out and shouted at the officer. Ms. Hall claims that at that point, the officer struck her in the face with a baton. She later identified the officer as Edward Nolan. After being struck, she fell to the ground, hit her head, and lost consciousness for a short period. To my knowledge, there is no video footage of the alleged baton strike. There is video footage from the scene generally at the time, which shows that the demonstration was peaceful.

155. When Ms. Hall regained consciousness, she confronted the officer. She then walked to Mass General Hospital (MGH) to seek treatment for her injuries. She received one stitch for a laceration on the outside of her mouth.[128]

156. Officer Nolan testified at deposition that he does not recall if he ever had physical contact with Ms. Hall on May 31st, but that he does not believe he has ever hit anyone in the face with a baton. Officer Nolan did admit at his deposition, however, that despite his lack of recall, he found out the next day from his daughter that he was being accused on social media of hitting Ms. Hall,[129] a fact that should have led him to remember then whether or not he had hit Ms. Hall. He also testified multiple times that in the training he received from the BPD, he was not taught that there are certain body parts that officers should avoid striking with a baton.[130] Later in his

---

[127] Deposition of Caitlyn Hall, January 24, 2024 (pp. 72-77).

[128] Deposition of Caitlyn Hall, January 24, 2024 (pp. 14-23, 102-133).

[129] Deposition of Edward Nolan, May 30, 2023 (p. 15).

[130] Deposition of Edward Nolan, May 30, 2023 (pp. 25-28).

testimony, he provided a different response, stating that he was trained not to strike people in the head.[131]

157. Although there is no video footage of the alleged baton strike, video evidence is generally consistent with Ms. Hall's version of events.[132] If the allegation is valid, then the use of force by Officer Nolan is contrary to BPD Rule 304, which prohibits strikes above the thigh with the exception of the arms [D007322]. It is also contrary to nationally accepted police standards and practices which discourage strikes to the head due to the risk of death or serious injury.

### D. Benjamin Chambers-Maher

158. Plaintiff Benjamin Chambers-Maher attended a protest at the State House on May 31, 2020. At approximately 8:45pm, as the event was winding down, he left the State House and began walking toward his car, which was parked on the street near the U.S. Coast Guard Station, to drive home to Bedford. However, the road that he initially chose was blocked by a line of police officers. Mr. Chambers-Maher testified that a police cruiser drove through a crowd of people and he was struck by its mirror. Then a police officer pointed what he described as a "grenade launcher" toward his face.[133]

159. Mr. Chambers-Maher testified that he then attempted to take side streets to navigate his way back to his car, but these streets were blocked by police officers. He thanked the officers for being there and told them to go home safely. He also asked them for directions and then followed their advice on which way to walk. Mr. Chambers-Maher testified that while he was attempting to return to his car, he encountered a bicycle officer named McManus who deployed pepper spray at him and then rammed him with a police bicycle. The officer then pepper sprayed him a second time. Mr. Chambers-Maher was unable to drive immediately because the chemical irritant compromised his vision. He estimated that he made it back to his car by about 10:30pm and had arrived home by about 11pm.[134]

160. Officer McManus testified at deposition that he was in fear for his life throughout the night on May 31, 2020. He also stated that he felt threatened by Mr. Chambers-Maher, even though he was unable to articulate any specific behavior or action by Mr. Chambers-Maher that may have

---

[131] Deposition of Edward Nolan, May 30, 2023 (pp. 21-22, 68-69).

[132] Caitlyn near Nolan on Johns video.mp4; Cecilio Exhibit 3 IMG_9792.MOV [video]; Hall clip at 948 from AXON_Body 2_ Video_2020-0S- 31_2147.mp4; Rudyversus video annotated.mp4 [video]

[133] Deposition of Benjamin Chambers-Maher, February 14, 2024 (pp. 53-65).

[134] Deposition of Benjamin Chambers-Maher, February 14, 2024 (pp. 65-80).

led to that perception. Officer McManus also testified that Mr. Chambers-Maher was following police orders to move back prior to being pepper-sprayed.[135]

161. Video evidence reveals that Officer McManus was behaving in an unprofessional manner, swearing at people and pepper-spraying them indiscriminately even though they appeared to be following police orders to move back.[136] The use of pepper spray in this instance actually diminished people's ability to comply with police orders, since once people are sprayed they are less able to back up due to the effects of the chemical irritant. If the strategic objective is to move a crowd back, using chemical agents against people who are complying with police orders makes it more difficult to achieve that objective.

