**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

---

|  |  |
|---|---|
| JASMINE HUFFMAN, JUSTIN ACKERS, CAITLYN HALL, and BENJAMIN CHAMBERS-MAHER, | ) ) ) ) |
| Plaintiffs, | ) C.A. 21-10986-ADB ) |
| v. | ) ) |
| CITY OF BOSTON, and MICHAEL BURKE, EDWARD JOSEPH NOLAN, and MICHAEL J. MCMANUS, in their individual capacities, | ) ) ) ) |
| Defendants. | ) ) |

---

# EXHIBIT 175



3026 NW 31 Way
Boca Raton, FL 33496
(561) 302-0756 Tel
(561) 892-8250 Fax
ascott@ajspoliceconsulting.com
www.ajspoliceconsulting.com

## United States District Court
## District of Massachusetts

| | | |
|---|---|---|
| JASMINE HUFFMAN, JUSTIN ACKERS, CAITLYN HALL and BENJAMIN CHAMBERS-MAHER | ) ) ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | C.A. 21-10986 |
| | ) | |
| CITY OF BOSTON, AND MICHAEL BURKE, EDWARD JOSEPH NOLAN, AND MICHAEL J. MCMANUS, in their individual capacities, | ) ) ) ) | |
| | ) | |
| *Defendants.* | ) | |

### ATTORNEY:

Mr. Howard Friedman, Esq.
Mr. Mark Loevy- Reyes, Esq.

### FIRM ADDRESSES:

Law Offices of Howard Friedman, P.C.
1309 Beacon Street, Suite 300
Brookline, Massachusetts 02446.
(O): 617-742-4100

Loevy & Loevy
398 Columbus Avenue, #294
Boston, MA 02116

311 N. Aberdeen Street, 3rd Floor
Chicago, Illinois 60607
(O): 312-243-5900

1

**ITEMS REVIEWED:**

1. Complaint.
2. Audio Statement of Boston Police Department (BPD) Officer Burke, re: Huffman complaint.
3. Audio Statement of Ms. Huffman.
4. Audio Statement of BPD Officer Lopes.
5. Audio Statement of Mr. Chambers-Maher.
6. Audio Statement of BPD Officer Edward Nolan, re: Hall complaint.
7. Audio Statement of BPD Officer Michael Burke, re: Ackers' complaint.
8. Audio Statement of BPD officer McManus, re: Chambers-Maher complaint.
9. BPD IAD documents related to the Huffman Complaint (Bates Stamped D006242-006997).
10. Audio Statement of BPD Lt. Conley (I.A.).
11. Huffman Internal Affairs Investigation (Bates Stamped Huffman 00397-00435) (Exhibit 24).
12. Chambers-Maher Internal Affairs Investigation (Bates Stamped Huffman 0485-0546) (Exhibit 25).
13. IAD Memo to Deputy Superintendent Eddy Crispin from Internal Affairs Sergeant Michael Hanson, dated 9/9/22, Subject: IAD Complaint Number IAD2020-0217(Exhibit 59).
14. Randall Maas-Ackers File (Bates Stamped D 07467-7555).
15. Audio of David O'Connor I.A. Interview.
16. Audio of Officer Edward Nolan I.A. interview.
17. Audio of Officer Robert Lucas I.A. interview.
18. Transcript of Lt. O'Connor's statement.
19. Transcript of Officer Nolan.
20. Transcript of Officer Lucas.
21. Facebook pictures of facial injury to Ms. Hall (2 photos).
22. Hall Complaint to BPD (Bates Stamped D 007299-007301).
23. BPD Investigation into Hall Complaint (Bates Stamped D 009086-009102).
24. Video of Protest (2020-0531212628) (D 9103).
25. Body Worn Camera (BWC) video of BPD Officer Direnzo (May 31-9106).
26. BWC video of BPD Officer Wozniak (May 31-9105).
27. Video (2020-531213306) (D 9104).
28. Audio Statement of Lieutenant Conley.
29. Transcript of Officer Burke IA Statement.
30. Transcript of Lieutenant Conley IA Statement.
31. Transcript of Ms. Huffman IA Statement.
32. Transcript of Officer Lopes IA Statement.
33. Officer Burke's Complete BWC (Downtown Riots).
34. Video (1306) (B001015-42022-IAD-2020-0200).
35. Huffman IA Investigation (Bates Stamped D 01467-01480).

36. Huffman IA Complaint (Bates Stamped D 1169-1209).
37. Audio of Officer O'Connor Interview (1297).
38. Audio of Officer Ed Nolan (1299).
39. Audio of Officer Lucas (1305).
40. Transcribed IA Interview of David O'Connor.
41. Transcribed IA Interview of Edward Nolan.
42. Transcribed IA Interview of Robert Lucas.
43. Video (1295-Benjamin Chambers-Maher).
44. Audio of Chambers-Maher Interview.
45. Audio of Officer McManus Interview.
46. BPD IA Investigation of Chambers-Maher Complaint (Bates Stamped D 01327-D01384).
47. BPD Officer McManus Use of Force Report.    ·
48. Transcript of I.A. Statement of Mr. Chambers-Maher.
49. Transcript of I.A. Statement of Officer McManus.
50. Memo to Deputy Superintendent Eddy Chrispin from Sergeant Morgan dated June 20, 2022,
    General Inquiry # 2020-0226, Complainant Rebecca Eppler-Epstein.
51. Street Camera Number 1.
52. Street Camera Number 2.
53. Street Camera Number 3.
54. Map and timeline of street cameras on Washington Street, Boston, June 1, 2020 (Pages 1-6).
55. BPD I.A. Investigation of Captain John Danilecki (Bates Stamped D007226-7298).
56. BPD Memo regarding I.A. D2020-0193 (Bates Stamped D7331-7345) (Complainant Kaitlin
    Corey).
57. Audio of Captain Danilecki I.A. interview.
58. Audio of Casey Cosky interview.
59. Video of Captain Danilecki ripping protest sign.
60. Rose Case Policy and Procedure Review.
61. City of Boston Mayor, Kim Janey Press Release, dated May 14, 2021.
62. Memo authored by Attorney Tamsin R. Kaplan to Henry Luthin dated 4/29/21, Subject:
    Independent Investigation in the Matter of Police Commissioner Dennis A. White.
63. Spreadsheet of BPD complaints received from 2016 through 2020.
64. BPD Spreadsheet of sustained complaints from 2016 through 2020.
65. Deposition of Gregory Long with exhibits.
66. Deposition of William Ridge with exhibits.
67. Deposition of William Gross with exhibits.
68. Expert Declaration of Mr. Todd McGhee.
69. BPD Rule 304.
70. City of Boston Ordinance Establishing an Office of Police Accountability and Transparency
    dated December 16, 2020.

