UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JASMINE HUFFMAN, JUSTIN ACKERS, CAITLYN HALL, and BENJAMIN CHAMBERS-MAHER, | * * * * * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. 21-cv-10986-ADB |
| | * | |
| CITY OF BOSTON, and MICHAEL BURKE, EDWARD JOSEPH NOLAN, and MICHAEL J. MCMANUS, in their individual capacities, | * * * * | |
| Defendants. | | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Jasmine Huffman ("Huffman"), Justin Ackers ("Ackers"), Caitlyn Hall ("Hall"), and

Benjamin Chambers-Maher ("Chambers-Maher," collectively, "Plaintiffs") bring this civil-rights

action against three police officers, Michael Burke ("Burke"), Edward Joseph Nolan ("Nolan"),

and Michael J. McManus ("McManus," collectively, the "Officer Defendants"), and against the

City of Boston ("City," and, together with the Officer Defendants, "Defendants").  Before the

Court are Burke's motion for summary judgment on Ackers's claims against him, [ECF No.

171]; the City's motion for summary judgment on Plaintiffs' claim against it, [ECF No. 173];

and Defendants' motion to bifurcate, [ECF No. 175].  For the reasons set forth below, the Court

**DENIES** Burke's motion for summary judgment; **GRANTS IN PART** and **DENIES IN PART**

the City's motion for summary judgment; and **DENIES WITH LEAVE TO RENEW**

Defendants' motion to bifurcate.

## I.    RELEVANT BACKGROUND

### A.    Material Facts[1]

#### 1.    The May 31, 2020 Protest and Police Response

On May 31, 2020, thousands of people gathered in downtown Boston to protest the

murder of George Floyd.  [ECF No. 197 ¶ 1].  The Boston Police Department ("BPD") knew in

advance about the protest, [id. ¶ 3], and prepared an operations plan that detailed command and

personnel assignments from various districts, [ECF No. 186 ¶¶ 20, 24]; see also [ECF No. 177-

10].  BPD Superintendent William Ridge ("Ridge") was the Incident Commander for the protest,

[ECF No. 177-10 at 1], and, as such, had the authority to decide when and what force could be

used, [ECF No. 197 ¶ 28].

Most protesters were peaceful, [ECF No. 197 ¶ 16], but around 9:00 pm, some protesters

threw objects at the police, [id. ¶ 15]; [ECF No. 186 ¶¶ 36–38, 41, 84]; later that night, between

9:45 and 10:00 pm, a police cruiser was set on fire, [ECF No. 186 ¶ 86].  The police did not

stand idly by.  According to Ridge, "[a]t a certain point in the evening, every person that

remained for the most part was, or . . . for that time being was considered part of . . . the

demonstration that had gotten out of hand and turned into rioting," [ECF No. 188-53 at 35], and

Timothy Connolly, the Commander of the BPD Tactical Operations Center, confirmed that "[a]t

some point . . . [t]he Boston Police Department authorize[d] any officer to use force on any

---

[1] The Court draws the facts from the parties' combined Rule 56.1 statement of material facts,
which consists of Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts,
[ECF No. 186], Defendants City of Boston and Michael Burke's Responses to Plaintiffs'
Statement of Additional Material Facts, [ECF No. 197], and documents referenced therein.

person who remained present," [ECF No. 188-43 at 20–21].  BPD Deputy Superintendent Kevin

McGoldrick testified that at some point, he heard the Massachusetts State Police issue a dispersal

order at the corner of Tremont Street and Stuart Street, [ECF No. 197-1 at 3], and, at 9:40 pm,

the BPD put out an update on Twitter, stating that "[p]eaceful protesters along Tremont Street

are asked to vacate the area," [ECF No. 186 ¶ 43].

As relevant here, a jury could find that the Officer Defendants used force against each of

the Plaintiffs that evening:  Nolan struck Hall in the face and knocked her to the ground in the

vicinity of Downtown Crossing, [ECF No. 186 ¶ 77]; McManus used pepper spray on

Chambers-Maher around 9:39 pm, [ECF No. 187 ¶ 60]; lohf90, Exhibit 74 at 0:13–0:25,

YouTube (Nov. 18, 2024), https://www.youtube.com/watch?v=ycofgQiILsI;[2] Burke struck

Ackers with his wooden riot baton around 10:08 pm, knocking him to the ground, [ECF No. 197

¶ 95]; lohf90, Exhibit 199 at 0:03–0:04, YouTube (Nov. 18, 2024),

https://www.youtube.com/watch?v=nUCWZSDKUN0 ("Burke Body Camera"); and Burke

struck Huffmann with his baton around 10:44 pm, [ECF No. 197 ¶ 55]; lohf90, Exhibit 73 at

0:04–0:05, YouTube (Nov. 18, 2024), https://www.youtube.com/watch?v=JM40YI-q1Nc.  None

of the Plaintiffs was arrested.  [ECF No. 197 ¶ 54].

Plaintiffs filed internal-affairs complaints with the BPD after the May 31, 2020 protest.

[ECF No. 186 ¶ 204].  BPD's internal-affairs function on average took at least one and a half

years to complete its investigations of Plaintiffs' complaints, [ECF No. 197 ¶ 257], eventually

exonerating McManus and Burke, and determining that the complaint against Nolan was

"unfounded," [ECF No. 186 ¶ 205].  Prior to May 31, 2020, BPD had received no complaints of

---

[2] The time recorded in the upper right of the body camera videos is four hours ahead of the actual
time.  [ECF No. 197 at 16 n.5].

use of excessive force against McManus or Burke, and one excessive-force complaint against Nolan, which was not substantiated. [Id. ¶¶ 221–24].

### 2.    Burke's Use of Force Against Ackers

Because Burke has moved for summary judgment on Ackers's claims against him, the Court describes the conduct underlying Ackers's claims in greater detail. Burke arrived at the intersection of Tremont Street and Bromfield Street with other members of the BPD's Gang Unit public order platoon at around 10:06 pm. [ECF No. 186 ¶¶ 83, 88]; [ECF No. 177-33]. There was a burning police cruiser at the intersection. [ECF No. 186 ¶¶ 86, 88]. Burke and other BPD officers formed a line on Tremont Street, facing toward Park Street, with their backs to Government Center. lohf90, Exhibit 136 at 0:00–0:13, YouTube (Nov. 18, 2024), https://www.youtube.com/watch?v=SLmzbBOStcw ("Street Camera"). Ackers had participated in the protest earlier that day, but, in the evening, after a police officer sprayed him in the face with pepper spray, he decided to go home. [ECF No. 197 ¶¶ 67–71, 74–75]. He retrieved his moped, and headed up Tremont Street, keeping a foot on the pavement as he slowly moved his moped through the crowd toward the line of police officers. [Id. ¶¶ 75–76, 85–86]. The line of police officers started moving forward to clear the crowd, shouting "move." Street Camera at 0:13–0:17; Burke Body Camera at 0:00–0:03; see also [ECF No. 188-64 at 1]; lohf90, Exhibit 173 at 0:08–0:16, YouTube (Nov. 18, 2024), https://www.youtube.com/shorts/Gdwz8v3PFBM. Ackers turned away from the police officers and, shortly after he did, around 10:08 pm, Burke struck Ackers from behind with his baton, hitting Ackers's backpack and the back of his right arm and knocking him from his moped. [ECF No. 186 ¶¶ 89, 101]; [ECF No. 197 ¶ 95]; Burke Body Camera at 0:03–0:05. Burke testified that Ackers "turned very quickly" and "had just changed direction" before he struck him. [ECF No. 186 ¶ 90].

Ackers was eventually able to retrieve his moped and go home, [ECF No. 197 ¶¶ 100,

102–03], but Burke remained at the protest.  As relevant here, at 10:17 pm, Burke struck the

handle of a protestor's sign that read "LATINOS UNIDOS con BLACK LIVES MATTER."  [Id.

¶ 106]; lohf90, Exhibit 139 at 0:08–0:10, YouTube (Nov. 18, 2024),

https://www.youtube.com/watch?v=nq2nU0OL9YE.  He also later struck two other protestors,

one of whom was Huffman, causing them to fall to the ground.  [ECF No. 197 ¶ 106].  After

these incidents, Burke was on the Boston Common, where, around 10:55 pm, he was recorded

saying to a fellow officer, "These are all bozos . . . this is not even a real parade. . . . No one here

is from Roxbury, Dorchester, Mattapan."  [Id. ¶ 108]; lohf90, Exhibit 140 at 0:12–0:24,

YouTube (Nov. 18, 2024), https://www.youtube.com/watch?v=k2c3EIYakHs.  A few minutes

later, around 11:03 pm, Burke was discussing police tactics with a fellow officer and stated, "we

don't even know what the fuck to do; it was almost better to have them in the Common because

when they're in the Common they couldn't destroy us."  [ECF No. 197 ¶ 108]; lohf90, Exhibit

141 at 0:22–0:26, YouTube (Nov. 18, 2024), https://www.youtube.com/watch?v=tlzOgvOGf0M.

BPD Officer Stephen Canto, who was also present at the protest on May 31, 2020,

testified that, in crowd control situations, police should not use enough force to knock people to

the pavement.  [ECF No. 197 ¶ 104].  Todd McGhee, Plaintiffs' use-of-force expert, opined that,

based on the body-camera footage, Ackers was not a threat to the police and was attempting to

comply with the police's orders when Burke struck him.  [ECF No. 186 ¶ 104]; [ECF No. 197

¶ 123].  McGhee also opined that Burke had time to restrain himself from striking Ackers.  [ECF

No. 197 ¶ 124].

### 3.    BPD Policies and Customs

As relevant to the City's summary judgment motion, the Court sets forth evidence pertaining to certain alleged City policies and practices.