162. My review of the evidence suggests that Officer McManus's actions during his interaction with Mr. Chambers-Maher were contrary to BPD Rule 304, constituted conduct unbecoming a police officer, and were inconsistent with generally accepted policies and standards in policing.

## VIII.  BPD Accountability Mechanisms

## A. BPD Had Insufficient Internal Controls for Addressing Officer Misconduct

163. The BPD appears to have "circled the wagons" and sought to shield its officers from discipline for misconduct that occurred during the GFP. I reach this conclusion for several interconnected reasons. First, my review of the video footage from the GFP identified numerous inappropriate uses of force against peaceful protesters, including the Plaintiffs, who were not given sufficiently amplified or audible warnings or orders to disperse. Moreover, numerous officers who used inappropriate force were not disciplined.

164. Second, there is evidence that some protesters, including Plaintiff Caitlyn Hall, were struck by police impact weapons in vulnerable parts of the body – such as the head and face – where the impact could have caused serious injury or death. Once again, I did not find any evidence that officers involved in these inappropriate uses of force and violations of BPD policy were ever disciplined.

165. Third, video footage from the GFP reveals numerous instances of officers not behaving with an appropriate professional demeanor.

---

[135] Deposition of Michael McManus, January 10, 2024 (105-116).

[136] body cam with view of BCM incident - Cedric Lopes body cam.mp4; McManus body cam - BCM incident.mp4; Video taken by Chambers-Maher (22).mp4

- At 9:13pm, an officer says to a person in a "media" vest, "Get the fucking camera out of there."[137]
- At 9:21pm, an officer says "start spraying the motherfuckers."[138]
- At 9:25pm, an officer yells "Yeah, motherfuckers" when a tear gas canister is deployed toward protesters.[139]
- At 9:43pm, an officer says this was the first time he had sprayed people and it "felt good."[140]
- At 9:43pm, an officer says, "We are going to OC the fuck out of them."[141]
- At 9:47pm, an officer yells "next person who throws something I'm gonna fuck you up."[142]
- At 9:49pm, an officer says "keep moving, you assholes."[143]
- At 9:52pm, an officer points at a protester and says "I want to hit this asshole."[144]
- At 10:20pm, an officer says "I want to get that fucker… clothesline that kid."[145]
- At 10:20pm, Sergeant Clifton McHale brags about hitting protesters with his car, stating, "I'm f---ing hittin' people with the car"[146]
- At 10:57pm, an officer tells another officer, "Dude, three cans…you would've been proud, three cans of OC." He then laughs.[147]
- At 11:06pm, an officer says, "I'm getting that mother fucker right there. You see the kid with the... you see him pointing right now? I'm getting him."[148]

---

[137] Bodyworn video footage, Michael McManus, May 31, 2020 (PROTEST-2.mp4)

[138] Bodyworn video footage, Thomas Finn, May 31, 2020 (AXON_Body_2_Video_2020-05-31_2118.mp4)

[139] Bodyworn video footage, Kathleen Senise, May 31, 2020 (Protest_Tremont.mp4)

[140] Bodyworn video footage, Eugenio Fernandes, May 31, 2020 (PROTEST_-_DOWNTOWN_BOSTON.mp4)

[141] Bodyworn video footage, Kevin McGoldrick, May 31, 2020 (Protest_Wash_Tremont_Stuart.mp4)

[142] Bodyworn video footage, Austin Brooks, May 31, 2020 (protest-3.mp4)

[143] Bodyworn video footage, Mathew Shea, May 31, 2020 (AXON_Body_2_Video_2020-05-31_2133.mp4)

[144] Bodyworn video footage, Chad Wozniak, May 31, 2020 (AXON_Body_2_Video_2020-05-31_2147.mp4)

[145] Bodyworn video footage, Pierce Norton, May 31, 2020 (tremont_street_and_washington_street_.mp4)