71. McCarthy, B., Ryan, A., and Allen, E., (November 24, 2020). *A database of 10 years of Boston Police disciplinary action.* The Boston Globe.
72. Boston University Alumni Magazine (March 27, 2023). *Boston Police Commissioner Michael Cox Scaled the Blue Wall of Silence.*
73. Ryan, A., (April 10, 2021). *For years, the Boston Police kept a secret: the union president was an alleged child molester.* The Boston Globe.
74. Ryan, A. and McDonald, D. (July 29, 2021). *Report urges more transparency for Boston police internal affairs after Patrick Rose case.* The Boston Globe.
75. Memorandum from Tamsin R. Kaplan to Henery C. Luthin, Subject: Independent Investigation in the Matter of Police Commissioner Dennis A. White, dated April 29, 2021.
76. Jones, G. (August 16, 2022). *Michael Cox's Long Journey Leads Him Back Home to Boston.* The Boston Globe.
77. Cotter, S. (October 25, 2023). *Advocates call for answers over Boston police internal affairs investigation.* The Boston Globe.
78. Allen, E., Rocheleau, M., and Ryan, A. (July 18, 2020) *Within the Boston Police Department, complaints against officers are rarely confirmed or result in punishment.* The Boston Globe.
79. Editorial Board (April 13, 2021). *Ending the code of silence for Boston police.* The Boston Globe.
80. Rose Case Policy & Procedure Review.
81. BPD Rule 102 titled The Conduct and General Rights and Responsibilities of Department Personnel (Amended) (June 5, 2015).
82. BPD Rule 102 titled The Conduct and General Rights and Responsibilities of Department Personnel (Amended) (April 15, 2021).
83. BPD Rule 102 titled The Conduct and General Rights and Responsibilities of Department Personnel (Amended) July 21, 2020).
84. Allen, E., and Ryan, A. (April 18, 2023). *An alleged assault by a police captain, and a long, long wait for justice.* The Boston Globe.
85. Ebbert, S., and Fatima, S. (May 14, 2021). *11 disturbing revelations in the investigative report on suspended BPD commissioner Dennis White.* The Boston Globe.
86. BPD Internal Affairs investigation report regarding complainant Rebecca Eppler-Epstein, General Inquiry #2020-0226, dated June 20, 2022, authored by Sgt. Det. Philip Morgan (Bates Stamped D 009161-009165).
87. BPD Memo to Michael Cox from Phillip Owens re: I.A. Recommendations concerning Captain John Danilecki, dated June 6, 2023, Complainant: Mr. Nave.
88. BPD Memo to Eddy Crispin from Sgt. Det. Taxter re: Complaint # IAD2019-0124 – Captain John Danilecki, dated August 23, 2021, Complainant: Mr. Nave.
89. Letter to Massachusetts POST Commission from attorney Howard Friedman re: Complaint against BPD IA Department and Captain John Danilecki, dated December 13, 2023.

90. BPD Memo to Coutney Matthews from Sgt. Det. Lucas Taxter re: IAD Complaint # 2019-0548-BPD re: Captain John Danilecki, dated June 24, 2020, Complainant Meghan Anderson aka David John Anderson.
91. BPD Memo to Willaim Gross from Coutney Matthews, subject Internal Affairs Recommendations re: Captain John Danilecki, dated August 24, 2020, Complainant Meghan Anderson.
92. Street camera videos of encounter between Mr. Nave and Captain Danilecki.
93. Two photographs of Captain John Danilecki tearing up a protester's sign.
94. BPD Officer Kathleen Senise Body Worn Camera (BWC) (2X8140909) dated June 1, 2020, 1:58:22 memorializing BPD Officer McManus pushing a protester with his bicycle and partially tearing the protester's sign.
95. Video of Captain Danilecki tearing up a protester's sign during George Floyd protest.

## INCIDENT, DATE, TIME AND LOCATION:

May 31, 2020 - June 1, 2020, approximately 9:00 p.m. - 12:00 a.m.

Near or about downtown Boston and the Boston Commons
Boston, Massachusetts

## INDIVIDUALS INVOLVED:

Ms. Jasmine Huffman
Mr. Justin Ackers
Ms. Caitlyn Hall
Mr. Benjamin Chambers-Maher

## LAW ENFORCEMENT:

Officer Michael Burke
Officer Edward Nolan
Officer Michael McManus

Jurisdiction: Boston (MA) Police Department

## INCIDENT SUMMARY:

*The incident summary is based upon the materials noted in this report's "Items Reviewed" section, including statements, depositions, video evidence, photographs and police reports. This writer makes no credibility assessments of any of the individuals involved in this incident.*

In the late afternoon hours into the evening of May 31, 2020, and into the early morning hours of June 1, 2020, the City of Boston was subjected to protests related to the death of George Floyd.[1] The protest initially culminated at the State House in the City of Boston. As the protest continued, additional individuals joined. As the number of protesters increased, and the actions of some the protesters became violent, the Boston Police Department determined that the protest escalated into a riot.

The BPD was aware of the anticipated protest before it actually occurred. Various members of the BPD were convened to react to the protests, however insufficient BPD personnel were called out to deal with the protesters (Deposition testimony of Officer Burke, Officer McManus and Officer Nolan). To that end, the department's Public Order Platoon (POP) was deployed to disperse the protestors, but with insufficient personnel to sufficiently staff the POP contingent, particularly the aspect of providing arrest teams (William Ridge deposition, p. 114). Arrest teams are a critical component of POP which allows for the immediate apprehension of protestors committing crimes while not hindering the advancement of the forward motion of the POP.[2]

The Plaintiffs in this matter participated in the protests. Each of the Plaintiffs were subjected to force by members of BPD. Each of the Plaintiff filed complaints against certain members of the BPD. These complaints are summarized below:

### Ms. Jasmine Huffman:

Ms. Jasmine Huffman was a protester on May 31 2020, in the City of Boston. She filed a complaint with the Boston Police Department. The BPD Internal Affairs investigation into the matter stated, in part, under *Summary of Complaint,*

---

[1] George Floyd was killed while being taken into custody by Minneapolis (MN) police officers on May 25, 2020. The death of Mr. Floyd at the hands of Minneapolis police officers was captured on video and publicly exhibited throughout the world. For many weeks thereafter many United States cities experienced civil unrest protesting Floyd's death.

[2] BPD's POP contingent is a derivative of crowd control tactics conceptualized by Miami (FL) Police Department and Miami-Dade (FL) County Police Department after experiencing civil unrest in Miami and Miami-Dade County jurisdictions in 1979.

*"Boston Police used excessive force against her. She stated that she saw a video of herself on YouTube and wanted to make a complaint. She emailed a copy of the video which showed a contingent of Police Officers clearing a large disturbance in front of, what appeared to be the Boston Common at Park Street Station. A person can be seen standing in front of the approaching Officers and not moving. Everyone else appears to clear the area and a person is knocked to the ground.*
*Web Complaint*
*"I was knocked down while my hands were up and then trampled by the police. Then dragged and tossed to the side viciously."[3]*

Ms. Huffman filed her complaint with BPD on June 5, 2020. The Boston Police Department Internal Affairs Division concluded its investigation on September 7, 2021. BPD I.A. "Exonerated"[4] Officer Burke for the actions and force he used against Ms. Huffman. The interaction with BPD officers and Ms. Huffman was captured on video. It took BPD I.A. one year and three months to complete its investigation of Officer Burke.

## Mr. Benjamin Chambers-Maher:

Mr. Benjamin Chambers-Maher was a protester on May 31 2020, in the City of Boston. He filed a complaint with the Boston Police Department on June 6, 2020. The BPD Internal Affairs investigation into the matter stated, in part, under *Summary of Complaint*,

*"Mr. Benjamin Chambers-Maher alleged that on May 31st, 2020 he was a member of a peaceful protest in front of the Massachusetts State House. Mr. Chambers-Maher stated once the organizers of the protest instructed the attenders to disperse he attempted to walk back to his vehicle, which was parked by the U.S. Coast Guard base 427 Commercial St, Boston. Mr. Chambers-Maher indicated he was not familiar with the streets of Boston and walked with the crowd to the Theater District area. Mr. Chambers-Maher stated there, while protesting peacefully and complying with police officer's commands, he was sprayed with mace on two occasions by officer Michael McManus and called a "pussy" by the officer. Mr. Chambers-Maher feels this action by Officer McManus amounts to an assault of an unarmed, compliant civilian."[5]*

---

[3] BPD Internal Affairs investigation report, Complaint # IAD2020-0200, dated August 19, 2021, authored by I.A. Sergeant Detective Philip Morgan (Bates Stamped Huffman 0397-0435) (Exhibit 24-DEF COB DEP.)

[4] Exonerated means the actions by the officer occurred but comported with agency policy.

[5] BPD Internal Affairs investigation report, Complaint # IAD2020-0186, dated March 16, 2021, authored by I.A. Lt. Detective Timothy P. Gaughan (Bates Stamped D 01332-0136 & D 01327-01328)

Mr. Chambers-Maher filed his complaint with BPD on June 6, 2020. The Boston Police Department Internal Affairs Division concluded its investigation on March 16, 2021. BPD I.A. "Exonerated" Officer McManus for the actions and force he used against Mr. Chambers-Maher. Mr. Chamber-Maher was notified of the disposition of the investigation on March 22, 2022. The interactions of BPD Officer McManus and Mr. Chambers-Maher were captured on video. It took BPD I.A. nine months to complete its investigation of Officer McManus.