The BPD has two written policies that are relevant to Plaintiffs' claims: BPD Rule 304 and BPD Rule 200.  BPD Rule 304 governs the use of less than lethal force, including pepper spray (also called "OC spray") and batons.  [ECF No. 197 ¶ 147]; [ECF No. 188-67].  It permits officers to use such force for self-defense and when faced with "active resistance," [ECF No. 197 ¶ 152]; see also [ECF No. 188-67 at 4], and notes that "[t]he 'Reasonableness' of a particular use of force must be judged from [the] perspective of [a] reasonable officer on the scene," citing Graham v. Connor, 490 U.S. 386 (1989), [ECF No. 188-67 at 2].  BPD Rule 200, entitled "Critical Incident Management," "establish[es] the policy of the [BPD] for its response to and management of all critical incidents," and, as relevant here, it contains, among other addenda, Addendum B, entitled "Crowd Control Situation."  [ECF No. 186 ¶¶ 122–24]; [ECF No. 177-47].  Plaintiffs' expert Dr. Edward R. Maguire authored a report for this litigation, in which he criticized the BPD's use-of-force and crowd-management policies, as well as BPD training on these topics as inaccurate, incomplete, and outdated.  [ECF No. 188-16 at 23–35].

Plaintiffs allege that there was a longstanding and widespread code of silence at the BPD, under which "Boston police officers understood that they were not to report misconduct by fellow officers."  [ECF No. 15 ¶¶ 111–12].  In 1995, when a BPD officer was assaulted by fellow officers, no officer would come forward to say what happened.  [ECF No. 187 ¶ 207].  In 2021, the City made public a report about BPD Commissioner Dennis White, which, among other things, "detailed . . . a culture of fear and coverup within the Boston Police Department."  [ECF No. 188-74 at 2].  Then-Mayor Kim Janey held a press conference at which she said that

"[t]he investigation revealed a culture of fear and silence within the Boston Police Department" and that "[s]worn officers refused to speak to investigators, frustrating efforts to uncover the truth." [Id. at 3]. Janey noted that "[w]hat is often referred to as a blue wall of silence was confirmed by one retired officer, who said he received five phone calls, directing him not to cooperate with this investigation." [Id.]. In her deposition in this case, however, she qualified her prior statements, saying that "perhaps it is a poor choice of words in that press conference, because one incident does not make a culture." [ECF No. 177-54 at 7]. Many BPD officers who sat for depositions in this litigation denied or could not recall having ever witnessed any police misconduct or unreasonable use of force and could not recall any instance of an officer filing a complaint about a fellow officer's use of force. [ECF No. 197 ¶¶ 198–99, 202]. In Plaintiffs' formulation, which Defendants do not dispute, officers with a combined "229+ years of service" said they never saw any unreasonable use of force, [id. ¶ 199], and officers with "254 combined years" of service were unable to name a time that an officer reported another officer for misconduct against a civilian, [id. ¶ 202].

Plaintiffs' expert Dr. Andrew Scott authored a report for this litigation in which he criticized the BPD's internal-affairs function as "historically and currently . . . inconsistent with well-established police practices and procedures." [ECF No. 188-65 at 30]. BPD has no system to track how long it takes to complete investigations or that requires that they be conducted in any timeframe, [ECF No. 197 ¶ 226], which Dr. Scott opines is contrary to national policing standards, [id. ¶ 227]. BPD has not conducted an audit since 1989 to evaluate whether internal investigations are conducted impartially. See [id. ¶ 228]. There is no BPD policy or rule that sets forth what an internal investigation must include, and there is no requirement that all witnesses to an event be identified, documented, or interviewed, that video evidence be

reviewed, or that there be written notes documenting witness statements.  [Id. ¶¶ 230, 236–38].

Investigators may forward their list of questions to officers before interviewing them, and are not

required to ask officers follow-up questions to challenge the officers' versions of what happened.

[Id. ¶¶ 233–34].  In his report, Dr. Scott analyzed BPD complaint data from 2016 to 2020, noting

that, of 2,420 complaints, 556 complaints or 23.0 percent were sustained, and that, based on the

total number of complaints, "a complainant could expect that an officer would be suspended 4.2

percent of the time or receive an oral reprimand 7.1 percent of the time," or be terminated for

misconduct ".06 percent of the time."  [ECF No. 188-65 at 22].  He also cited a July 18, 2020

Boston Globe article for the proposition that complaints against BPD officers were not often

confirmed or did not result in punishment, with only 3 percent of excessive use force complaints

being sustained between 2016 and 2020.  [Id. at 23]; see also Evan Allen et al., Within the

Boston Police Department, Complaints Against Officers Are Rarely Confirmed or Result in

Punishment, Boston Globe (July 18, 2020),

https://www.bostonglobe.com/2020/07/18/metro/within-boston-police-department-complaints-

against-officers-are-rarely-confirmed-or-result-punishment/; Brendan McCarthy et al., A

Database of 10 Years of Boston Police Disciplinary Action, Boston Globe (Nov. 24, 2020),

https://www.bostonglobe.com/2020/11/24/metro/heres-searchable-database-boston-police-

department-internal-investigations-disciplinary-actions-more/.

### B.    Procedural History

Plaintiffs initiated this case on June 14, 2021, [ECF No. 1], and filed the operative

Amended Complaint on August 16, 2021, asserting excessive-force and First Amendment claims

against the Officer Defendants and a Monell claim against the City under 42 U.S.C. § 1983,

[ECF No. 15].  Defendants filed motions to dismiss all claims against them, [ECF Nos. 22, 24,

26, 35], and the Court denied those motions on June 27, 2022, [ECF No. 39]. After the close of

discovery, Burke moved for summary judgment on Ackers's claims against him, [ECF No. 171],

the City moved for summary judgment on Plaintiffs' claims against it, [ECF No. 173], and

Defendants filed a motion to bifurcate, requesting a separate trial for each defendant, [ECF No.

175]. All motions are fully briefed. See [ECF Nos. 172, 191]; [ECF Nos. 174, 190, 196]; [ECF

Nos. 176, 193].

## II.    LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). An issue is considered "genuine" when "the evidence of record permits a

rational factfinder to resolve it in favor of either party." Borges ex rel. S.M.B.W. v. Serrano-

Isern, 605 F.3d 1, 4–5 (1st Cir. 2010) (citing Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896

F.2d 5, 8 (1st Cir. 1990)). A fact is considered "material" when "its existence or nonexistence

has the potential to change the outcome of the suit." Id. at 5 (citing Martínez v. Colón, 54 F.3d

980, 984 (1st Cir. 1995)).

"To succeed in showing that there is no genuine dispute of material fact, the moving

party must direct [the Court] to specific evidence in the record that would be admissible at trial."

Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015). "That is, it must

'affirmatively produce evidence that negates an essential element of the non-moving party's

claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party

will be unable to carry its burden of persuasion at trial.'" Id. at 4–5 (quoting Carmona v. Toledo,

215 F.3d 124, 132 (1st Cir. 2000)). Once the moving party has laid out its basis for summary

judgment, the burden shifts to the party opposing summary judgment to demonstrate, "with

respect to each issue on which she would bear the burden of proof at trial, . . . that a trier of fact could reasonably resolve that issue in her favor."  Borges, 605 F.3d at 5.

On a motion for summary judgment, the Court reviews "the entire record in the light most hospitable to the party opposing summary judgment."  Podiatrist Ass'n v. La Cruz Azul de P.R., Inc., 332 F.3d 6, 13 (1st Cir. 2003) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)).  Where inferences are to be drawn from the proffered facts, those inferences "must be viewed in the light most favorable to the party opposing the motion."  Oleskey ex rel. Boumediene v. U.S. Dep't of Def., 658 F. Supp. 2d 288, 294 (D. Mass. 2009) (citing Founding Church of Scientology of Wash., D.C., Inc. v. Nat'l Sec. Agency, 610 F.2d 824, 836 (D.C. Cir. 1979)).  The Court, however, "safely may ignore conclusory allegations, improbable inferences, and unsupported speculation."  Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (internal quotation and citation omitted).  "[T]he inferences that can reasonably be drawn are limited by the existence of video evidence," Mitchell v. Miller, 790 F.3d 73, 76 (1st Cir. 2015), in that the Court must "view[] the facts in the light depicted by the video evidence" if that evidence "blatantly contradict[s]" other evidence.  Underwood v. Barrett, 924 F.3d 19, 20 (1st Cir. 2019) (quoting Scott v. Harris, 550 U.S. 372, 377 (2007)).

## III.    DISCUSSION

### A.    Burke's Motion for Summary Judgment

Burke argues that his use of force against Ackers did not violate the Fourth Amendment because it was reasonable, [ECF No. 172 at 2–7], that he did not violate the First Amendment because Ackers's protected conduct was not a "substantial or motivating factor" of Burke's actions, [id. at 8–9], and that, in the alternative, Burke is entitled to qualified immunity on

Ackers's claims, [id. at 9–10].  As discussed further below, the Court holds that both Ackers's Fourth and First Amendment claims survive summary judgment.

### 1.    Excessive Force

The Fourth Amendment of the U.S. Constitution guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  It applies to state and municipal actors as well as to the federal government, see Graham v. Connor, 490 U.S. 386, 394–95 (1989); Mapp v. Ohio, 367 U.S. 643, 655 (1961), and prohibits law enforcement from using "excessive force," Graham, 490 U.S. at 395.  Police force is excessive if it is not "justified from 'the perspective of a reasonable officer on the scene.'" Barnes v. Felix, 605 U.S. 73, 79 (2025) (quoting Graham, 490 at 396); see also Graham, 490 at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." (citation omitted)).  The key inquiry is whether the officer's use of force was "objectively reasonable," which "requires analyzing the 'totality of the circumstances.'"  Barnes, 605 U.S. at 80 (quoting County of Los Angeles v. Mendez, 581 U.S. 420, 427–28 (2017)).  In engaging in this inquiry, the Court bears in mind that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  Graham, 490 U.S. at 397.