[146] Bodyworn video footage, Robert Dirienzo, May 31, 2020 (Riots_May_31.mp4)

[147] Bodyworn video footage, Michael McManus, May 31, 2020 (PROTEST-2.mp4)

[148] Bodyworn video footage, Norman Texeira, May 31, 2020 (PROTEST.mp4)

- At 11:08pm, an officer instructs "anybody wearing a badge right now" to "take it off and put it in your pocket."[149]

These utterances are contrary to professional standards in policing and BPD's Rule 102, which regulates employee conduct, including conduct unbecoming an employee.[150] When officers behave in this manner, particularly during a protest that is focused on concerns about police behavior, they diminish the perceived legitimacy of the police agency and promote conflict rather than de-escalating it. To my knowledge, only one of these officers was disciplined for making these inappropriate and unprofessional comments.

166. Fourth, the BPD's processing of potential or alleged GFP-related misconduct by officers does not reflect a serious or impartial effort to investigate these issues. The Plaintiffs in this case testified at deposition about how the complaint-processing system at the BPD led them to believe the deck was stacked against them. For an agency to be perceived as legitimate by those it is meant to serve, it must have a robust, fair, and transparent complaint-processing system that holds officers accountable for misconduct.

167. Fifth, one key mechanism that police agencies rely on to improve accountability and control misconduct is to establish standardized reporting procedures for documenting discretionary decisions like making arrests and/or using force. For example, ensuring that officers file timely, accurate, and sufficiently detailed use of force reports is an important way for police leaders to track the use of force by officers and to hold officers accountable for their actions.

168. Unfortunately, the BPD's use of force reporting procedures during the GFP were confusing and chaotic. By not enforcing proper reporting procedures for officers to follow during the protests, the BPD defeated its own ability to hold officers accountable for their actions. Without proper use of force reports, the Department lacked sufficient information to conduct thorough, professional internal affairs investigations into allegations of excessive force by officers. Officers failed to file use of force reports for three of the four Plaintiffs in this case. For the fourth Plaintiff (Chambers-Maher), Officer McManus filed an overly general use of force report that lacked substantial detail and contained a false statement that Mr. Chambers-Maher could not be arrested because he fled the area. I am not aware of any of these officers being disciplined for failing to follow the BPD's use of force reporting requirements and/or providing false information.

169. The IACP *Model Policy on Reporting Use of Force* states that "the authority to use force carries with it the need for accountability in order to safeguard the rights of the public

---

[149] Bodyworn video footage, Andre Watson, May 31, 2020 (protest-3.mp4)

[150] https://police.boston.gov/rules-procedures

and to preserve the integrity of the law enforcement agency and the jurisdiction that provides this authority."[151] Timely and accurate use-of-force statements are crucial for transparency, accountability, and legitimacy.

170. The *IACP Model Policy on Crowd Management* states that "Use-of-force reporting requirements apply equally to policing demonstrations and civil disturbances. It is very important for law enforcement agencies to document and investigate uses of force during these events, not only for managerial and accountability reasons, but also to respond effectively to potential complaints alleging excessive force following an event."[152]

171. The Office of Community Oriented Policing Services and the National Policing Institute co-published a set of recommendations for police handling of protests.[153] One of the recommendations advises police agencies to "ensure they have policies that demonstrate a commitment to constitutional policing and serving the community fairly and equitably. When officers appear to engage in public misconduct, agencies should address the behavior with the community as soon as possible, thereby reinforcing the agencies' commitment to transparency…The community needs to hear that the agency will respond with appropriate discipline if it is determined, after appropriate procedures, that misconduct occurred" (p. 20). This recommendation is consistent with nationally accepted police standards and practices for ensuring accountability and legitimacy in policing. The BPD's response to allegations of officer misconduct during the GFP were inconsistent with this recommendation.

172. In summary, the BPD does not appear to have taken concerns about officer misconduct during the police response to the GFP seriously. Officers were allowed to violate policy, adopt an unprofessional demeanor, use excessive force, and fail to submit use of force reports without consequence. Moreover, the BPD's investigation of citizen complaints illustrates that the department is not serious about holding officers accountable for misconduct during the GFP, and demonstrates a clear pattern of failing to discipline officers in a timely and appropriate manner.