## Ms. Caitlyn Hall:

Ms. Caitlyn Hall[6] was a protester on May 31, 2020, in the City of Boston. An individual, Marshall Hahn, filed a complaint with the Boston Police Department on June 1, 2020, on Ms. Hall's behalf. The BPD Internal Affairs investigation into the matter stated, in part, under *Summary of Complaint*,

*"On June 1, 2020, the Internal Affairs Division received an online complaint alleging an unknown officer (Badge #1185) struck the victim, Caitlyn Hall, in her mouth with a baton. According to the complaint, the officer was alleged to have been overly aggressive the entire night towards protesters who were standing in a line with their hands up."*

The Boston Police Department Internal Affairs Division concluded its investigation on October 25, 2023. BPD I.A. determined that the actions of Officer Nolan were "Unfounded."[7] It is unclear if Ms. Caitlyn Hall or Mr. Hahn were ever notified of the BPD investigation disposition. There was no video evidence in this case depicting the interaction between Ms. Hall and Officer Nolan. However, there is video evidence of Ms. Hall before being struck by Officer Nolan and after Ms. Hall was injured. It took BPD I.A. three years and four months to complete its investigation of Officer Nolan.

## Mr. Justin Ackers:

Mr. Justin Ackers was a protester on May 31 2020, in the City of Boston. On June 16, 2021 BPD was made aware of a lawsuit filed against BPD Officer Michael Burke involving Mr. Ackers. BPD I.A. initiated an investigation. The BPD Internal Affairs investigation into the matter stated, in part, under *Summary of Complaint*,

---

[6] Caitlyn Hall's name was subsequently changed to Caitlyn Papa but I will use Hall for consistency with prior documents..

[7] Unfounded means that there was no basis for the complaint.

8

*"On June 16, 2021, the Boston Police Internal Affairs Division was made aware that police officer Michael Burke was named in a civil lawsuit (C.A. 21-10986). This civil action was filed by Attorney Howard Friedman on behalf of his client, Justin Ackers. I do note that there are two additional Boston Police Officers named in this same lawsuit. These two additional officers are named for unrelated incidents that have been independently investigated by other members of the Boston Police Internal Affairs Division. As it pertains to Mr. Ackers, the complaint reads as follows:*

*Mr. Ackers came to Boston to peacefully protest the murder of George Floyd. He was recording the protest and the police on his phone. As he was recording, an unknown Boston police officer sprayed him in the face with OC spray for no reason, causing pain and confusion. At approximately 10:08 pm, Mr. Ackers was preparing to go home and was on his moped at Tremont Street near Park Street. As he turned his moped to go home, Mr. Ackers was blindsided and knocked to the ground."*

*"On Tuesday, June 29, 2021, I began a review of this case. On this date, I spoke with Attorney Howard Friedman, who represented Mr. Justin Ackers in this matter. Mr. Friedman stated that he did not believe that his client was interested in participating in the Internal Affairs investigation. On Friday, July 2, 2001, Attorney Friedman confirmed that his client had no desire or interest in participating in the Internal Affairs investigation. The notification was made by telephone and followed up by an e-mail from Attorney Friedman. Officer Burke was on military orders when Mr. Ackers complaint was brought. Officer Burke returned from military orders in April 2022 and was interviewed in June 2022."*

The Boston Police Department Internal Affairs Division concluded its investigation on May 15, 2023. BPD I.A. "Exonerated" Officer Burke for the actions and force he used against Mr. Ackers. It is unclear if Mr. Ackers was ever notified of the disposition of the investigation. The interactions of BPD Officer Burke and Mr. Ackers was captured on video. It took BPD I.A. one year and 11 months to complete its investigation of Officer Burke.

## SUMMARY OF PRIMARY OPINION(S):

### *My opinions are provided to educate the jury on well-established police practices and procedures.*

My opinions and the basis for my opinions are formed from the totality of my specialized knowledge, skill, education, research, literature, training, and information I have reviewed. My opinions and basis for my opinions are based on sufficient facts and data reviewed; they are the product of reliable law enforcement principles and methods. I have applied these law

enforcement principles and methods reliably to the facts and circumstances of this case. There is a body of knowledge in literature about the practices and standards to which modern, professionally administered police agencies should adhere. The standards and accepted practices have evolved in the interest of fostering and maintaining police agencies that are professional, effective, and whose practices and policies are observant of the law. Standards have evolved, in part, as a response to reported cases of police misconduct and as tools to limit police discretion and ensure that police behavior is within acceptable professional, legal, and constitutional limits.

There is a substantial body of literature and knowledge regarding the types and causes of police misconduct. I am well familiar with and have contributed to the literature and body of knowledge regarding the types and causes of police misconduct. Within the broad range of criminal justice, my area of study and practical experience is, and has been, high liability police practices, including police misconduct and its relationship with policy, procedure, training, supervision, and accountability mechanisms. I am a life member of the International Association of Chiefs of Police (IACP), a member of the Police Executive Research Forum (PERF), a life member of the Florida Police Chiefs Association (FPCA), and a life member of the Palm Beach County Association of Chiefs of Police (PBCAC). I hold a Doctor of Criminal Justice degree from Saint Leo University, Florida. My other experience, knowledge, and training are further identified in my Curriculum Vitae, which is attached to this report.

My opinions are also based on my 30 years of law enforcement experience, knowledge, and training (see attached Curriculum Vitae). My experience includes seven years as Chief of Police and four years as an Assistant Chief of Police. My experience and training include being an Assessor and Team Leader for The Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA) and an assessor, Team Leader, and former Chairperson for the Commission on Florida Law Enforcement Accreditation, Inc. (CFA). As an assessor for both accreditation bodies, I conducted assessments for over 100 law enforcement agencies nationwide. These assessments included a review of all the department's written policies, including use of force, criminal investigations and Internal Affairs. My opinions were also derived from my experience as a patrol Officer, criminal investigator, Sergeant, Lieutenant, Commander of Criminal Investigations, Commander of Internal Affairs, and Commander of Uniform Patrol during my law enforcement career, and as an instructor teaching officers on conducting Internal Affairs investigations. I have also instructed members of law enforcement on the concepts of Field Force formulation and deployment during civil unrest events. My opinions were also supported by written material published by The International Association of Chiefs of Police (IACP) Model Policies, Training Keys, Concepts & Issues papers, CALEA standards, and other published peer-reviewed articles on criminal investigations, Internal Affairs, supervision, and police use of force.

***I presently hold the following opinions to a reasonable degree of professional certainty:***

## Opinion 1:

The Boston Police Department has a custom and practice of failing to investigate complaints thoroughly and completely against its members. Many complaint investigations conducted by Boston Police Department languish for extended periods of time (months and years) and are not completely investigated by internal affairs or other agency members. Complaints are hampered by BPD officers not wanting to provide information about fellow officer misconduct. The actions of the Boston Police Department regarding investigating complaints against its members is inconsistent with well-established police practices and procedures.

## Analysis:

1.1     One of the most important functions of a law enforcement agency is to ensure that officer behavior is properly monitored and if deviations are noted that complete and thorough investigations are conducted to determine if the actions of the officer violated agency policy or were within the four corners of agency policy. Deviations of proper officer behavior can be observed and reported internally by agency members or supervisors or citizens can file complaints. The Internal Affairs function, also referred to as the Professional Standards Bureau, is usually tasked with investigating such complaints. The foundation of community trust and agency credibility transparency is based on the ability of an agency to investigate its members' behavior honestly, quickly, and with integrity.[8] To that end, noted in the subsequent paragraphs of this report are citations from professional law enforcement groups and scholars as to the importance of the Internal Affairs function of a police department to enhance the public trust, maintain agency legitimacy, and breech the "Blue Wall" or "Conspiracy of Silence."[9]

1.2     The International Association of Chiefs of Police (IACP) publication titled *Investigation of Allegations of Employee Misconduct* (April 2019) states, in part, under section B, titled *Background*,

> ***"Law enforcement officers possess unique powers and discretion to take actions that require professional supervision, management, oversight, control, and adherence of***

---

[8] Department of Justice-Office of Community Oriented Policing Services and the International Association of Chiefs of Police (2009). *Building Trust Between the Police and the Citizens They Serve.*

[9] Blue Wall or Conspiracy of Silence refers to a law enforcement officer's reluctance to report misconduct of a fellow officer.