Although the totality-of-the-circumstances analysis is inherently factual and context-specific and there is no "easy-to-apply legal test," Barnes, 605 U.S. at 80 (quoting Scott, 550 U.S. at 382), the First Circuit has set forth the following non-exclusive list of factors for courts to consider:

> [1] whether a reasonable officer on the scene could believe that the suspect posed an immediate threat to police officers or civilians, [2] whether a warning was given

11

before the use of force and whether the suspect complied with this command, [3] whether the suspect was armed . . . at the time of the encounter or whether the officers believed the suspect to be armed, [4] the speed with which officers had to respond to unfolding events, both in terms of the overall confrontation and the decision to employ force, [5] whether the suspect was advancing on the officers or otherwise escalating the situation, [6] the suspect's physical proximity to the officers at the time of the use of force . . . , [7] whether multiple officers simultaneously reached the conclusion that a use of force was required, and [8] the nature of the underlying crime.

Bannon v. Godin, 99 F.4th 63, 78 (1st Cir. 2024) (citation modified) (quoting Est. of Rahim v. Doe, 51 F.4th 402, 414 (1st Cir. 2022)).  This guidance is in line with the Supreme Court's instructions to consider "the severity of the crime, . . . actions the officer took . . . , such as giving warnings or otherwise trying to control the encounter, . . . [a]nd the stopped person's conduct," which may "indicate[] the nature and level of the threat he poses, either to the officers or to others."  Barnes, 605 U.S. at 80; see also Graham, 490 U.S. at 396 (mentioning "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight"). "[T]he 'totality of the circumstances' inquiry into a use of force has no time limit."  Barnes, 605 U.S. at 80.  Rather, "[t]he history of the interaction, as well as other past circumstances known to the officer, . . . may inform the reasonableness of the use of force."  Id. at 80–81.

Here, a reasonable jury could conclude that Burke used excessive force against Ackers. Each of the First Circuit's eight Rahim factors arguably weighs against Burke's use of force. First, the jury could find that a reasonable officer in Burke's shoes would not have considered Ackers to be "an immediate threat to police."  Rahim, 51 F.4th at 414 (citation omitted).  Burke emphasizes that Ackers had been advancing toward Burke on his moped in the moments before Burke struck him, [ECF No. 172 at 5], but the video evidence shows that Burke did not strike Ackers until after Ackers had turned away from Burke, Burke Body Camera at 0:03, and the jury

could find that it was unreasonable to think that Ackers still posed a threat at that time.  Second, the jury could find that, by turning after he reached the skirmish line, Ackers was "compl[ying] with [the police's] command" to move back.  Rahim, 51 F.4th at 414 (citation omitted); [ECF No. 172 at 5–6].  Third, Ackers was not "armed" during his interaction with the police, Rahim, 51 F.4th at 414 (citation omitted), as Burke concedes [ECF No. 172 at 6].  Fourth, although the overall confrontation between the protestors and the police was rapidly unfolding, the jury could find, based on the video evidence and Plaintiffs' expert's testimony, the admissibility of which Burke has not challenged at this stage, see [ECF No. 197 ¶ 68 n.3]; [ECF No. 197 ¶ 124], that Burke had time to consider the "decision to employ force," Rahim, 51 F.4th at 414 (citation omitted).  Fifth, the jury could find that Ackers was not "advancing on the officers or otherwise escalating the situation" when Burke used the challenged force.  Id.  Sixth, Ackers was close to the police line when Burke struck him, but he was facing away from the police, and a jury could thus reasonably conclude that he was not "within range to seriously injure the officers."  Id. at 415.  Seventh, there is no evidence that officers other than Burke "simultaneously reached the conclusion that a use of force was required."  Id.  Eighth, Ackers was not arrested or charged with any crime.  See id. at 407.

Burke resists this straightforward application of the law by emphasizing the split-second nature of his judgment and the "backdrop of widespread civil unrest."  [ECF 172 at 5–6].  These circumstances are not irrelevant to the analysis, and the Court will not endorse Defendants' characterization of the protests, see [ECF No. 186 at ¶¶ 34–48], or draw any other inferences in Burke's favor at this stage in the litigation, see Oleskey, 658 F. Supp. 2d at 294.  The Court finds, however, that, viewing the facts in the light most favorable to Ackers, the situation in which Burke found himself would not compel the jury to find that Burke's use of force was

13

reasonable and therefore it cannot grant his motion for summary judgment.  Burke also cites

several in-circuit cases involving suspects actively resisting arrest or attacking police officers,

[ECF No. 172 at 7], which, since Ackers was not actively resisting arrest and was not attacking

Burke, are plainly distinguishable from the case at bar and do not support his position.  See, e.g.,

Rodríguez-Rodríguez v. Ortiz-Vélez, 391 F.3d 36, 40 (1st. Cir. 2004) (holding that, after plaintiff

hit a police officer, another police officer "probably would have been acting reasonably . . . if she

used her baton to prevent a second blow by [the plaintiff] or hit him by accident in trying to

break up the crowd gathering around him or for any of several other defensible reasons");

LaFrenier v. Kinirey, 478 F. Supp. 2d 126, 138 (D. Mass. 2007) (holding that officers' alleged

use of force against plaintiff was reasonable where plaintiff was actively resisting arrest and

attempting to flee the scene and engaged in violent behavior that "clearly posed an immediate

threat to himself and the officers"), aff'd, 550 F.3d 166 (1st Cir. 2008).  Simply put, based on the

facts in the record, a jury could conclude it was not "objectively reasonable" for Burke to strike

Ackers from behind, Barnes, 605 U.S. at 80, and therefore that Burke violated Ackers's Fourth

Amendment rights.

## 2.    First Amendment Retaliation

The First Amendment to the U.S. Constitution protects "the freedom of speech . . . [and]

the right of the people peaceably to assemble, and to petition the government for a redress of

grievances."  U.S. Const. amend. I.  Like the Fourth Amendment, it applies to states and

municipalities.  See Gitlow v. New York, 268 U.S. 652 (1925); De Jonge v. Oregon, 299 U.S.

353, 364 (1937).  "Retaliation, though it is not expressly referred to in the Constitution, is

nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of

constitutional rights."  Powell v. Alexander, 391 F.3d 1, 16–17 (1st Cir. 2004) (quoting ACLU of

Md., Inc. v. Wicomico Cnty., 999 F.2d 780, 785 (4th Cir.1993)).  Thus, "[a]s a general matter,"
the First Amendment prohibits government officials from retaliating against an individual for
engaging in protected speech.  Nieves v. Bartlett, 587 U.S. 391, 398 (2019).

      To establish a prima facie claim of First Amendment retaliation, "[a] plaintiff
must . . . prove that (1) he or she engaged in constitutionally protected conduct, (2) he or she was
subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial
or motivating factor in the adverse action."  D.B. ex rel. Elizabeth B v. Esposito, 675 F.3d 26, 43
(1st Cir. 2012).  The third element, on which the parties focus their attention, requires Ackers to
prove that Burke's "retaliatory motive" was a "but-for cause" of his adverse action.  Nieves, 587
U.S. at 398–99.  Put differently, Ackers must prove that Burke would not have struck Ackers
"absent the retaliatory motive."  Id.  "Although [Ackers] may rely on circumstantial evidence to
make this showing, [he] must produce some facts linking" Burke's use of force with Ackers's
exercise of rights protected by the First Amendment.  Salmon v. Lang, 57 F.4th 296, 312 (1st
Cir. 2022) (quoting McGunigle v. City of Quincy, 835 F.3d 192, 203 (1st Cir. 2016)).  Causation
is typically an issue for the jury, see, e.g., Index Newspapers LLC v. U.S. Marshals Serv., 977
F.3d 817, 827 (9th Cir. 2020), but, on occasion, "the question is so free from doubt as to justify
taking it from the jury," De Mian v. City of St. Louis, 86 F.4th 1179, 1182 (8th Cir. 2023).

      Here, Burke does not appear to contest that Ackers has satisfied the first two elements of
his retaliation claim, [ECF No. 172 at 8–9], and a reasonable jury could conclude that Ackers has
satisfied the third.  Burke argues that "there is absolutely no evidence" that he "knew who
Ackers was or whether he had participated in the protest earlier that evening" and "no way [he]
could have known" that Ackers was filming when Burke struck him, and that "the overwhelming
motive" for his "use of force was the desire to defend himself and the other officers . . . against

15

the threat posed by Ackers and his scooter." [Id.].  The Court is not convinced.  Ackers was part of a crowd of protesters that the BPD was seeking to disperse, so whether Burke knew Ackers, that he was filming, or that he had participated in earlier parts of the protest that evening is not dispositive.  [ECF No. 191 at 13]; see also [ECF No. 39 at 11–13].  Moreover, as discussed supra, a jury could reasonably conclude that Burke was not, in fact, acting to defend himself or other officers and thus would not have struck Ackers "absent the retaliatory motive."  Nieves, 587 U.S. at 399.[3]  Because there is "evidence from which a reasonable juror could infer . . . a link" between Ackers's exercise of his First Amendment rights and Burke's use of force against him, Salmon, 57 F. 4th at 312, this is not the rare case where the issue of causation is "free from doubt," De Mian, 86 F.4th at 1182.  Thus, a jury could find that Burke violated the First Amendment by retaliating against Ackers.

### 3.    Qualified Immunity

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  To determine whether an official is entitled to qualified immunity, courts must consider "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation."  Maldonado v.

---

[3] The other circumstantial evidence upon which Ackers relies to create a triable issue is considerably weaker, if not irrelevant.  The fact that Burke also struck other protesters and the handle of another protester's sign and, later that evening, referred to the protesters as "bozos" and commented that they "couldn't destroy us" if they were on the Boston Common, [ECF No. 191 at 14], says little, if anything, about Burke's motivation in striking Ackers.