## IX.    Conclusion

173. The racial justice protests in the summer of 2020 represented a profound challenge for U.S. police agencies. Suddenly, communities were facing massive protests that in some cases devolved into rioting. These events helped reveal the strengths and weaknesses in the capacity of law enforcement agencies at all levels of government to handle large, disruptive crowd events.

---

[151] International Association of Chiefs of Police (2017), note 117.

[152] International Association of Chiefs of Police (2019), note 36.

[153] National Policing Institute and Office of Community Oriented Policing Services (2022), note 44.

174. A large body of evidence on how to handle crowd events has emerged in recent decades from two main sources: (a) from research carried out by scholars who specialize in the study of crowds, policing, and violence, and (b) from practitioners whose experiences in handling these types of events are often insightful. The blend of these two sources of knowledge is instructive for police agencies seeking to adopt evidence-based practices.

175. My review of the most relevant BPD policies and training prior to and during the GFP finds that they were inaccurate, incomplete, and outdated. As a result of these deficiencies, the BPD did not provide its officers (at all levels of the organization) with the appropriate knowledge, skills, and abilities to help them minimize or prevent tension, conflict and violence and honor the constitutional rights of protesters and others present in and around the GFP in Boston. More generally, the indiscriminate and overly forceful response of the BPD and its partners to the GFP helped to create the conditions under which officers then perceived the need to use force against members of the public. The failure of the BPD to provide its officers with appropriate and up-to-date policies and training led, in part, to the constitutional violations and injuries experienced by the Plaintiffs and others during the GFP in Boston.

176. The BPD did not rely sufficiently on the crowd management strategies that are known to be most effective in managing crowds. Crowd management strategies were not part of the operational plan established by the BPD's incident commander. Moreover, the incident commander himself dismissed the importance of communication-based approaches for reducing tension, conflict, and violence. A long line of scientific research has demonstrated the importance of crowd management strategies for reducing adverse outcomes during crowd events. Unfortunately, the BPD chose not to rely on them in its response to the GFP. This decision escalated conflict between police and the public and led, in part, to the constitutional violations and injuries experienced by Plaintiffs and others.

177. Instead of relying on crowd management strategies, the BPD relied primarily on heavy-handed crowd control tactics including skirmish lines, chemical agents, less-lethal impact munitions, and batons. As shown clearly in the scientific literature, these approaches tend to instigate and escalate matters between police and protesters and to amplify violence and disorder rather than preventing or mitigating these undesirable outcomes. The video footage I reviewed in this case revealed numerous instances of police using force inappropriately against people who were behaving in a peaceful and lawful manner and had not been issued an amplified and audible order to disperse. In other instances, the police were warranted in using force, but the level of force was out of proportion with the severity of the offense or the threat posed by the suspect. In several instances – including those involving the Plaintiffs – the police used force in a manner that violated BPD policy and was contrary to generally accepted police standards and practices.

178. As noted in earlier in this report, the BPD appears to have "circled the wagons" and sought to shield its officers from discipline for the numerous instances of misconduct that occurred during the GFP. I see little evidence that the BPD has demonstrated a genuine commitment to

conducting thorough investigations into citizen complaints about alleged police misconduct, or to holding its officers accountable for their behavior during the GFP. There was a clear custom or practice among BPD officers of not filing timely and accurate use of force reports. These inactions helped to create an environment in which officers were shielded from any real sense of accountability for misconduct.

179. In short, the BPD responded in an overly forceful manner to people whose behavior didn't warrant such a response. It treated the crowd as a homogeneous whole and used force against people who had committed no crime due to the violent behaviors of others. It did all of this within an environment of impunity against officers who engaged in routine, overt acts of misconduct.

180. Police officers in the United States have an obligation to facilitate peaceful First Amendment expression and public safety during protests. They also have an obligation to behave in a lawful and transparent manner that embraces accountability and builds trust with the community. The materials I reviewed in this case reveal that the BPD did not live up to these obligations during the GFP. Instead, they behaved in a manner that likely escalated tension, conflict, and violence with protesters Moreover, a review of BPD training materials reveals that, in choosing to engage primarily in crowd control rather than crowd management, BPD officers were doing what their agency trained them to do.