*officers to a rigid code of conduct and professionalism. In response to this, law enforcement agencies have a duty to fully and completely investigate allegations of employee misconduct. Through the development of policies and procedures to detect and respond to instances of employee misconduct, a law enforcement agency can protect its interests and reputation, promote public trust, ensure that heightened integrity remains a mainstay of the law enforcement profession, and mitigate potential civil litigation. To be effective, internal investigation and disciplinary procedures must be consistently applied to all employees in an equitable manner. Inconsistent discipline can undermine the entire disciplinary process and lead to charges of disparate treatment and civil litigation. In addition, all employees should be provided with regular training and guidance to foster increased understanding and acknowledgement of agency policy on this topic. Law enforcement agencies have the responsibility and duty to conduct internal investigations of allegations of misconduct in accordance with the law and professionally accepted practices. An employee who is the subject of an internal investigation retains certain rights, which may vary according to applicable law or the terms of a collective bargaining agreement. In addition, the characterization of the investigation as administrative or criminal will determine the applicable rules.*"[10]

1.3    The IACP publication further states, in part, under Section C titled *Community Relations*,

*"Some members of the public are unaware that the complaint process exists. The need for increased transparency regarding the complaint process and ultimate disposition of complaints is even more apparent with the availability of Internet and social media options that permit timely and open access and dialogue with the public. Failure to address public complaints or involve the public in this process can result in officers who are hostile or overly aggressive to remain in their positions of authority and to continue to abuse that authority. In addition, incidents of discriminatory behavior by law enforcement personnel that are not identified and appropriately addressed could increasingly alienate large segments of the population. Public trust and confidence are built when the public perceives that employee misconduct is addressed and corrected by the agency. This, in turn, promotes public willingness to assist the agency in carrying out its mission. In a climate that fosters trust and transparency between the public and law enforcement, citizens are more likely to come forward to testify, provide evidence of criminal acts, and contribute other needed assistance in reducing crime."*[11]

---

[10] IACP (April 2019, p.1). Investigation of Allegations of Employee Misconduct. Law Enforcement Policy Center.
[11] Ibid (p. 2).

1.4    The IACP publication further states, in part, under Section III titled *Investigative Procedures*, subsection B titled *Disposition Following Investigations-Time Limit on Review Process*,

*"Whenever possible, the investigation of a complaint should be completed within a reasonable period of time. A period of 45 days from the time of the initial receipt of the complaint to its disposition would be considered reasonable under most circumstances unless a waiver is granted by the chief executive or their designee. In addition, alternate time frames may be established by agency policy, law, or collective bargaining agreements. This time limit may be impractical in investigations involving criminal activity where the administrative investigation is suspended to allow the criminal investigation to begin or to proceed."[12]*

1.5    The Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA) was created in 1979 as a direct result of the collaborative efforts by the four distinguished professional law enforcement groups in the United States, the International Association of Chiefs of Police (IACP), the National Sheriff's Association (NSA), the Police Executive Research Forum (PERF) and the National Organization of Black Law Enforcement Executives (NOBLE). CALEA has codified well-established police practices and procedures through its standards on a variety of law enforcement functions including police discipline and Internal Affairs. Participation in CALEA is on a voluntary basis. The Boston Police Department is not a CALEA accredited law enforcement agency.

1.6    The Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA) dedicates an entire chapter of law enforcement standards on discipline and Internal Affairs titled Disciplinary Procedures and Internal Affairs (Chapter 26).[13] The existence of CALEA Chapter 26 and its standards exemplifies the critical function of a law enforcement agency to monitor officer behavior and provide corrective actions to improve officer performance and behavior.

The introduction of CALEA Chapter 26 states,

- *"The elements of an effective disciplinary system should include training, rewarding, counseling, and punitive actions in the interest of discipline. The ultimate goal of*

---

[12] Ibid (p. 10).

[13] Commission on Accreditations for Law Enforcement Agencies, Inc. (CALEA). Chapter 26 titled *Disciplinary Procedures and Internal Affairs*. (Version 6.15).

*the disciplinary system is to correct the behavior or performance of the employee. Training, counseling, and punitive actions should be designed to restore professionalism, which ultimately supports the integrity of the agency and the employee. Effective discipline is a positive process when its perceived purpose is to train or develop by instruction. Among the programs having an impact on discipline in a law enforcement agency are selection, training, direction, supervision, and accountability. These elements are interdependent, and a weakness in any one is damaging to effective discipline. Rewarding exceptional work performance, including meritorious and heroic acts, provides employees recognition of their outstanding contribution to the success of the agency.*

- *The internal affairs function is important for the maintenance of professional conduct in a law enforcement agency. Standards in this section are a direct reflection of the importance of the internal affairs function. The honor and veracity of the agency depends on the personal integrity and discipline of each employee. To a large degree, the public image of the agency is determined by the quality of the internal affairs function in responding to allegations of misconduct by the agency or its employees.*

- *Standards in this chapter assume large agencies will utilize a specialized organizational component, usually as a part of the office of the chief executive, responsible for internal affairs matters. In cases involving the integrity of the agency, the specialized unit will actually conduct the investigation and carry out all assignments related to resolving the issue. The specialized unit should be a resource and should review internal affairs matters of lesser importance investigated by supervisory personnel.*

- *In smaller agencies, use of a specialized unit may not be possible or practical. The internal investigation function may be assigned to an individual on an as needed basis or be conducted by the chief executive officer.*

- *Agencies having an internal affairs function consistent with these standards will have the capability to respond appropriately to allegations of misfeasance, malfeasance, and nonfeasance by employees, and to complaints about the agency's response to community needs, thereby instilling public confidence in the agency."[14]*

---

[14] Ibid (Chapter 26 Introduction).

14

1.7   The publication titled *Building Trust Between the Police and the Citizens They Serve*, produced by the U.S. Department of Justice (DOJ) Office of Community Oriented Policing Services (COPS) in association with the IACP states, in part,

*"Law enforcement officers have accepted a position of visible authority within their communities and are held to a tremendously high standard of honesty, integrity, equity, and professionalism. Public trust in law enforcement may be fleeting if police executives do not continually reinforce sound, ethical policies and procedures to agency personnel and to the public. Law enforcement executives, therefore, bear the responsibility for demonstrating proper behavior, informing the community about their department's role in maintaining honor and integrity within the organization, and building and sustaining a trusting working relationship between the public and the police.*

*Establishing Internal Affairs policies and procedures within an agency is not just important, but essential. If misconduct occurs, the agency should already have measures in place to investigate and address such behavior. Internal Affairs investigations, however, should be but one component of a systemic approach to ethical conduct. If law enforcement executives hire the appropriate staff, deliver ethics training, establish an early intervention system, and properly supervise staff, all of which build trust within their communities, the Internal Affairs process may be necessary only in rare instances."[15]*

1.8   The COPS and IACP publication further states, in part,

*"Police departments must adhere to the principles of integrity and professionalism as cornerstones of community trust-building. Because officers occupy a position of trust and confidence in their communities and are afforded awesome authority to carry out their duties, any excessive use of that authority, abuse of power, or failure to fulfill their duties can erode public trust and reduce or destroy their credibility within the communities they serve. Every member of a police department must understand that he or she represents the entire agency, that personal conduct is his or her own responsibility, and that he or she will be held accountable for all conduct, whether positive or negative.*

---

[15] Department of Justice-Office of Community Oriented Policing Services and the International Association of Chiefs of Police (2009, p. 5). *Building Trust Between the Police and the Citizens They Serve.*

15

*Transparent Internal Affairs processes, although critically important to any agency, are only one building block in maintaining community trust. A department's Internal Affairs practices should always be part of a larger culture of integrity and ethical conduct. "[16]*

1.9     The COPS and IACP publication further states, in part,

*"Effective Internal Affairs processes ensure that complaints about an officer are heard and dealt with effectively within the department, and that an officer is protected against false or malicious accusations through fair, thorough, accurate, and impartial investigations (Noble and Alpert, 2009). A strong Internal Affairs function should both improve morale within an agency and increase trust within the community. "[17]*

1.10    The United States Department of Justice Office of Community Oriented Policing Services published a document titled *Standards and Guidelines For Internal Affairs: Recommendations from a Community of Practice[18]* states, in part, under *3.6 Recommendations for time limits,*

*"Completion of Internal Affairs investigations should occur as rapidly as is reasonably necessary to fulfill the investigative mission. In all instances, however, an internal investigation should be completed within a reasonable time before any applicable statute of limitations or other bar to officer discipline has run out. It is preferable to conclude investigations within 180 days.*

*Commentary*

*Given localized statute requirements and wide variation in personnel and financial resources available to devote to Internal Affairs investigations, a specific, global standard for all agencies stating the time by which an internal investigation should be concluded is not feasible. Agencies with more limited staffing may, in good faith, require a longer duration of time for completing an investigation.*

---

[16] Ibid (p. 7).