Fontanes, 568 F.3d 263, 269 (1st Cir. 2009) (citing Pearson, 555 U.S. at 231).  "The plaintiff

bears the burden of demonstrating that the law was clearly established at the time of the alleged

violation, and it is a heavy burden indeed."  Mitchell v. Miller, 790 F.3d 73, 77 (1st Cir. 2015).

As discussed above, a jury could find that Burke violated Ackers's Fourth and First Amendment

rights.  The issue, then, is whether Ackers has demonstrated that those rights were "clearly

established" at the time of Burke's alleged violations, a question of law.  Stamps v. Town of

Framingham, 813 F.3d 27, 39 (1st Cir. 2016).  The Court concludes that he has.

      To determine whether a right is "clearly established" at the time of the alleged violation,

the Court "inquire[s] into (1) the clarity of the law at the time of the alleged violation and (2)

whether a reasonable official, under the facts presented, would have understood that his conduct

violated a constitutional right."  Pike v. Budd, 133 F.4th 74, 91 (1st Cir. 2025).  The Supreme

Court's caselaw "does not require a case directly on point for a right to be clearly established,"

but "existing precedent must have placed the statutory or constitutional question beyond debate."

Rivas-Villegas v. Cortesluna, 595 U.S. 1, 5 (2021) (per curiam); see also Alfano v. Lynch, 847

F.3d 71, 75 (1st Cir. 2017) (requiring plaintiff to "identify either 'controlling authority' or a

'consensus of cases of persuasive authority' sufficient to send a clear signal to a reasonable

official that certain conduct falls short of the constitutional norm" (quoting Wilson v. Layne, 526

U.S. 603, 617 (1999))).  Clearly established law "must not be gauged at too high a level of

generality," Alfano, 847 at 76, especially in excessive-force cases "where . . . it is sometimes

difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual

situation the officer confronts," Rivas-Villegas, 595 U.S. at 6 (quoting Mullenix v. Luna, 577

U.S. 7, 12 (2015) (per curiam)).  At the same time, "[i]n an obvious case" the general standards

of the Supreme Court's excessive-force jurisprudence "can 'clearly establish' the answer, even

17

without a body of relevant case law." Id. (quoting Brosseau v. Haugen, 543 U.S. 194, 199 (2004) (per curiam)).

Here, for his Fourth Amendment claim, Ackers relies primarily on the First Circuit's decision in Asociación de Periodistas de Puerto Rico v. Mueller, 529 F.3d 52 (1st Cir. 2008), arguing that Mueller clearly established that "use of any force against individuals who pose no safety threat is unreasonable," [ECF No. 191 at 16].  He also cites additional First Circuit caselaw for the proposition that Burke should have known "not to use force knocking down a person on a moped when he is complying with the police order to move."  [Id. at 17].  In response, Burke cites First Circuit cases involving individuals resisting arrest, which he argues "lend[] support to the reasonableness" of his actions.  [ECF No. 172 at 7].

The Court finds that Burke is not entitled to qualified immunity as to Ackers's excessive-force claim.  Mueller shows why.  There, a crowd of "some fifteen to twenty people" confronted FBI agents executing a search warrant inside a gated multi-unit condominium; an unruly crowd of "members of the media and the general public, including some local students" congregated on the street and sidewalk outside.  Mueller, 529 F.3d at 55–56.  The FBI ordered the group within the gated area to leave, but when the group attempted to do so, according to the plaintiffs, the agents "without giving them an opportunity to exit . . . physically grabbed and assaulted the reporters and cameramen using pepper spray and metal batons."  Id. at 56.  The First Circuit described the agents' alleged conduct as "without provocation . . . beat[ing] and appl[ying] pepper spray into the faces of the non-threatening plaintiffs to force them to exit the gated area," and found that the conduct violated the Fourth Amendment, id. at 60, and that the agents were not entitled to qualified immunity, id. at 60–61.  Specifically, the court found that it was "obvious" that the agents' conduct violated the Fourth Amendment, and that both the

"'consensus of cases of persuasive authority' . . . and the general prohibition against excessive force," put them on notice of that fact. Id. (quoting Wilson, 526 U.S. at 617).

Here, even Mueller alone places the unlawfulness of Burke's alleged actions beyond debate. As discussed supra, Burke struck Ackers when Ackers was facing away from him, and the jury could find that Burke acted "without provocation" and that Ackers was "non-threatening." Mueller, 529 F.3d at 60. Further, Ackers, like the plaintiffs in Mueller, was hemmed in when he was ordered to move and not given "an opportunity to exit" before Burke struck him. See id. at 56. To be sure, neither Mueller nor any of the other cases Ackers cites involve a police officer striking an individual with a baton in a crowd control situation that directly parallels the situation in this case. A case "directly on point," however, is not required, and, in the Court's view, Mueller "placed the . . . constitutional question beyond debate." Rivas-Villegas, 595 U.S. at 5 (citation omitted).

The Court also finds that, as with the alleged FBI conduct in Mueller, based on Ackers's account of events, "this case falls within [the] category of obvious violations." Mueller, 529 F.3d at 61. The Court is mindful that, in many excessive-force cases, determining what level of force is constitutionally permissible can be challenging for police officers. Rivas-Villegas, 595 U.S. at 6; see also Saucier v. Katz, 533 U.S. 194, 206 (2001) ("Qualified immunity operates . . . to protect officers from the sometimes 'hazy border between excessive and acceptable force.'" (citation omitted)). This is not such a case. Simply put, a reasonable police officer would know the Constitution does not permit him to strike from behind an unarmed individual who is not resisting arrest and poses no immediate threat without giving that individual a chance to obey a police order to disperse. Burke's in-circuit cases, which involve individuals who, unlike Burke, were attacking police officers or otherwise actively resisting arrest, do not show that Burke's

conduct—viewed in the light most favorable to Ackers—was objectively reasonable or that the unconstitutionality of Burke's conduct was not clearly established.  [ECF No. 172 at 7].  Burke is not entitled to qualified immunity on Ackers's excessive-force claim at this juncture.

Although the parties barely address the issue of qualified immunity for Ackers's First Amendment claim, see [ECF No. 172 at 9–10]; [ECF No. 191 at 17–18], the Court also finds that Ackers's right to engage in peaceful protest (and film the police) without being subject to retaliatory force was clearly established in 2020.  See, e.g., Sanderlin v. Dwyer, 116 F.4th 905, 911 (9th Cir. 2024) (holding that it was "clearly established that police officers may not use their authority to retaliate against individuals for protected speech" at the time of May 29, 2020 George Floyd protests in San Jose); Welch v. Dempsey, 51 F.4th 809, 813 (8th Cir. 2022) (affirming "district court's conclusion that [protesters'] right to be free from a retaliatory use of force was clearly established at the time of the incident," which took place on May 30, 2020 at George Floyd protests in Des Moines); see also Glik v. Cunniffe, 655 F.3d 78, 85 (1st Cir. 2011) ("[A] citizen's right to film government officials, including law enforcement officers, in the discharge of their duties in a public space is a basic, vital, and well-established liberty safeguarded by the First Amendment").  Burke, therefore, is also not entitled to qualified immunity on Ackers's First Amendment claim at this stage in the litigation.

### B.    The City's Motion for Summary Judgment

Although "a municipality cannot be held liable under § 1983 on a respondeat superior theory," § 1983 does impose "liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights."  Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 691–92 (1978).  To establish a Monell claim, "a plaintiff must show that the violation occurred as a result of the municipality's 'policy or custom.'"  Freeman

20

v. Town of Hudson, 714 F.3d 29, 38 (1st Cir. 2013) (quoting Monell, 436 U.S. at 694); see also

Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 25 (1st Cir. 2005) (requiring

execution of a policy or custom to be "the 'moving force' behind the constitutional violation"

(quoting Monell, 436 U.S. at 694)).  The plaintiff must also show that the municipality had the

"requisite level of fault," which is "deliberate indifference."  Young, 404 F.3d at 26.[4]

     "Official municipal policy includes the decisions of a government's lawmakers, the acts

of its policymaking officials, and practices so persistent and widespread as to practically have the

force of law."  Connick v. Thompson, 563 U.S. 51, 61 (2011).  In other words, official policy

"can take the form of either an 'officially adopted' policy statement or regulation . . . or an

informal custom amounting to a widespread practice that, although 'not authorized by written

law,' is 'so permanent and well settled as to constitute a "custom or usage" with the force of

law.'"  Lavigne v. Great Salt Bay Cmty. Sch. Bd., 146 F.4th 115, 125 (1st Cir. 2025) (citation

omitted); see also Baron v. Suffolk Cnty. Sheriff's Dep't, 402 F.3d 225, 236 (1st Cir. 2005)

("[U]nlike a 'policy,' which comes into existence because of the top-down affirmative decision

of a policymaker, a custom develops from the bottom-up." (citation omitted)).  A city's "'policy

of inaction' in light of notice that its program will cause constitutional violations 'is the

functional equivalent of a decision by the city itself to violate the Constitution.'"  Connick, 563

U.S. at 61–62 (quoting City of Canton v. Harris, 489 U.S. 378, 395 (1989) (O'Connor, J.,

concurring in part and dissenting in part)).

---

[4] Liability under Monell requires that "plaintiff's harm was caused by a constitutional violation."
Young, 404 F.3d at 26.  This element is satisfied based on the Court's conclusion that Ackers's
excessive-force and retaliation claims survive summary judgment.

Plaintiffs argue the City is liable under 42 U.S.C. § 1983 based on (1) its "express policies" regarding the use of force and crowd control, [ECF No. 190 at 29–34]; (2) the actions of its "final policymakers," [id. at 34–36]; and (3) certain "widespread practices" at the BPD, including a "code of silence," inadequate internal affairs investigations, and a failure to train officers in crowd management, [id. at 36–45].  The City responds that its written policies are consistent with the Supreme Court's guidance on the use of force, [ECF No. 196 at 2–3]; see also [ECF No. 174 at 14–17]; that its final policymakers did not authorize mass violence against protesters, [ECF No. 196 at 3–6]; that the City's internal affairs practices did not cause the alleged constitutional violations, [id. at 6–10]; and that any lack of training did not cause Plaintiffs' alleged constitutional injuries or reflect any deliberate indifference on the part of the City, [id. at 10–11].