181. In short, the BPD's policies, training, strategies, and tactics led to the constitutional violations and injuries experienced by the Plaintiffs and others during the GFP.

182. My rate of compensation for review is $350 per hour. I am aware that discovery is ongoing in this case. My opinions may be added to, or amended, upon review of any additional information that becomes available.

Respectfully submitted,

Edward R. Maguire, Ph.D.
Dated: June 7, 2024

**X. List of Materials Reviewed**

<u>Audio files</u>
  1705.05312020 THRU 06012020 CH01 1800 THRU 0300AM - CONFIDENTIAL SUBJECT
  TO PROTECTIVE ORDER

<u>Deposition Transcripts</u>
  Ackers depo transcript.pdf
  Barboza depo transcript.pdf
  Boyle depo transcript.pdf
  Browning depo transcript.pdf
  Burke depo transcript.pdf
  Canto depo transcript.pdf
  Cecilio depo transcript.pdf
  Chambers-Maher depo
  transcript.pdf
  Conley depo transcript.pdf
  Connolly depo transcript.pdf
  Danilecki depo transcript.pdf
  Dottin depo transcript.pdf
  Eblan depo transcript.pdf
  Gross depo transcript.pdf
  Hall depo transcript.pdf
  Healy depo transcript.pdf
  Huffman depo transcript.pdf
  Janey depo transcript.pdf
  Jones depo transcript.pdf
  Keaveney depo transcript.pdf
  Kerriana Hall depo transcript.pdf
  Long depo transcript.pdf
  Lucas depo transcript.pdf
  Lyons depo transcript.pdf
  Madeira depo transcript.pdf
  McGoldrick depo transcript.pdf
  McManus depo transcript.pdf
  Nolan depo transcript.pdf
  Ridge depo transcript.pdf
  Romano depo transcript.pdf
  Tarantino depo transcript.pdf