[17] Ibid (p. 17).

[18] Representatives from the Boston Police Department were members of the DOJ project team, among representatives from several other law enforcement agencies throughout the country, who helped develop the recommendations for Internal Affairs.

16

*Statutory limits on investigative duration should be the minimum standard. Consideration should be given to the broader principles of the policy. It is valuable, for example, to complete investigations promptly out of respect to employees, recognizing that they suffer stress awaiting the disposition their case. It is also valuable to the development of public trust when citizens are notified that their complaints have been investigated promptly. There is value in taking swift corrective action to help a wayward employee avoid further problems. An agency can exploit the opportunity inherent in an investigative duration policy to enunciate broader principles which at once inspire prompt investigations and inspire respect for people."[19]*

1.11   Finally, according to Delattre (2002, p. 90) "Conspiracies of Silence" exist in law enforcement, as well as other professional groups. Moreover, according to Delattre (p. 90), Herman Goldstein stated "The most formidable barrier to eliminating corruption [in policing]: the blue curtain-the conspiracy of silence among police." The concept of the code of silence suggests that police officers will not "rat" on another police officer for known or observed misconduct of another police officer. This behavior can permeate the entire culture of a police organization to include the Internal Affairs function and command staff.

## Willaim Ridge (Ret. BPD Superintendent Chief-Bureau Field Services)

1.12   According to the deposition testimony of William Ridge (p. 7) he never forwarded a use of force report for further investigation to internal affairs to determine if the force was reasonable during his tenure with the Boston Police Department. He further testified that he did not recall if anyone in the Boston Police Department reviewed any videos to determine if BPD personnel engaged in any misconduct during the civil unrest in May 2020. He further testified (p. 15) that no one in BPD told him that any BPD member was looking at videos to determine if officers engaged in misconduct. He testified (p. 15) that no officer misconduct was brought to his attention as he was the superintendent of field services. However, he testified (p. 16) that he was aware that BPD detectives were looking at the videos to determine what happened. He further testified (p. 18) that he relied on the detectives reviewing the videos to bring any officer misconduct to his attention. He stated that if the action of the officer was egregious, that the detectives would bring that behavior to his attention. He testified that he trusted his detectives with that discretion, meaning bringing information to him about officer misconduct.

---

[19] Department of Justice-Office of Community Oriented Policing Services (2006, p. 33-34). *Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice.*

1.13    Mr. Ridge testified (p. 21, p. 32) that in his 35 years with BPD, he has never referred anybody to Internal Affairs to be investigated for alleged unreasonable force and he did not recall any fellow officer make an allegation of another BPD officer using excessive force.

1.14    Mr. Ridge testified (p. 22) that he has heard the term, "Code of Silence." but he did not believe it existed in BPD. He further testified (p. 23) that in his 35 years as a police officer with BPD, he has never seen any officer use excessive force or unreasonable use of force. Mr. Ridge testified (p. 23), that after he reviewed the Floyd protest videos, he did not seen any BPD officer use unreasonable force. He further testified (p. 24- 25) that every use of force that he observed on the videos was within BPD policies, training, and customs. Mr. Ridge testified (p. 69) that use of force reports are required to be completed for force used by BPD officers during protest incidents.

1.15    Mr. Ridge testified (p. 98) that an officer can use OC (Oleoresin Capsicum)[20] spray on a person who is not necessarily threatening the officer. The use of OC can be deployed on a person who is part of a group that is using force against officers. He further testified (p. 100) that if a peaceful protester was with other non-peaceful protesters who were engaged in misconduct, the police could use nonlethal force against the peaceful protestors. Mr. Ridge testified that if a person was present with a group that was assaulting police officers and they were told to disperse and those people remained, the use of OC would be acceptable.

1.16    Mr. Ridge testified (p. 106) that he did not recall any order being given to the protesters to disperse. Mr. Ridge testified that he did not give the command that the whole assembly of people had to leave. He testified (p. 109) that anyone who remained was considered to be part of the protest, which he believed had gotten out of hand and turned into rioting.

1.17    Mr. Ridge testified (p. 114) that the Field Force team used during the civil unrest did not have specific arrest teams that was associated with the Public Order Platoon (POP). He further testified (p. 116) that he was unaware of anyone telling the protesters that the protest was unlawful.

1.18    Mr. Ridge testified (p. 120-121) that if protesters were ordered to leave, and it was a riot, officers were allowed to use OC spray on individuals because they remained on the

[20] Oleoresin Capsicum (usually referred to as "pepper spray). BPD policy, Rule 304, refers to the use of OC spray as an "Incapacitating Agent

18

scene. He further testified (p. 128) that he did not remember any announcement provided by BPD personnel telling protesters that if they remain, they would be considered to be trespassing. He testified (p. 147) that all protesters who remained on the scene and after the protest was determined to be a riot were considered threats and, per BPD Rule 304,[21] OC spray could be used on a person.

## Gregory Long (Ret. BPD Acting Police Commissioner during the Floyd protest)

1.19  Mr. Long testified in his deposition (p. 51-55, p. 148) that after viewing the video evidence involving the use of force by BPD officers against Mr. Ackers and Ms. Huffman he thought the officers complied with BPD agency policy. Mr. Long testified (p. 62) that the force used by Officer Burke striking Ms. Hoffman, [with her hands raised in the air], was consistent with BPD policy. Mr. Long testified (p. 131-132, p. 185-186), after reviewing the video evidence of Mr. Chambers-Maher being sprayed twice by Officer McManus with OC spray that he could not determine if the use of the OC comported with BPD policy on use of force. Mr. Long testified he could not make a determination about the use of OC on Mr. Chambers-Maher because he did not know the context in which it was deployed. However, Mr. Long later testified (p. 149-157-Exhibit 33) that the use of force against Mr. Chambers-Maher comported with BPD policy. Mr. Long testified (p. 148, p. 177) that after reviewing the video of Mr. Ackers being knocked down by Officer Burke was complying with BPD policy.

1.20  Mr. Long testified (p. 132-133) that he could not determine, after viewing video evidence, if the use of OC spray on an individual who appeared to be recording the protest was justifiable or not, again citing he did not know the context of which the spray was used. Mr. Long reviewed another video (Exhibit 31) of a BPD officer using OC spray on another individual (Long deposition, p. 137) who was just standing along a fence line. Mr. Long testified (p. 137) that he could say if the officer's use of OC was inconsistent with BPD policy. However, Mr. Long testified (p. 141) that a BPD officer cannot use OC spray on a person without effecting an arrest of the person sprayed. Mr. Long testified that BPD did not conduct any investigation regarding how its officers used OC spray during the protests.

1.21  Mr. Long testified (p. 65) that he was in command of BPD during the re-investigation of alleged misconduct by a former Boston Police Commissioner (White). Mr. Long testified (p. 66) that he took no steps to investigate the complaint against the Commissioner or the allegations that BPD officers contacted a witness in the investigation of Commissioner

---

[21] BPD Policy on use of non-lethal force.

White and told the witness not to cooperate with the investigation. Mr. Long testified (p. 70) that he [BPD] did not actively get involved with assisting with the investigation because he did not want to give the appearance he was trying to influence the investigation. He testified (p. 71) that he did not have the authority to order any BPD member to participate in an independent investigation of Mr. White.