### 1.    Written BPD Policies

Plaintiffs focus on two written BPD policies:  Rule 304, which governs the use of less lethal force such as pepper spray and batons, [ECF No. 188-67], and Rule 200 Addendum B, which governs crowd-control situations, [ECF Nos. 177-46, 177-47].  These policies, however, do not create liability for the City under Monell because a reasonable jury could not find that they caused the actions of the Officer Defendants that allegedly violated Plaintiffs' constitutional rights.

Plaintiffs argue that Rule 304 caused the Officer Defendants' violations of their constitutional rights because it authorized police officers to use force based on a subjective standard, "without any intent to arrest someone," and "simultaneously with a police command." [ECF No. 190 at 29–31].  The Court can find no support for these arguments in the plain language of Rule 304, which explicitly cites to Graham's objective standard.  [ECF No. 188-67

at 2].  Nor, for that matter, did Graham state that police officers could use reasonable force only in connection with an arrest, contrary to what Plaintiffs imply, [ECF No. 190 at 30].  See Graham 490 U.S. at 395 (holding that "all claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard"); see also Torres v. Madrid, 592 U.S. 306, 309 (2021) (defining Fourth Amendment seizure as the "application of physical force to the body of a person with intent to restrain").  Finally, the deposition testimony to which Plaintiffs cite does not single out Rule 304 as the relevant policy that supposedly allowed officers to use force simultaneously with issuing an order to move or disperse.  [ECF No. 188-51 at 59 (agreeing that "there might be a time . . . where it's [in] compliance . . . with Boston Police Department rules and regulations to . . . issue an order simultaneously with using force"].  Rule 304 is facially constitutional, and Plaintiffs have not offered evidence from which a reasonable jury could infer that this rule caused the Officer Defendants to violate Plaintiffs' constitutional rights.  Borges, 605 F.3d at 5; see also Sarah Mikva Pfander, The Path to Municipal Liability for Racially Discriminatory Policing, 69 UCLA L. Rev. 1270, 1292–93 (2023) ("Because police departments draft their use of force policies to avoid civil liability for excessive force violations, police policies themselves will rarely be the causal force.").

With regard to Rule 200 Addendum B, Plaintiffs fault the rule for "fail[ing] to give guidance" for situations where only some members of a larger group of protesters engaged in misconduct and for not requiring the police to give dispersal orders before authorizing the use of force.  [ECF No. 190 at 31].  In other words, Plaintiffs for the most part do not take issue with

what Rule 200 says, but, rather, base their claim on what it does not say.[5]  The mere failure of Rule 200 to address dispersal orders, however, is far from dispositive; "what is needed is evidence that there is a true municipal policy at issue, not a random event."  Calhoun v. Ramsey, 408 F.3d 375, 380 (7th Cir. 2005); see also id. ("At times, the absence of a policy might reflect a decision to act unconstitutionally, but the Supreme Court has repeatedly told us to be cautious about drawing that inference.").  Because nothing in the policy itself is constitutionally suspect, Plaintiffs could, at most, base their claim on the theory that the City has a "widespread" informal practice of failing to issue appropriate dispersal orders, Connick, 563 U.S. at 61, though the Court does not understand Plaintiffs to be proceeding on such a theory here.  The City's written policies, however, do not give rise to Monell liability.

## 2.    Actions by Final Policymakers

"'A plaintiff can establish the existence of an official policy by,' inter alia, 'showing that the alleged constitutional injury was caused . . . by a person with final policymaking authority.'" Walden v. City of Providence, 596 F.3d 38, 55 (1st Cir. 2010) (quoting Welch v. Ciampa, 542 F.3d 927, 941 (1st Cir. 2008)).  "Whether an official has th[e] requisite level of specific policymaking authority is a matter of state law."  Id. at 56.

---

[5] Plaintiffs' use-of-force expert, Dr. Maguire, criticizes Rule 200 for making inaccurate statements about crowd psychology and for providing "an inaccurate portrayal of the types of crowd events" that officers are likely to face.  [ECF No. 177-1 at 23]; see also [ECF No. 177-47 at 1–4].  He opines that the typology that Rule 200 offers "is likely to encourage the use of more aggressive police tactics during events labelled as non-peaceful."  [ECF No. 177-1 at 23].  There is no evidence in the record, however, that connects this policy to the Officer Defendants' alleged constitutional violations, and, in any event, the relevant section of the policy indicated that law enforcement personnel should "engage persons involved in any violent and/or criminal activities as appropriate," [ECF No. 177-47 at 3 (emphasis added)], which does not appear to apply to Plaintiffs.

Plaintiffs have sufficiently shown that then-BPD Commissioner William Gross ("Gross") and Superintendent William Ridge, who was the Incident Commander on March 31, 2025 and to whom Gross had delegated complete authority to plan and manage the BPD's actions during the protest, see [ECF No. 197 ¶¶ 27–29], had the "requisite level of specific policymaking authority" to make official municipal policy for purposes of Monell.  Walden, 596 F.3d at 56.  Although Plaintiffs do not point to specific Massachusetts statutes to support their claim that Gross's delegation gave Ridge final policymaking authority, Defendants concede that Ridge had broad authority over the BPD's use of force during the protest, see [ECF No. 197 ¶¶ 26–29], which, for purposes of summary judgment, where the Court must view the record in the light most favorable to the non-moving party, is enough.  Putnam v. Town of Saugus, 365 F. Supp. 2d 151, 193 (D. Mass. 2005) ("[G]iven the evidence in the record, this Court finds that the absence of final policymaking authority has not been established as a matter of law."); LaSota v. Town of Topsfield, 979 F. Supp. 45, 49 (D. Mass. 1997) ("While the record is currently underdeveloped, it appears likely that as a matter of Massachusetts law, one or more of the defendants had final policy making authority."); see also City of Bos. v. Bos. Police Superior Officers Fed'n, 993 N.E.2d 693, 696 (Mass. 2013) (identifying statutory powers of BPD Commissioner); Welch, 542 F.3d at 942 (Chief of Police had final policymaking authority); Dawn v. City of Bos., No. 01-cv-10425, 2002 WL 487161, at *4 (D. Mass. Mar. 29, 2002) (BPD Commissioner had final policymaking authority), vacated sub nom., Dwan v. City of Bos., 329 F.3d 275 (1st Cir. 2003).

As to Ridge's allegedly unconstitutional decision, viewing the record in the light most favorable to Plaintiffs, a jury could conclude that Ridge authorized police officers to use force indiscriminately on all who remained on the street after 9:15 pm.  See [ECF No. 190 at 34].  Ridge's critical testimony was that "every person that remained for the most part was, or . . . for

that time being was considered part of . . . the demonstration that had gotten out of hand and turned into rioting." [ECF No. 188-53 at 35]. Defendants argue that Ridge was merely describing his personal views at the time, not any official instructions given to officers, [ECF No. 196 at 4], but a jury could conclude otherwise, both based on Ridge's testimony, which suggests that his view was widely shared, [ECF No. 188-53 at 35 ("was considered")], and based on the testimony of Timothy Connolly, the Commander of the Tactical Operations Center, who said that "[a]t some point . . . [t]he Boston Police Department authorize[d] any officer to use force on any person who remained present," [ECF No. 188-43 at 20–21]. Defendants point to arguably contradictory testimony by Ridge, specifically, that he did not tell anyone that he believed that the police could use "whatever force you'd like" and that he did not "recall" anyone "in the command staff" telling officers that "any civilian who was still present could be considered a rioter and could be sprayed with OC spray or hit with a baton." [ECF No. 196 at 4]; [ECF No. 197-2 at 2–3]. Not only is that testimony not inconsistent with Ridge having authorized the police to use at least some force on all who remained, but a jury could credit the testimony of Connolly over that of Ridge on this issue. Thus, a jury could find that Ridge established an unconstitutional policy for the BPD, and, furthermore, it could also find that this policy caused Plaintiffs' injuries and that the City had the requisite level of fault, issues that the City does not dispute in its summary-judgment briefing.[6] See generally [ECF No. 196 at 3–6].

---

[6] The Court does not reach Plaintiffs' separate argument that Gross and Ridge "ratified" the BPD's use of force. [ECF No. 190 at 35–36]. Defendants are wrong to claim, however, that "after-the-fact ratification . . . has not been accepted in the First Circuit." [ECF No. 196 at 6]. Contra Lavigne, 146 F.4th at 127–28; Saunders v. Town of Hull, 874 F.3d 324, 330 (1st Cir. 2017).

### 3.    Custom or Usage

Evidence of a single incident of a constitutional deprivation "is insufficient, in and of itself, to establish a municipal 'custom or usage' within the meaning of <u>Monell</u>."  <u>Mahan v. Plymouth Cnty. House of Corr.</u>, 64 F.3d 14, 16–17 (1st Cir. 1995) (emphasis omitted).  Evidence of "multiple instances of misconduct" that suggest a "systemic pattern of activity," however, may support an inference of a municipal custom.  <u>Doe v. Town of Wayland</u>, 179 F. Supp. 3d 155, 172–73 (D. Mass. 2016) (citation omitted).  Plaintiffs here assert claims based on three allegedly unconstitutional customs: (i) a code of silence, (ii) a failure to supervise, and (iii) a failure to train.  [ECF No. 190 at 36–45].  Although these theories overlap somewhat, the Court discusses each in turn.