Other Documents

  1-74.BPD Rule 200.pdf

  176-192.Crowd Control Presentation.PDF

  1994-2134 Use of Force Defensive Tactics 2019 edition.pdf

  2028-2033Rule 304 April 2013.pdf

  57-17 Crowd Management Manual.pdf

  7000-7039.Rule 102 Versions.pdf

  7210.CM 10-007 Disciplinary Policy Statement.pdf

  7211-7218.Rule 113.pdf

  7302-7305.5-13_Changes_Rule_304.pdf

  7306-7314_.Additional Reports.pdf

  7315-7324 Rule 303D impact launcher R304 May 2020.pdf

  7452-7453.5.29.20 bodycam Evidence Search Results (1-13).pdf

  75-82.BPD Rule 304 updated 2021.pdf

  7603 - 8178 police reports from late may to early june.pdf

  8905-9042.Field Force Operations.pdf

  9870-9952. Rules and Special Orders re BWC and video management.pdf

  AAR handout.pdf

  After Action Review by Meade.pdf

  After Action Review by Tarantino.pdf

  All Requests for Documents and Responses from City.pdf

  Boston Police Intro to Chemical Munitions 2020.pdf

  Captain UOF Report.pdf

  Crowd Control Presentation - Sgt Eblan.pdf

  Ex. 10 1652- D01704. 06012020 Civil Unrest Action Plan.pdf

  Ex. 11 1652-1939.Use of Force Reports_USE ME_PW removed_now Unsecured.pdf

  Ex. 12 Protest planning docs.pdf

  Ex. 19 20-24 Tweets from BPD and MBTA.pdf

  Ex. 2 75-82.BPD Rule 304.pdf

  Ex. 21 381-385 Public Records Request to City for May 31 Plan UOF etc.pdf

  Ex. 24 397-435 Huffman IA investigation.pdf

  Ex. 25 485-546 Chambers-Maher IA Investigation.pdf

  Ex. 26 6074-6076.McManus IA resume.pdf

  Ex. 27 6077-6079.Nolan IA resume.pdf

  Ex. 28 6080-6081.Burke IA resume.pdf

  Ex. 29 chambers Maher log.pdf

  Ex. 3 83-175.Crowd Control Book Final.pdf

  Ex. 4 176-192.Crowd Control Presentation.pdf

  Ex. 5 UOF Force Training.pdf

  Ex. 6 crowd control.pdf

  Ex. 7 1-74.BPD Rule 200.pdf

  Ex. 8 lethal and non-lethal force SO.pdf

  Ex. 9 BLM 1602-1651.Police Operations.pdf

Randall_Maas_9077-9085 After Action Review.pdf
Rule 303 Use of Deadly Force.pdf
Rule 303A Use of Less Lethal Force.pdf
Rule 304 reissued May 29 2020.pdf
Rule_303_5-19-2021.pdf
Rule_303A_10-19-2021.pdf
Rule_303D_6-19-2018.pdf
Rule_303D_6-27-2018.pdf
Rule_304_4-29-2013.pdf
Stern report.pdf
UOF2020-004 - bike unit OC spray on May 29%2FUOF2020-004.pdf

Video files
7454.650_Harrison_Ave.mp4
IAD2020-0178 sign ripping video - from City of Boston.MOV
street camera 901 Downtown Crossing.mp4
street camera 943 car on fire.mp4
Video taken by Chambers-Maher (18).MOV
7455.Protest.mp4
7456.Protest-2.mp4
7457.Protest-3.mp4
7458.Protest-4.mp4
7459.Protest-5.mp4
7460.Protest-6.mp4
7461.Protest-7.mp4
7462.Protest-8.mp4
7463.Protest-9.mp4
7464.Protest-10.mp4
7465.Protest-11.mp4
7466.Protest-12.mp4
A1 - Wash & Summer 1 PTZ_2020-05-31_20-50-57_2020-05-31_21-05-38.dvt
Ackers assault on Burke bodycam - from Appeal montage.mp4
Ackers OC sprayed - street cam.mp4
body cam with view of BCM incident - Cedric Lopes body cam.mp4;
Bodyworn video footage, Andre Watson, May 31, 2020 (protest-3.mp4)
Bodyworn video footage, Austin Brooks, May 31, 2020 (protest-3.mp4)
Bodyworn video footage, Chad Wozniak, May 31, 2020 (AXON_Body_2_Video_2020-05-31_2147.mp4)
Bodyworn video footage, Eugenio Fernandes, May 31, 2020 (PROTEST_-_DOWNTOWN_BOSTON.mp4)
Bodyworn video footage, Kathleen Senise, May 31, 2020 (Protest_Tremont.mp4)
Bodyworn video footage, Kevin McGoldrick, May 31, 2020 (Protest_Wash_Tremont_Stuart.mp4)

Bodyworn video footage, Mathew Shea, May 31, 2020 (AXON_Body_2_Video_2020-05-31_2133.mp4)

Bodyworn video footage, Michael McManus, May 31, 2020 (PROTEST-2.mp4)

Bodyworn video footage, Norman Texeira, May 31, 2020 (PROTEST.mp4)

Bodyworn video footage, Pierce Norton, May 31, 2020 (tremont_street_and_washington_street_.mp4)

Bodyworn video footage, Robert Dirienzo, May 31, 2020 (Riots_May_31.mp4)

Bodyworn video footage, Thomas Finn, May 31, 2020 (AXON_Body_2_Video_2020-05-31_2118.mp4)

Caitlyn near Nolan on Johns video.mp4

Cecilio Exhibit 3 IMG_9792.MOV

Ex. 30 cop spraying Ackers - body cam footage from distance.mp4

Ex. 31 Ackers OC sprayed - street cam.mp4

Ex. 32 Huffman assaulted on BPD body camera.mp4

Ex. 34 Street cam - Ackers incident.mp4

Ex. 35 street cam - Ackers OC sprayed.mp4

Ex. 36 Street cam - Huffman incident.mp4

Ex. 37 Ackers assaulted on BPD body camera.mp4

Hall clip at 948 from AXON_Body 2_ Video_2020-0S- 31_2147.mp4

McManus body cam - BCM incident.mp4

Rudyversus video annotated.mp4 [video]

Video of bike officer in black vest knocking sign - slow motion.mp4

Video taken by Chambers-Maher (22).mp4