1.22    Mr. Long testified ( p.20) that he has heard of the "Code of Silence" [in law enforcement]. He further testified (p. 192) that a "Blue wall or code of silence" did not exist in BPD.

**Willaim Gross (Ret. BPD Police Commissioner)**

1.23    Mr. Gross testified in his deposition (p. 27) that he has heard of the "Code of silence" or the "Blue Wall."

1.24    During Mr. Gross' deposition he was shown various videos of police use of force on various protestors during the Floyd protest. Some of the videos memorialize BPD officers' interactions with Ms. Huffman, Mr. Chambers-Maher, and Mr. Ackers. For each of the videos Mr. Gross viewed, he could not determine if the force used in each instance was inconsistent with BPD policy (Gross deposition, p. 46, 48), with the exception of the video of Ms. Huffman being pushed down. He testified ( p. 52) that the force used against Ms. Huffman was consistent with BPD policy. Mr. Gross further testified (p. 54) that it was not BPD policy for an officer to indiscriminately rip or tear down a protestor's sign (referring to Lt. John Danilecki's video documented actions of tearing a protestor's sign). He testified that the Danilecki incident did not come to his attention.

1.25    During Mr. Gross's deposition, he was asked about a previous event in the City of Boston referred to as "Straight Pride Parade" (Gross deposition, p. 59). Mr. Gross testified ( p. 59) that he did not recall any BPD officer being disciplined for using excessive force during that event nor did he see any sustained complaint against any BPD officer for alleged misconduct. Mr. Gross testified (p. 83) that all uses of non-lethal use of force by BPD officers during the Straight Pride Parade was investigated by BPD I.A.

1.27    Mr. Gross testified (p. 80) that he did not order any type of review or audit to be conducted on any video footage that occurred during the Floyd protests. He testified (p. 79) that he thought BPD I.A. probably reviewed the video evidence, but did not recall an audit being conducted. Mr. Gross testified (p. 81) that without a complaint [of BPD officer misconduct] there would be no audit to confirm if BPD officers were complying with BPD rules and regulations.

## 1.28    Complaints Filed Against BPD members (2016-2020)[22]

- 2,420 complaints were filed in the above five year period.
- 795 complaints were filed internally (by BPD members) or 32.9 percent of the complaints.
- 893 complaints were pending or 37 percent of all complaints.
- 1,625 complaints were filed by citizens or 67.1 percent of the complaints.
- 556 complaints were sustained or 23.0 percent of the complaints. 77.0 percent of the remaining complaints were determined to be either unfounded, exonerated, pending or not sustained.
- Of the 556 sustained complaints, disciplinary actions taken by BPD included, but not limited to:
    - o  Oral reprimands (31 percent),
    - o  Suspension of the BPD member (18.3 percent). Days of suspension ranged from one day (for most instances) up to 240 days (rare instances),
    - o  Termination (2.7 percent),
    - o  The BPD member resigned with charges pending ( 4.3 percent),
    - o  Suspension/settlement agreement (7.9 percent),
    - o  Suspension held in abeyance (5.2 percent),
    - o  Resigned with charges pending (5.1 percent),
    - o  Settlement agreement (2.5 percent),
    - o  Retired (3.4 percent),
    - o  Oral reprimand and counseling (.07 percent),
    - o  Oral reprimand and retraining (.05 percent),
    - o  Written reprimand (.09 percent).
    - o  Counseling (.03 percent)
- Based on the total number of complaints filed during the period of 2016-2020, a complainant could expect that an officer would be suspended 4.2 percent of the time or receive an oral reprimand 7.1 percent of the time. Termination of a police officer for misconduct would occur .06 percent of the time.
- Many I.A. cases took over a year to investigate and determine a disposition. Some investigations took nearly four years to complete. Almost every case filed in 2020 had no disposition noted and indicated the case was pending.

---

[22] Spreadsheet of all complaints received by BPD between 2016-2020.

1.29     According to The Boston Globe (Allan, E., Rocheleau, M., and Ryan, A., July 18, 2020) complaints against officers are not often confirmed nor result in punishment.[23] The article claimed that 3 percent of excessive use force complaints were sustained between 2016-2020.[24] Additionally, termination of an agency member for misconduct is rare with only four terminations occurring during that period of time.[25]

## Conclusion:

1.30     As previously noted in this report, the dispositions of the complaints filed by Ms. Huffman, Mr. Chambers-Maher, Ms. Caitlyn Hall, and Mr. Justin Ackers resulted that either exonerated the officer's actions, meaning the actions comported with agency policy and training, or, in Ms. Hall's complaint, determined to be unfounded. Most of the interactions of BPD personnel and the Plaintiffs were captured, in part, via private cellphone video or BPD Officer body-worn-cameras, or street cameras.

1.31     The BPD dispositions of the Plaintiffs' complaints do not correlate with the actions captured on the video evidence. Specifically, Officers Burke and McManus testified in their respective Internal Affairs statements that there was insufficient personnel to effect an arrest of Ms. Huffman, Mr. Ackers and Mr. Chambers-Maher because they did not have "arrest teams" as part of the POP contingent, and used the force necessary to move the crowd of protestors. However, in their effort to move the crowd forward, Ms. Huffman was violently pushed back by Officer Burke using his baton in a forward-thrust. Ms. Huffman had her hands up as the police line approached when she was violently pushed to the ground. The police line walked over her and on her as the police line progressed forward, leaving her behind the police line. Ms. Huffman was not arrested. Video evidence captured the encounter between Ms. Huffman and Officer Burke. BPD IA investigation "Exonerated" Officer Burke's actions.

1.32     Similarly, Mr. Ackers was forcibly knocked off his moped by Officer Burke's forward-thrust of his baton to the side and back of Mr. Ackers as he was turning his moped away from the police line. He too was left on the ground as the police line moved forward. Mr. Ackers was not arrested. Video evidence captured the encounter between Mr. Ackers and Officer Burke. BPD IA investigation "Exonerated" Officer Burke's actions.

---

[23] Allan, E., Rocheleau, M., and Ryan, A., July 18, 2020). *Within the Boston Police Department, complaints against officers are rarely confirmed or result in punishment.* The Boston Globe.
[24] Ibid.
[25] Ibid.

1.33    Mr. Chambers-Maher was positioned along a sidewalk videoing the police presence and
        complying with the officers' orders to move back. However, Officer McManus, while on
        his police bicycle, went ahead of the police line (contrary to his training) and sprayed
        Mr. Chambers-Maher with OC spray debilitating him. Officer McManus retreated back
        to the police line, and then returned to Mr. Chambers-Maher and deployed a second burst
        of OC spray on him. As the police line advanced, Mr. Chambers-Maher was left behind.
        Mr. Chambers-Maher was not arrested. Video evidence captured the encounter between
        Mr. Chambers-Maher and Officer McManus. BPD IA investigation "Exonerated" Officer
        McManus' actions.

1.34    BPD Officer Nolan was identified via his badge number as the officer who struck Ms.
        Caitlyn Hall in her mouth with his baton causing a tooth to perforate her lip requiring
        medical care. There was video evidence of Ms. Hall near the police line but there was no
        video evidence of the actual use of force by Officer Nolan. Ms. Nolan fell to the ground
        after the strike, hitting her head on the pavement. As with the other Plaintiffs in this
        matter, Ms. Hall was pushed to the side as the police line advanced forward, leaving her
        behind the police line with her injury and no medical attention provided. Officer Nolan
        testified in his I.A. statement that he did not remember the incident involving Ms. Hall.
        Ms. Hall was not arrested. The BPD IA investigation determined the complaint to be
        "Unfounded."