#### i.    Code of Silence

Plaintiffs claim that the City tolerated a "code of silence," which "led Defendant Officers to know they could abuse Plaintiffs without any repercussions."  [ECF No. 190 at 36–38].  A "'code of silence' can give rise to a valid <u>Monell</u> claim," but "such a claim requires more than evidence of 'individual misconduct by . . . officers'; it requires 'a <u>widespread practice</u> that permeates a critical mass of an institutional body.'"  <u>Giese v. City of Kankakee</u>, 71 F.4th 582, 589 (7th Cir. 2023) (quoting <u>Rossi v. City of Chicago</u>, 790 F.3d 729, 737 (7th Cir. 2015)); <u>see also</u> <u>Baron</u>, 402 F.3d at 238 (affirming denial of motion for judgment as matter of law and new trial based on evidence of "custom of retaliation to enforce a code of silence").

Here, Plaintiffs' evidence of a code of silence appears weak, but it is arguable that, viewing that evidence in the light most favorable to Plaintiffs, a reasonable jury could find that there was a widespread code of silence at the BPD.  Plaintiffs primarily point to the testimony of the Officer Defendants, who denied ever seeing a BPD officer use unreasonable force or

knowing of any instance where an officer reported another for misconduct, [ECF No. 197 ¶¶ 199, 202], but such anecdotal evidence alone is insufficient to create a triable issue that there was a widespread practice "permeat[ing]" the BPD.  Giese, 71 F.4th at 589.  Nor do Plaintiffs' references to incidents in the 1990s prove much, as such long-ago incidents are hardly relevant to whether a widespread practice existed in 2020.  See, e.g., Alston v. Town of Brookline, 308 F. Supp. 3d 509, 535 (D. Mass. 2018) (noting absence of authority for using conduct that was "wide-ranging, disparate, and remote in time" to "prov[e] a custom to establish municipal liability").  Plaintiffs also point, however, to then-Mayor Kim Janey's public statements, on May 14, 2021, about an investigation that, in her words, "revealed a culture of fear and silence within the Boston Police Department" and a "blue wall of silence," [ECF No. 188-74 at 3].  In her comments, Mayor Janey was arguably characterizing the White investigation rather than making a statement about the BPD as a whole, as she testified in her deposition.  [ECF No. 177-54 at 7 ("So perhaps it is a poor choice of words in that press conference, because one incident does not make a culture.")].  Nevertheless, a jury could, perhaps, credit her comments as "evidence of a custom," Baron, 402 F.3d at 238, and infer from them that there was a widespread code of silence at BPD that transcended the White investigation, especially in light of the Officer Defendants' testimony that they had never witnessed or reported any misconduct.

Baron in particular is instructive.  There, a former county corrections officer brought a § 1983 claim against, among others, the county sheriff's department, alleging that he was "harassed and forced to quit his job after he broke a code of silence by reporting a fellow officer's misconduct."  Baron, 402 F.3d at 229.  The sheriff's department argued that there was insufficient evidence of a code of silence because there was no evidence that any officers other than the plaintiff had suffered similar retaliation or that other complaints had not been adequately

investigated.  Id. at 237.  The district court disagreed, and the First Circuit affirmed, relying

particularly on testimony by a senior officer in the department, who agreed that there was a code

of silence in the police department and that the plaintiff had violated that code by reporting his

fellow officer.  Id. at 237–38.  Even though other department employees "denied . . . the

existence of a code of silence," the First Circuit held that "[t]he jury could have found that [the

senior officer's] statements, together with [the plaintiff's] testimony . . . demonstrated a custom

of retaliation to enforce a code of silence," noting that the senior officer's testimony was "all the

more significant" given the "difficulties in corroborating a code of silence."  Id. at 238; see also

LaPorta v. City of Chicago, 277 F. Supp. 3d 969, 989 (N.D. Ill. 2017) ("[T]he Mayor's

acknowledgement of a code of silence, along with the findings of the City's Police

Accountability Task Force and the DOJ's report, provide further, significant evidence regarding

the existence of a code of silence within the CPD." (citation omitted)).  Here, although Mayor

Janey's characterization of the White investigation is somewhat less definitive than the testimony

in Baron, it arguably provides evidence of a code of silence, which, coupled with the Officer

Defendants' denials, could permit a jury to find that the BPD had "a practice of condoning

aggressive behavior."  Giese, 71 F.4th at 589.

The Court need not decide, however, whether the limited evidence of a code of silence

rises to the level of a triable issue because, even assuming that it does, Plaintiffs have not put

forth sufficient evidence that this alleged custom caused the Officer Defendants to violate

Plaintiffs' constitutional rights.  To establish causation, Plaintiffs appear to rely primarily on

statements that the BPD Commissioner made nine months before the May 31, 2020 protests,

arguing that "BPD telegraphed that the code of silence would exist" during the protests.  [ECF

No. 190 at 37]; see also [ECF No. 197 ¶ 214]; [ECF No. 188-71].  Plaintiffs also state that, with

respect to the May 31, 2020 protests, "[n]o officer reported the actions of fellow police officers,"

arguing that this shows that the "code of silence led Defendant Officers to know they could

abuse Plaintiffs without any repercussions," and highlight the actions of John Danilecki, a BPD

Captain who had been the subject of numerous complaints in the past and, at the May 31, 2020

protest, tore a protester's sign.  [ECF No. 190 at 38]; see also [ECF No. 186 ¶ 208].

       In the Court's view, Plaintiffs have not put forth sufficient evidence to create a triable

issue on whether the BPD's code of silence was the "moving force" behind the Officer

Defendants' alleged violations of Plaintiffs' constitutional rights.  Young, 404 F.3d at 25

(citation omitted).  In cases in which Monell claims based on a code of silence survived

summary judgment, Plaintiffs have generally presented evidence of "instances of wrongdoing

that were committed because a deputy believed he or she would be protected by the code of

silence and not disciplined as a result" or that "officers refused to testify or provide information

adverse to a fellow deputy."  Orellana v. Cnty. of Los Angeles, No. 12-cv-01944, 2013 WL

12122692, at *27 (C.D. Cal. Apr. 29, 2013), aff'd, 630 F. App'x 730 (9th Cir. 2016); see also

Cazares v. Frugoli, No. 13-cv-5626, 2017 WL 1196978, at *18–19 (N.D. Ill. Mar. 31, 2017)

(denying summary judgment where officer "had been the subject of numerous citizen

complaints, none of which were sustained or resulted in discipline" and the investigating

officer's "failure to investigate" the incidents at issue "could have engrained in [the officer] the

presence of a code of silence and promoted the belief that he could drink and drive with

impunity"), abrogated on other grounds by First Midwest Bank ex rel. Est. of LaPorta v. City of

Chicago, 988 F.3d 978 (7th Cir. 2021); LaPorta, 277 F. Supp. 3d at 992 (denying summary

judgment where "19 separate allegations of misconduct . . . resulted in no sustained [complaints],

no behavioral intervention or modification, and no civil or administrative sanction" against

officer); Doe v. City of San Diego, 35 F. Supp. 3d 1233, 1245 (S.D. Cal. 2014) (denying

summary judgment based on "voluminous record of misconduct" of officer who "called himself

the 'Teflon Don,' flaunting the fact that no allegations could stick to him"); Obrycka v. City of

Chicago, No. 07-cv-02372, 2012 WL 601810, at *9 (N.D. Ill. Feb. 23, 2012) (denying summary

judgment based on officer's "yell[ing] out 'Chicago Police Department' while flexing his

biceps" and "stat[ing] 'nobody tells me what to do,'" as well as later making phone calls "to

initiate a cover-up of his misconduct"), abrogated on other grounds by Est. of LaPorta, 988 F.3d

978.

Here, by contrast, the Officer Defendants' disciplinary records do not reveal a lengthy

track record of complaints, [ECF No. 186 ¶¶ 221–24], or any other evidence from which the jury

could reasonably infer that the BPD's code of silence emboldened the Officer Defendants to

engage in the alleged misconduct, apart from the Officer Defendants' refusal to condemn the

actions of their co-defendants in this litigation. The long history of complaints with apparently

few disciplinary consequences against Danilecki, who is not a defendant in this litigation, [id.

¶ 208], is not, by itself, probative of what caused the Officer Defendants to act in the way they

did. Nor could a reasonable jury accept Plaintiffs' characterization of the BPD Commissioner's

September 2019 statements as "telegraph[ing] that the code of silence would exist" nine months

later, during the May 31, 2020 protests, [ECF No. 190 at 37], when what the Commissioner

actually said was that he "could not be more proud or impressed with the high levels of restraint

and professionalism displayed" by BPD officers and that the BPD would review "all actions

taken by [its] officers, including the use of non-lethal force," [ECF No. 188-71 at 3–4]. In sum,

because there is no evidence in the record that the code of silence was a "moving force" behind

the Officer Defendants' allegedly unconstitutional actions, it cannot give rise to <u>Monell</u> liability against the City.  <u>Young</u>, 404 F.3d at 25 (citation omitted).

ii.     <u>Failure to Supervise</u>

Plaintiffs claim that the City failed to supervise its officers by waiving the requirement that use-of-force reports be completed, and by tolerating serious deficiencies in the BPD's internal affairs function, including with respect to the May 31, 2025 protests.  [ECF No. 190 at 38–43].

To establish liability under a failure-to-supervise theory, a plaintiff must show a pattern of constitutional violations.  <u>See, e.g.</u>, <u>Salem v. Stoneham Police Dep't</u>, 752 F. Supp. 3d 282, 299 (D. Mass. 2024) (considering "whether [defendant's] disciplinary practices demonstrate a broad failure to supervise and discipline its officers"); <u>Barker v. City of Bos.</u>, 795 F. Supp. 2d 117, 124 (D. Mass. 2011) ("[T]he Plaintiff must show a persistent failure to discipline.").  "[T]he failure of a police department to discipline in a specific instance" cannot give rise to liability under <u>Monell</u>.  <u>Santiago v. Fenton</u>, 891 F.2d 373, 382 (1st Cir. 1989).  Nevertheless, "post-event evidence of the lack of proper internal investigation . . . and the failure [to] take strong disciplinary action against the officers involved" may "show what customs or policies were in effect" at the time of the alleged constitutional violation.  <u>Bordanaro v. McLeod</u>, 871 F.2d 1151, 1166 (1st Cir. 1989).