1.35    If one were to look at the BPD's I.A. investigations into the four Plaintiffs' complaints
        from a **micro** perspective, BPD conducted I.A. investigations based on the complaints
        filed by Ms. Huffman, Mr. Chambers-Maher, and eventually from Mr. Ackers and Ms.
        Hall.[26] BPD I.A. determined that the BPD officers' actions in those complaints were
        either exonerated or determined to be unfounded. However, the video evidence in each
        instance contradicts the ultimate I.A. dispositions. The I.A. interviews of Officer Burke,
        Officer McManus and Officer Nolan were so general in nature without any thorough
        follow-up as to the officers' actions, captured on video, to determine if their actions
        comported with agency policy. I.A. Investigators generally accepted the officers' denials
        of policy violation, routinely allowed the officers to claim that their actions were based
        on their training, even though video evidence indicated their actions contradicted their
        training.[27] In contrast, the I.A. Investigators virtually cross examined the Plaintiffs who
        were interviewed, Jasmine Huffman and Ben Chambers-Maher. Investigators accused
        Mr. Chambers-Maher of lying because of the route that he took to go home. This

---

[26] Correspondence from attorney Howard Friedman to BPD Sgt. Det. Moore date July 1, 2021.
[27] Plaintiff's use of force expert Declaration of Mr. McGhee.

demonstrates that I.A. Investigations were not done to determine the facts, which is the purpose of a properly conducted police investigation.

1.36    That difference in questioning between civilian complainants and police was not only seen in this case. In the Capt. Danilecki complaint regarding his ripping a sign, I.A. Investigators virtually cross-examined the complainant and blamed her for being present after the protest while accepting Danilecki's explanation (that is rebutted by video evidence) that he thought it was a looted poster without follow-up questions. I.A. The Investigators did so even though the street camera videos show: (1) the protesters had not come out of any store, contrary to Capt. Danilecki's version; and (2) Capt. Danilecki looked at the sign, which stated "#BLACKLIVESMATTER" before tearing it up.[28] Investigators also failed to review relevant video available (street camera videos) related to the incident that would have rebutted Capt. Danilecki's explanation for tearing the sign. Furthermore, a private video memorializes Capt. Danilecki holding and looking at the protest sign before he tore it up. Similarly, in a prior incident involving Captain Danilecki and a citizen, Mr. Nave, I.A. Investigators did not challenge Capt. Danilecki's change in his version of an incident involving an excessive force complaint related to David Nave after video evidence undermined his original version given to I.A. Investigators.[29] [30]

1.37    The BPD I.A. Investigators also claimed that they could not find Caitlyn Hall as part of the investigation despite Ms. Hall's identified public presence on social media, which was introduced in the excessive force complaint to I.A. I.A. Investigators could have communicated with Ms. Hall through that method but made no known effort to do so. Again, BPD I.A. Investigators made no serious effort to locate Ms. Hall. BPD I.A. had photographs of Ms. Hall and her injuries acquired from Facebook (FB). However, BPD I.A. did not try to reach out to Ms. Hall via FB. BPD I.A. investigators had Ms. Hall's full name, but no effort was done to locate her via the state's driver's license repository. Similarly, there is no documentation that BPD attempted to locate Mr. Healy, the initial complainant regarding Ms. Hall being battered by Ofc. Nolan. The failure to attempt to locate the victim of police violence as well as the long duration of investigations could be seen as passive steps to let complaints languish so that they could be concluded by stating

---

[28] Video evidence shows two other officers (including Defendant McManus here) under Capt. Danilecki's command also ripped protesters' signs without any punishment or inquiry by BPD.
[29] Allen, E., and Ryan, A. (April 18, 2023). *An alleged assault by a police captain, and a long, long wait for justice.* The Boston Globe.
[30] BPD Memo to Michael Cox from Phillip Owens re: I.A. Recommendations concerning Captain John Danilecki, dated June 6, 2023, Complainant: Mr. Nave.

24

that the complainants/victims could either not be found or abandoned the complaint. An additional example of resolving complaints through attrition is a complaint by Rebecca Eppler. She submitted an IA complaint on June 3, 2020, but the only contact with her was through a certified letter sent on June 21, 2022, one day *after* IA closed her file due to a lack of response from Rebecca.[31]

1.38    The BPD I.A. Investigators failed to compile and include available video evidence as part of their investigations relating to claims of excessive force during the George Floyd protests. For instance, street camera footage was available to investigators, though there was no known effort to retrieve that footage as part of the investigations.

1.39    The BPD I.A. Investigators failed to analyze the officers' statements, their actions, and agency policy, and compare them to the video evidence, which resulted in the dispositions previously noted in this report. The I.A. investigators failed to consider each incident within the confines of the particular complainant encounter with BPD members and, instead, globally justified the officers' misconduct because of the overall civil unrest. Use of force in a civil unrest event must be justified based on reasonableness, not carte blanche use of force on anyone and everyone near an officer.

1.40    Furthermore, I.A. investigators did not elaborate on the department's utter failure to properly prepare for the protest, or the fact that the department did not fully staff the department's Public Order Platoon. Most critical to the POP are arrest teams, but no arrest teams were provided due to inadequate staffing. Therefore, I.A. investigators justified the officers' inappropriate use of force on the Plaintiffs when no arrests were made and, similarly, overlooked the unreasonableness of force used against the Plaintiffs. Plaintiff's expert, Mr. McGhee, pointedly stated in his declaration that ***"To authorize force without a mechanism to arrest is a practice of punishment."***[32] The constant refrain in the officers' statements was that they were scared, frightened, and feared for their lives. However, a review of the video evidence in these instances revealed none of the Plaintiffs threatened the officers nor did they place the officers' lives in immediate danger.

1.41    This writer recognizes that civil disturbances are chaotic and, at times, potentially dangerous. However, an officer being in a civil disturbance does not waive an officer's duty to adhere to the constitutional rights afforded a citizen. Civil disturbances do not

---

1.    [31] BPD Internal Affairs investigation report regarding complainant Rebecca Eppler Epstein, General Inquiry #2020-0226, dated June 20, 2022, authored by Sgt. Det. Philip Morgan (Bates Stamped D 009161-009165).

[32] Plaintiffs' expert declaration by Mr. Todd E. McGhee (p. 14).

give law enforcement carte blanche to use indiscriminate force on protesters. However, it is apparent BPD I.A. and senior staff members errantly justified the officers' actions because they (BPD officers) were involved in a civil disturbance. Former senior BPD staff members, including the former Police Commissioner, viewed the various video evidence in this matter and rarely could they conclude that the actions of the BPD officers violated agency policy, particularly BPD Rule 304. The dispositions of the I.A. investigations involving the Plaintiffs in this matter (and Capt. Danilecki) lends to the belief, and rightfully so, by the public that law enforcement in general, and BPD specifically, support its officers' behavior contrary to the evidence presented. This perception, founded in reality, denigrates the public's trust for law enforcement.

1.42    Further exacerbating the public's confidence regarding the Plaintiffs' incidents is the length of time it took for the agency to conclude its investigations. The length of time to investigate a complaint correlates with the public's trust, or lack thereof, that the complaint was taken seriously and that it is being thoroughly investigated. In this instance,

- The Huffman complaint was received by BPD June 5, 2021. BPD Investigation concluded on September 7, 2022 (15 months).
- The Chambers-Maher complaint was received by BPD June 6, 2021. BPD Investigation concluded on March 22, 2022 (nine months).
- The Ackers complaint was received by BPD July 1, 2021. BPD Investigation concluded on May 15, 2023 (22 months).
- The Hall complaint was received by BPD (initially on June 3, 2020) July 1, 2021.[33] BPD investigation concluded on October 26, 2023 (35 months or 25 months depending on the actual date the complaint was received by BPD).[34]

1.43    The length of delay here is consistent with BPD's I.A. investigations. It was widely reported by the media that BPD's I.A. investigation of Capt. Danilecki for an excessive force complaint by David Nave in 2019, which included video evidence and changing stories from Capt. Danilecki, took almost four years from the incident to the final completion of the case in 2023.[35] BPD's treatment of Capt. Danilecki received widespread coverage in local media (and, therefore, likely within the ranks of the BPD),

---

[33] Correspondence from attorney Howard Friedman to BPD Sgt. Det. Moore date July 1, 2021.
[34] Ibid. Attorney Friedman wrote that Ms. Hall tried to initially file a complaint on June 3, 2020 but was rebuffed by a BPD member claiming she had to file the complaint in person).
[35] Allen, E., and Ryan, A. (April 18, 2023). *An alleged assault by a police captain, and a long, long wait for justice.* The Boston Globe.

which would be a message to officers generally that BPD would not meaningfully investigate officers for civilian claims of misconduct.