At the motion-to-dismiss stage, the Court found that the Plaintiffs' allegations that the City had a custom of failing to investigate or discipline police misconduct were "just barely" sufficient to state a claim, noting that Plaintiffs had "done little to link their allegations together to present a 'systemic pattern' of persistent failure to discipline or investigate."  [ECF No. 39 at 16].  Now, with the benefit of discovery, Plaintiffs fare only slightly better.  Plaintiffs' expert Dr.

32

Scott offers a variety of criticisms of the BPD's internal-affairs function, see [ECF No. 188-65 at 30], and the City does not dispute that, for example, the BPD has not conducted an audit to ensure that investigations are conducted impartially since 1989, or that the average investigation takes more than two years to complete, among other shortcomings.  See [ECF No. 197 ¶¶ 225– 26, 228, 230, 233–34, 236–41].  Apart from evidence related to the BPD's investigations of the May 31, 2020 protests, however, Plaintiffs have presented little concrete evidence of BPD's failure to investigate specific complaints alleging excessive force or First Amendment retaliation or of an attendant failure to discipline officers.  Specifically, Dr. Scott's report analyzed BPD complaint data from 2016 to 2020, showing that complaints were sustained in 23 percent of cases and resulted in an oral reprimand in 7.1 percent of cases, a suspension in 4.2 percent of cases, and in termination in 0.06 percent of cases.  [ECF No. 188-65 at 22].  Plaintiffs and Dr. Scott additionally rely on a series of articles published in the Boston Globe in 2020 that analyzed selected BPD complaint data from 2010 to 2020 and concluded that the BPD rarely believed citizens who reported misconduct, as evidenced by the fact that only "3 percent of excessive use force complaints were sustained," and that often only mild forms of discipline, such as oral reprimands, followed a finding of misconduct.  See [ECF No. 186 ¶ 202]; [ECF No. 188-65 at 5, 23, 28, 30].  Finally, Plaintiffs point to the "code of silence cases [from the 1990s] and the long history of open and notorious repeat offenders like Danilecki."  [ECF No. 190 at 43]; see also [ECF No. 197 ¶¶ 207–11, 272–76]; [ECF No. 188-65 at 28–30].

This is somewhat thin gruel.  The general flaws that Dr. Scott identified in the BPD's internal-affairs function may, in theory, have made it more likely that meritorious complaints did not result in discipline, but they say little about the frequency and adequacy of BPD investigations and discipline.  Nor does Dr. Scott's analysis, which includes no information

about the merit of the underlying complaints or the severity of the misconduct, establish that the BPD persistently failed to discipline officers who used excessive force or retaliated against protesters for exercising their First Amendment rights.  See, e.g., Aldrich v. Town of Milton, 881 F. Supp. 2d 158, 174 (D. Mass. 2012) (describing similar evidence as "gauzy" and granting summary judgment on Monell claim for failure to train, supervise, and discipline).  The Boston Globe's analysis, which specifically suggests that excessive-force complaints were rarely sustained, suffers from similar flaws as Dr. Scott's analysis and is concededly based on incomplete data.  See McCarthy et al., supra.  Finally, as discussed above, the two incidents in the 1990s are too remote in time to be relevant to any custom or usage in 2020, and Danilecki's disciplinary history, even when viewed in the light most favorable to Plaintiffs, does not establish a widespread pattern of inadequate discipline.

The relative weakness of the evidence discussed above likely explains why the parties' briefing focuses on the BPD's handling of complaints stemming from the May 31, 2020 protests. No excessive-force complaint arising from the protests was sustained, and, apparently, only one officer, Danilecki, was disciplined for First Amendment-related misconduct.  See [ECF No. 197 ¶¶ 146, 172, 174]; [ECF No. 186 ¶¶ 208, 227].  Defendants argue that, while separate constitutional violations that occurred after May 31, 2020 may provide evidence of a pre-existing municipal custom or policy, Plaintiffs cannot use evidence related to the May 31, 2020 protest to establish an unconstitutional custom under Monell.  [ECF No. 196 at 7–9].  Plaintiffs counter that the Court "can and should consider BPD's response to the [May 31, 2020] [p]rotest," because BPD's "actions after the protests are evidence of its policies at the time."  [ECF No. 190 at 41–42].

The truth lies in the middle.  In the First Circuit, "the event itself" may "provide[] some proof of the existence of the underlying policy or custom," if it "involves the concerted action of a large contingent of individual municipal employees" and "other evidence of the policy has been presented."  Bordanaro, 871 F.2d at 1157; see also id. at 1161 ("[T]he jury could have considered the incident itself . . . combined with . . . other, independent evidence regarding police department policy.").  At the same time, "evidence of a single event alone cannot establish a municipal custom or policy," id. at 1156, without transforming Monell liability into respondeat superior, id. at 1161 n.8.

Here, although Plaintiffs' evidence appears weak, the Court finds that Plaintiffs have created a triable issue as to whether the City had an unconstitutional custom of failing to discipline officers who engaged in misconduct.  Viewing the independent evidence in the light most favorable to Plaintiffs, a jury could reasonably conclude that serious discipline was rare, even in cases where complaints were sustained, including in excessive-force cases.  It could infer from the undisputed evidence about issues with the BPD's internal-affairs function, and Dr. Scott's assessment of its sufficiency, that there were structural reasons for why complaints rarely resulted in discipline.  Moreover, along with this independent evidence, the jury may be allowed to consider the City's failure to discipline the Officer Defendants following the May 31, 2020 protest, from which it could reasonably draw inferences about the Officer Defendants' "understandings about whether they would be subject to discipline for their actions."  Id. at 1161. Viewing the entirety of the evidence in combination, the jury could find that the City had a

custom of persistently failing to discipline officers who engaged in misconduct, including those who used excessive force.[7]

As with the BPD's code of silence, however, Plaintiffs have failed to put forward any evidence from which the jury could draw a causal link between the BPD's failure to investigate and discipline and the Officer Defendants' actions on May 31, 2020.  See [ECF No. 174 at 20–23, 27].  It is true that "a violation of federal rights may be a highly predictable consequence" of a known failure to investigate complaints of, and discipline officers for, misconduct, and that "high degree of predictability may also support an inference of causation."  Bd. of Cnty. Comm'rs of Bryan Cnty v. Brown, 520 U.S. 397, 409–10 (1997).  If the City failed to remedy known or obvious problems with its internal-affairs function, Plaintiffs' failure-to-supervise claims might advance to the jury.  The record here, however, simply contains no evidence from

---

[7] Defendants' attempt to distinguish Bordanaro by contrasting the "17-point list of deficiencies" that the court identified in the police department's training, supervision, and discipline, [ECF No. 196 at 9], is unconvincing.  Bordanaro considered two alleged municipal customs, and found sufficient evidence to support the existence of each.  See 871 F.2d at 1156–57, 1159–61.  The First Circuit gave a five-bullet list to support the first, a practice of breaking down doors without a warrant when arresting a felon, and two of the five bullets related to the event itself.  Id. at 1156.  The second custom related not merely to a failure to discipline, as here, but to "inadequate recruitment, training, supervision or discipline," id. at 1158, and only five of the seventeen bullets of evidence supporting the custom related to a failure to discipline and were not based on the event itself, see id. at 1160–61.  Thus, the gulf between the evidence in Bordanaro and the evidence here is not as great as Defendants suggest.  In any event, courts in the First Circuit have applied the holding of Bordanaro to deny summary judgment in cases in which the independent evidence of the custom is considerably less substantial than in Bordanaro.  See, e.g., Salem v. Stoneham Police Dep't, 752 F. Supp. 3d 282, 299–300 (D. Mass. 2024).  As the Bordanaro court noted, "proving the existence of such police department policies and customs" can be challenging, because "Plaintiffs are likely to encounter hostile witnesses and incomplete documentation of past abuses."  871 F.2d at 1157 n.5.  Raising the bar for proving the existence of a custom too high would not only be inconsistent with the summary-judgement standard, which requires the Court to view the record in the light most favorable to Plaintiffs, see Podiatrist Ass'n, 332 F.3d at 13; it might also permit municipalities to evade accountability for unconstitutional practices for which rigorous statistical proof will only rarely be available.

which the jury could infer that that the City was on notice of issues with its internal-affairs function at the time that Plaintiffs were injured and failed to remediate them.  As such, Plaintiffs cannot prevail under this theory.

iii.    <u>Failure to Train</u>

Plaintiffs argue that the City did not adequately train officers to manage the protests in a way that would "protect[] against violations of [Plaintiffs'] First and Fourth Amendment Rights."  [ECF No. 190 at 44].  This claim does not survive summary judgment for two reasons.

First, Plaintiffs waived their ability to pursue a failure-to-train theory.  "Plaintiffs may not 'raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment.'"  <u>Miranda-Rivera v. Toledo-Davila</u>, 813 F.3d 64, 76 (1st Cir. 2016) (quoting <u>Calvi v. Knox Cty.</u>, 470 F.3d 422, 431 (1st Cir. 2006)).  Plaintiffs' Amended Complaint does not mention the City's training, referring only generically to "its policies, customs and practices in handling protest demonstrations and allowing the use of unreasonable and excessive force."  [ECF No. 15 ¶ 4].  Moreover, in opposing the City's motion to dismiss, Plaintiffs stated that they "ha[d] not alleged a failure to train police officers generally," only that "the City did not properly train officers on [the] use of the large wooden batons which were used on three of the four Plaintiffs," [ECF No. 32 at 10 & n.2], and the Court noted this statement in its decision on Defendants' motion to dismiss, [ECF No. 39 at 18 n.1].  For Plaintiffs now to pursue a wide-ranging failure-to-train theory "would prejudice defendants, who would have focused their discovery efforts on theories actually pled."  <u>Miranda-Rivera</u>, 813 F.3d at 76.