1.44    The amount of time for each of the Plaintiffs' complaints (and the complaints against Capt. Danilecki) was excessive and unnecessary and lends to public mistrust that complaints against the police are not taken seriously and effectively addressed. For example, an analysis of complaint cases filed with the BPD between 2010 and May 2022 revealed it took the BPD Internal Affairs Division, on average, two years and two months to complete. Many cases (400) have taken four years or more to complete.[36] The length of time it takes BPD to complete an I.A. investigation contradicts the recommended time to complete an I.A. investigation (45-180 days) recommended by the IACP and the Department. Ironically, two representatives of the BPD were part of the law enforcement subject matter experts who recommended the 180 day turnaround to complete I.A. investigations.[37]

1.45    If one were to look into BPD I.A. investigations on a more global (**macro**) perspective, one could conclude that the public's confidence in BPD to monitor, investigate and remediate officer misconduct is questionable at best. Furthermore, the data from the analysis of complaints filed between 2016-2020 support the public's contention that BPD fails to adequately investigate the complaints it receives, and more importantly, minimizes discipline for those found to have engaged in misconduct. Similar conclusions were made based on an analysis of BPD complaints reviewed between 2010-2020 by The Boston Globe.[38]

1.46    Plaintiff's use of force expert, Mr. Todd E. McGhee, reviewed the BPD interactions with the four Plaintiff's and opined that *"There was no reason to arrest any of the Plaintiffs or to use force on them."[39]* Based on the testimony, video evidence, and statements of the parties involved, I concur with Mr. McGhee's opinions.

1.47    A number of news articles have been published over the years claiming the BPD has failed to properly investigate complaints against its officers and suggested the agency

---

[36] Ibid.

[37] Department of Justice-Office of Community Oriented Policing Services (2006). *Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice.*

[38] McCarthy, B., Ryan, A., and Allen, E., (November 24, 2020). *A database of 10 years of Boston Police disciplinary action.* The Boston Globe.

[39] Plaintiffs' expert declaration by Mr. Todd E. McGhee (p. 25).

suffers from a "Blue Wall of Silence."[40] Ironically, Mr. Cox, currently the BPD Commissioner, was victim of a brutal beating by fellow BPD officers who allegedly mistook Mr. Cox as a fleeing felon in 1995. Dozens of other officers witnessed the beating but said nothing. No BPD officer came forward to corroborate the BPD officers' actions against Mr. Cox. Only until he filed a federal lawsuit did the facts and circumstances come to light.[41]

1.48    Another BPD incident involved the allegation that the former BPD union president, Officer Patrick Rose, sexually abused a child in 1995. The BPD I.A. Division investigated the allegation and sustained the allegation but no disciplinary action occurred and members with knowledge of the investigation and of the sustained complaint remained silent. However, Mr. Rose remained employed with the BPD until his retirement in 2018.[42] Mr. Rose was subsequently criminally charged for multiple counts of child molestation in 2020.[43] [44] Current Boston Mayor Janey commented to the public that *"It is shameful that it seems the actions taken [by BPD] were to protect their own, rather than protect children."[45]* Former BPD lieutenant Tom Nolan referred to the fact of how Rose was able to continue working with the department having a sustained allegation of sexual molestation of a child as *"An example of an institutional and systemic failure."* Former BPD Deputy Superintendent Willie Black said, *"Boston's police department has a long history of protecting its own from accountability."[46]*

1.49    On another occasion, BPD members were asked to assist in the investigation of former Boston Police Commissioner Dennis White, accused of domestic violence which occurred in 1993 and1999.[47] At that time BPD I.A. investigated the complaints and did not sustain the allegations. Subsequently, in 2021, an independent investigation commenced. looking into the BPD IA investigation of White. During the investigation by

---

[40] Boston University Alumni Magazine (March 27, 2023, n.a.). *Boston Police Commissioner Michael Cox Scaled the Blue Wall of Silence.*

[41] Ibid.

[42] Ryan, A., (April 10, 2021). *For years, the Boston Police kept a secret: the union president was an alleged child molester.* The Boston Globe.

[43] Editorial Board (April 13, 2021). *Ending the code of silence in Boston.* The Boston Globe.

[44] Ryan, A., (April 10, 2021). *For years, the Boston Police kept a secret: the union president was an alleged child molester.* The Boston Globe.

[45] Ryan, A. and McDonald, D. (July 29, 2021). *Report urges more transparency for Boston police internal affairs after Patrick Rose case.* The Boston Globe.

[46] [46] Ryan, A., (April 10, 2021). *For years, the Boston Police kept a secret: the union president was an alleged child molester.* The Boston Globe.

[47] Memorandum from Tamsin R. Kaplan to Henery C. Luthin, Subject: Independent Investigation in the Matter of Police Commissioner Dennis A. White, dated April 29, 2021.

the independent investigatory body, BPD officers refused to cooperate with the investigation. The investigation *"Revealed a culture of fear and silence within the Boston Police Department."*[48] According to the investigation, BPD officers refused to speak with investigators regarding the White matter and revealed what has been referred to as the blue wall of silence.[49]

1.50    A relatively recent news article published by The Boston Globe (Cotter, S., October 25, 2023) called for a review of the investigation of BPD of Captain Danilecki who has had 21 complaints filed against him during his career and recently received a three day suspension for several incidents but unrelated to a use of force incident that was captured on video which occurred in 2019. The three day suspension included an incident captured on video of Captain Danilecki ripping a protesters sign during the May 31, 2020 protests that occurred in the city.

1.51    As previously noted in this report, *The Boston Globe* published an article titled A database of 10 years (January 2010-August 2020) of Boston Police disciplinary action (McCarthy, B., Ryan, A., and Allen, E., November 24, 2020).[50] The article reviewed 3,095 internal affairs cases involving 7,500 allegations against 1,553 BPD officers. According to the article the BPD rarely believes citizens who report officer misconduct. If the department determines the officer did violate policy, more likely than not, the officer will receive an oral reprimand.

1.52    It is this writer's opinion, based on the facts and evidence presented in this matter that the BPD failed to investigate alleged officer misconduct properly and thoroughly. Furthermore, if the BPD I.A. investigation determined that the officer's actions violated agency policy, more likely than not, the officer would receive an oral reprimand as a form of discipline. Furthermore, most investigations languish for many months and years before a disposition was determined. The actions of the BPD Internal Affairs Division historically and currently are inconsistent with well-established police practices and procedures. My opinions are corroborated by comments and statements by former BPD police officers and the Mayor of Boston, who identified a *"culture of fear and silence"* within the police department.[51] My opinions are further corroborated by the creation of Office of Police Accountability and Transparency (OPAT) in December 2020 by the city of Boston. The purpose of the OPAT is:

---

[48] Press Release of Mayor Janey's remarks prepared for Friday, May 14, 2021.
[49] Ibid.
[50] McCarthy, B., Ryan, A., and Allen, E., (November 24, 2020). *A database of 10 years of Boston Police disciplinary action.* The Boston Globe.
[51] Press Release of Mayor Janey's remarks prepared for Friday, May 14, 2021.

*"Independent of the Boston Police Department, to investigate complaints of police misconduct, ensure that the Boston Police Department's internal affairs review process is fair and thorough, and review Boston Police Departments existing and proposed policies and procedures. The purpose of OPAT is to provide a single point of entry for individuals with concerns or complaints related to the Boston Police Department and its officers and sworn personnel to be heard and responded to, and to provide the staffing and legal authority necessary to support the work of OPAT and its related advisory boards and panels to undertake independent investigation and review of policing in Boston."[52]*

*I reserve the right to amend my opinions as needed in order to rebut the opinions set forth by the Defendant's expert and/or new information is brought to light upon further discovery.*

## APPENDICES:

Curriculum Vitae
Testimony List
Fees

Respectfully submitted,

Andrew J. Scott, III, D.C.J.
Doctor of Criminal Justice

AJS Consulting, LLC
ascott@ajspoliceconsulting.com
561-302-0756

June 6, 2024

---

[52] City of Boston Ordinance Establishing an Office of Police Accountability and Transparency dated December 16, 2020.

30