Second, even if the Court were to consider Plaintiffs' failure-to-train theory, which the City addresses in the memorandum accompanying its motion for summary judgment, [ECF No. 174 at 13–17], the theory fails on the merits.  To advance beyond summary judgment, plaintiffs

37

would need to present evidence from which a jury could infer that "municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of those inadequacies." Gray v. Cummings, 917 F.3d 1, 14 (1st Cir. 2019) (quoting Haley v. City of Boston, 657 F.3d 39, 52 (1st Cir. 2011)); see also Bannon, 99 F.4th at 88 ("The deliberate indifference standard is 'stringent' and 'requir[es] proof that a municipal actor disregarded a known or obvious consequence of his action.'" (quoting Connick, 563 U.S. at 61)).  "[A] training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient." Young, 404 F.3d at 27.  To show that the defendant was deliberately indifferent to a training program's unconstitutional effects, the plaintiff must typically show a "pattern of similar constitutional violations by untrained employees," Gray, 917 F.3d at 14 (quoting Connick, 563 U.S. at 62).  That said, the Supreme Court has "left open the possibility that, 'in a narrow range of circumstances,' . . . the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations," Connick, 563 U.S. at 63–64.  For example, this Court has previously held that "a reasonable jury could find that failing to train officers on their obligations to disclose exculpatory evidence leads to the highly predictable consequence that officers will not disclose exculpatory evidence" in violation of Brady v. Maryland, 373 U.S. 83 (1963).  Echavarria v. Roach, 565 F. Supp. 3d 51, 91 (D. Mass. 2021).

As far as the Court can discern, Plaintiffs rely on three pieces of evidence to support their failure-to-train claim.  First, they point to an After Action Review created by the BPD following the May 31, 2020 protests, which noted that "[m]any officers stated it had been years since they

were trained" and that "[i]t was very clear that some new supervisors had not been trained to be a supervisor . . . during a public disorder incident." [ECF No. 197 ¶ 282]; [ECF No. 188-68 at 7]. Second, it is undisputed that, although "[o]fficers assigned to crowd control duties had prior training in crowd control," that training did not include "training about protecting First Amendment rights, restraint in the face of verbally hostile protesters, [or] de-escalation." [ECF No. 197 ¶ 283]. Finally, as noted supra, Plaintiffs' expert Dr. Maguire has offered various criticisms of the City's crowd-management and use-of-force policies, opining that the City's training on crowd management and control was inaccurate, incomplete, and outdated. [Id. ¶¶ 167–71, 280–81, 286–87]; [ECF No. 188-16 at 23–35].

This evidence would not create a triable issue on the City's alleged failure to train. Plaintiffs have not identified a "pattern of similar constitutional violations by untrained employees," Gray, 917 F.3d at 14 (quoting Connick, 563 U.S. at 62), or shown that the City adopted a "policy of inaction" despite being on notice that "its training program . . . w[ould] cause violations of constitutional rights," Connick, 563 U.S. at 61–62. Rather, they argue that it is "obvious" that the alleged deficiencies in the City's training would lead to "multiple incidents of content-based misconduct and indiscriminate authorization of police violence against lawful protesters," [ECF No. 190 at 44]. It is undisputed, however, that BPD officers generally and at least one of the Officer Defendants did receive training in crowd management and control. [ECF No. 197 ¶ 283]; [ECF No. 186 ¶ 81]. Plaintiffs' and Dr. Maguire's criticisms of the BPD's policies are thus not that the City wholly failed to train officers, but, rather that the training was "imperfect or not in the precise form [they] would prefer." Young, 404 F.3d at 27. It is one thing to fail to train officers entirely on their obligations, see Echavarria, 565 F. Supp. 3d at 91–92; it is quite another to use training materials that, at least according to Dr. Maguire, do not

fully live up to current standards.  The former may, depending on the circumstances, lead to "unconstitutional consequences" that are "so patently obvious" as to subject the City to liability. Connick, 563 U.S. at 64.  Although the latter might, in combination with a pattern of misconduct, establish deliberate indifference, it is hard to see how research on crowd psychology or reports by police practices associations, some of which post-date 2020, see [ECF No. 188-16 at 14, 22], alone could have sufficiently put the City on notice that constitutional violations were likely. "The liability criteria for 'failure to train' claims are exceptionally stringent," Hayden v. Grayson, 134 F.3d 449, 456 (1st Cir. 1998), and this is not the "rare" case in which "'obviousness' can substitute for the pattern of violations," Connick, 563 U.S. at 63–64.  Thus, to the extent that Plaintiffs have not waived this theory, the City would nevertheless be entitled to summary judgment on it.

### C.    Defendants' Motion to Bifurcate

Defendants ask, pursuant to Federal Rule of Civil Procedure 42(b), that the Court hold five separate trials, for (1) Ackers's claims against Burke, (2) Huffman's claims against Burke, (3) Chambers-Maher's claims against McManus, (4) Hall's claims against Nolan, and (5) Plaintiffs' Monell claim against the City.  [ECF No. 175].  Plaintiffs oppose Defendants' motion and request that, should the Court decide to hold separate trials, the Monell claim be tried first.  [ECF No. 193].

"For convenience, to avoid prejudice, or to expedite and economize, the [C]ourt may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims."  Fed. R. Civ. P. 42(b).  "The moving party bears the burden of proving that separate trials are justified," Chapman ex rel. Est. of Chapman v. Bernard's Inc., 167 F. Supp. 2d 406, 417 (D. Mass. 2001), and the bifurcation decision is left to the Court's discretion, see

Gonzalez-Marin v. Equitable Life Assurance Soc'y of U.S., 845 F.2d 1140, 1145 (1st Cir. 1988). Although in cases like the one before the Court, it is a "familiar path" to bifurcate the claims of the individual defendants from the municipality, Wilson v. Town of Mendon, 294 F.3d 1, 7 (1st Cir. 2002), bifurcation is "dependent on the facts and circumstances of each case." Industrias Metálicas Marva, Inc. v. Lausell, 172 F.R.D. 1, 2 (D.P.R. 1997) (quoting Saxion v. Titan–C– Manufacturing, Inc., 86 F.3d 553, 556 (6th Cir. 1996)).

Defendants argue that Plaintiffs' evidence against the City could cause undue prejudice to the Officer Defendants, and that trying the Officer Defendants together would prejudice each of them and confuse the jury.  [ECF No. 176 at 4–6.]  They worry particularly about the inclusion of evidence of another protest that occurred on May 29, 2020, two days before the May 31, 2020 protest at the heart of this case, to which only McManus (but not Burke or Nolan) responded, and that Monell evidence could "unduly prejudice the defendants and cause the jury to confuse rule violations with constitutional violations."  [Id. at 4–5.]  Plaintiffs counter that any risk of unfair prejudice can be mitigated by appropriate limiting instructions, and represent that they will not introduce any evidence regarding McManus's presence at the May 29, 2020 protest or any prior bad acts of the Officer Defendants.  [ECF No. 193 at 4–5.]

Defendants also claim that bifurcation would be more efficient because a jury verdict in the Officer Defendants' favor would obviate the need for a trial against the City, which cannot be liable under Monell absent an underlying constitutional violation.  [ECF No. 176 at 6–7.] Plaintiffs respond that their evidence against the Officer Defendants is also relevant to their Monell claim against the City, and that holding multiple trials would be expensive for the parties. [ECF No. 193 at 3–7.]

41

The Court finds that Defendants have not met their burden to show that separate trials are justified and, in any event, will reserve its decision on this issue until it becomes clearer which parties will proceed to trial.  More specifically, with regard to splitting the claims against the Officer Defendants from the <u>Monell</u> claim against the City, the Court finds that there may be meaningful overlap between <u>Monell</u> evidence related to the City's alleged decision to authorize unlawful force against protesters and evidence regarding the Officer Defendants' subsequent use of force against Plaintiffs, such that bifurcation would lead to inefficiencies, with the same evidence needing to be presented twice.  In light of the Court's decision, <u>supra</u>, to grant summary judgment to the City on a substantial portion of Plaintiffs' <u>Monell</u> claim and Plaintiffs' representation that they will not introduce prior-bad-acts evidence against the Officer Defendants, the Court finds the potential for undue prejudice to be greatly reduced.  The Court recognizes that bifurcation is often sensible in § 1983 cases, but it also carries costs for litigants and the courts, <u>see</u> <u>Hutchins v. McKay</u>, 285 F. Supp. 3d 420, 431 (D. Mass. 2018), and may have the unintended result of "prevent[ing] litigants from establishing a municipality's responsibility for . . . unlawful police practices," ultimately stymying necessary "municipal reform," Douglas L. Colbert, <u>Bifurcation of Civil Rights Defendants: Undermining Monell in Police Brutality Cases</u>, 44 Hastings L.J. 499, 575 (1993).  Accordingly, as of now, this case will be tried in a single trial.  Defendants may renew this motion as we approach a trial date.

## IV.    CONCLUSION

For the reasons set forth above, Burke's motion for summary judgment, [ECF No. 171], is **<u>DENIED</u>**.  The City's motion for summary judgment, [ECF No. 173] is **<u>GRANTED IN PART</u>** insofar as Plaintiffs' claims are based on the City's written policies, code of silence, failure to supervise, and failure to train and **<u>DENIED IN PART</u>** insofar as they are based on the

42

acts of City policymakers.  Defendants' motion to bifurcate, [ECF No. 175], is **<u>DENIED WITH LEAVE TO RENEW</u>**.

      **SO ORDERED.**

September 29, 2025                                                */s/ Allison D. Burroughs*
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE